Table of Exhibits

1.)  Affidavit: David R. Wulf

2.)  Affidavit: Kelly Bates
      2A) Affidavit: Kelly Bates-No fraud

3.)  Expert Witness Report-Edgar M. Coster

4.)  Expert Witness Report-Don Fitzgerald

5.)  Affidavit: Katherine Scannell

6.)  Affidavit: Charles F. Bates, III-Crawford Conversations

7.)  Affidavit: Charles F. Bates, III-Funeral Letters
      7A) Affidavit: Charles F. Bates, III-No fraud

8.)  Email to Joe Hogan
      8A) Richard Dowden-Signature Stamp
      8B) Richard Dowden-Signature Stamp x2

9.)  Affidavit: Donald Francis-Missouri Auditor Allegiant
      9A) Custody Agreement
      9B) Advisor Letter
      9C) Rich Markow-emails about Allegiant Audit

10.)Affidavit  : Tony Lumpkin
      10A) Affidavit: Tony Lumpkin signed on or about 11/8/2013
      10B) Affidavit: Tony Lumpkin

11.)Affidavit: Darci Greco

12.)Affidavit: Susan Woods

# AFFIDAVIT OF DAVID R. WULF

My name is David R. Wulf, being of lawful age and duly sworn under oath, state as follows:

1.) Events leading to the November 1999 Allegiant Letter

2.) Rich Markow called me on the phone. He said he was sending an email to me and I should copy it to my Wulf, Bates, and Murphy, Inc (WBM) stationary. He said I needed to sign the letter and send the letter back to him. Rich Markow said the letter was 'formalizing the bank and National Prearranged Services (NPS) procedures'.

3.) I had known Rich for a couple of years and had heard nothing in his voice to indicate urgency, tension, or anxiety during our conversation. To the contrary, Rich sounded rather nonchalant and casual about the matter. I assumed it was standard new account paperwork. I expected the letter to be proper and legal. After we spoke, a few minutes later, I received Rich's email from the bank and did what I was directed to do by the bank. I printed the letter on WBM stationary, signed the letter, and sent the letter back to Rich Markow. To me, it was merely a normal activity in a normal day's work.

4.) What I did not know at the time of my conversation with Rich Markow was that numerous meetings and conversations had occurred between the Bank Trustees, NPS, the FDIC and the State of Missouri Auditors relating to the discovery of the bank's deficiencies. These deficiencies were exposed during a 1999 FDIC and State of Missouri audit. I was not involved in, nor was I aware of, any of these conversations or meetings, and therefore did not provide any input into any of the conversations or meetings called to address the deficiencies of the bank.

5.) I was not involved in and had no part in the 1999 letter or the language of the letter sent to me via email by Rich Markow. This letter was an attempt by the bank to remedy (along with the Custody Agreement) a negative situation that the bank had gotten itself into. During the trial, I found out the Regulators had told the bank that it was not in compliance with the law.

6.) I had not spoken to anyone at the bank, NPS, or the Regulators prior to Rich Markow's phone call to me. I did not know that this 'remedy letter' was out of compliance with the law. In fact, I expected this letter to be legal and proper because it was coming from Allegiant Bank's Trust Department. This letter was written and conceived by two of Allegiant's officers and former attorneys, Rich Markow and Herb Morissey.

NOTE: As a Registered Representative and Investment Advisor, it is not an exaggeration to say I have filled out or signed thousands of documents when opening or changing accounts. It is standard operating procedure to have these documents, requiring my signature, created by outside institutions. And the letter in question, the 1999 letter, came from a 'Bona Fide' financial institution (Allegiant Bank). I had a right to expect that these documents would be correct, proper, and legal. In the case of the Trust Department and Rich Markow (whom I knew was a lawyer and

President of the Trust), I did not give the request a second thought. I never believed the letter's purpose was to circumvent any laws or to aid in any kind of fraudulent purpose. My response on the phone was along the lines of: 'Sure, Rich. I will get the letter to you as soon as possible. Have a nice day. Bye.' Little did I know I would be putting myself, my business and my family in great peril.

I affirm under the penalties for perjury that the foregoing representations are true.

11-7-14

**DAVID R. WULF**

*Exh 2*

# AFFIDAVIT OF KELLY L. BATES

I, Kelly Bates, being of lawful age and duly sworn under oath, state as follows:

1.) I worked as Administrative Assistant at Wulf, Bates & Murphy (WBM) full time from the mid 1990s until July 2003. After a six month lapse I then worked on some Saturdays after early 2004 until the end of 2007.

2.) I was present in the offices of WBM, 10 South Brentwood Blvd, 4th floor in late 2001 or early 2002, when an NPS employee entered our offices during working hours, took about an inch thick of unused WBM stationery and started to walk out the front door.

3.) David R. Wulf, CEO of WBM, and Charles F. Bates III, President of WBM, were also present at this time. Charles F. Bates III will be my ex-husband.

4.) Dave Wulf stopped the NPS employee from leaving the office with the stationery. He instructed her to return the stationery and informed her she was not authorized to take WBM stationery. Further, he instructed her never to do this again. It is believed she worked for either Sharon Nekol Province or Jim Crawford, both employees of NPS.

5.) Charles F. Bates III and David r. Wulf were noticeably upset after this incident.

6.) I was in charge of keeping copies of any faxes received by the WBM office. WBM had only one fax machine. That fax machine was next to my desk. All faxed came through that machine. I saw the faxes to Dave Wulf and Charles F. Bates III. Any faxes received were kept in a file for a period of 3 years, as required by WBM compliance.

7.) During the period of my part-time employment by WBM, after July 2003, I didn't received or file any faxes from Angie Hall informing WBM that NPS had directed wired funds to or from any bank, for any reason.

I affirm under the penalties for perjury that the foregoing representations are true.

KELLY L. BATES

Subscribed and sworn to before me on ___June  25_____, 2014 by Kelly L. Bates

Notary Public, State of  Missouri

My commission expires: June 30, 2017

FREDERICK DANIEL HULSEY
Notary Public-Notary Seal
State of Missouri, Saint Louis City
Commission # 13498978
My Commission Expires Jun 30, 2017

*Exhibit 2A*

# AFFIDAVIT OF KELLY L. BATES

I, Kelly Bates, being of lawful age and duly sworn under oath, state as follows:

I have personal knowledge with regard to virtually all activities involving Wulf, Bates & Murphy, Inc. (WBM) and National Prearranged Services (NPS). I am certain that David Wulf did not knowingly participate in any fraudulent activities involving the NPS Trust.

I affirm under the penalties for perjury that the foregoing representations are true.

**KELLY L. BATES**

Subscribed and sworn to before me on 6ᵗʰ day of October , 2014 by Kelly L. Bates

JEREMY MATLOCK
Notary Public-Notary Seal
State of Missouri, Saint Louis City
Commission # 14387388
My Commission Expires Jul 22, 2018

Notary Public, State of *Missouri*
*County of St. Louis*
My commission expires: *July 22, 2018*

EXHIBIT
# 3

**Jo Ann Howard & Associates, P.C. et al. v. Douglas Cassity et al.**

**U.S. District Court for the Eastern District of Missouri**
**Case No. 4:09-cv-01252-ERW**

**Expert Report of Edgar M. Coster**

## I) INTRODUCTION

My name is Edgar M. Coster.  I was retained by Reilly Pozner LLP, in its role as counsel to Plaintiffs in *Jo Ann Howard and Associates, P.C., et al. v. J. Douglas Cassity, et al.*, Case No. 4:09-cv-01252-ERW (E.D. Mo.), to provide expert testimony regarding the conduct of several financial institutions that served as trustees of certain Missouri and Iowa pre-need funeral trusts. These institutions include: (1) Mark Twain Bank and Mercantile Bank, as predecessors in interest to U.S. Bank; (2) Allegiant Bank, as predecessor in interest to National City Bank and PNC Bank; (3) Marshall & Ilsley Trust Company and Southwest Bank, as predecessors in interest to BMO Harris Bank; (4) Bank of America; (5) American Stock Transfer and Trust Company; and (6) Comerica Bank and Trust (collectively, the "Trustee Defendants").

As described more fully below, it is my opinion that the Trustee Defendants grossly deviated from the standard of care in two ways that resulted in the damages alleged by the Plaintiffs.  First, prior to accepting the trusts, all of the Trustee Defendants negligently failed to observe established standards of due diligence expected of banks and trust companies in the trust business.  Second, once they agreed to serve as trustees of these trusts, all of the Trustee Defendants exhibited a reckless disregard of their fiduciary duties to the beneficiaries of the trusts.  Their individual and collective conduct fell far short of the requirements of the governing trust agreements, applicable laws, the most fundamental industry standards, and their own internal policies and standards.

In reaching this opinion, I have relied on my education, training, and experience.  In addition, I have considered the pleadings, documents, transcripts of depositions and associated exhibits, and other information listed in Exhibit B to this report.  I reserve the right to amend or supplement my work, based upon further evidence or pleadings presented to the Court and any other information put to me for my consideration by Plaintiffs or Defendants in this action subsequent to the date of this report.

Other than being compensated for my advice, opinion, the preparation of this report, and reimbursement for my expenses in connection with these activities, I have no interest in the business of any of the parties to this proceeding or in the outcome thereof.  I am charging my regular hourly rate of $325 for my services.

## II) PROFESSIONAL BACKGROUND AND QUALIFICATIONS

I am a recognized subject matter expert in trust, investment, and securities services and in the customs, standards and uses of such services as they are rendered by financial institutions including commercial banks and trust companies operating under federal and state charters.  I have over forty years of experience gained in managing such services in leading U.S. commercial banks and in providing specialized management consulting services with respect to these businesses for commercial banks, mutual fund companies and insurance companies, as well

as for vendors of technology and other services to the trust industry.  Exhibit A to this report is a detailed resume of my experience that is relevant to the subject matter of this case.

## III)   GENERAL CASE BACKGROUND

### A) *NPS, Lincoln, and Memorial*

The trusts at issue in this case were established by the Missouri-based company National Prearranged Services ("NPS") and subsidiaries of its affiliate, Forever Enterprises.  These companies were part of a larger consortium of related entities that were ultimately owned by a family trust of the St. Louis-based Cassity family, whose members are Doug, Rhonda, Brent, and Tyler Cassity.  In addition to several funeral-related businesses, this consortium of Cassity-controlled companies included two Cassity-owned life insurance companies—Lincoln Memorial Life Insurance Company ("Lincoln") and Memorial Service Life Insurance Company ("Memorial").

From approximately 1980 until 2008, NPS marketed and sold pre-need contracts.  Under a pre-need contract, a consumer pays a sum of money up front for future funeral services.  As a seller of pre-need contracts, NPS could keep 20% of this money, but it was required by Missouri and Iowa law to put the rest of the money—80%—in trust at a bank.[1]  Without the agreement of a bank to be the trustee, NPS could not have marketed or sold pre-need contracts in Missouri or expanded its business in Iowa.  When a consumer died, NPS was required to pay the funeral home for the funeral services purchased by the consumer.  NPS could then go back to the trustee bank to collect the funds related to the deceased consumer.

A number of banks voluntarily agreed to act as trustee for a variety of trust accounts which were purportedly set up to hold funds NPS had collected from pre-need consumers.  Five of these trust accounts, called NPS Pre-Need Trust I through NPS Pre-Need Trust V, were established to hold funds generated from the sale of pre-need contracts mainly in Missouri.  Another account, called the NPS Iowa Pre-Need Trust, was established to hold funds generated primarily from the sale of pre-need contracts in Iowa.  Two other trust accounts, called the "Mt. Washington Forever Pre-Need Trust" and the "Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust" were established by subsidiaries of Forever Enterprises, another Cassity-owned company, to hold funds generated from the sale of pre-need contracts at the Mount Washington Forever Funeral Home and by Mason Securities Association, respectively.

During the relevant time period (1989-2008), the vast majority of funds in the NPS pre-need trusts were used to purchase life insurance policies issued by Lincoln.  By purchasing life insurance policies from an affiliated life insurance company, the Cassitys were able to control and manipulate the purchase, payment, and value of the policies in order to accumulate funds for

---

[1] Iowa law also allows for pre-need contracts to be funded by insurance proceeds.  Iowa Code §523A.401(2), (3).

3

illicit and illegal purposes. For instance, the Cassitys would take out loans on the policies, surrender whole life policies in exchange for their cash value, and replace whole life policies with less valuable term policies. The cash generated by these transactions was often transferred to other affiliated entities and would be used, among other purposes, for the personal benefit of the Cassitys.

As set forth in more detail below, the banks that served as trustees for these accounts agreed, either expressly or implicitly, to allow NPS to maintain control of the assets, recordkeeping information, and accounting in these trusts. By abdicating their responsibilities, the Trustee Defendants facilitated a scheme by which the Cassitys and their cohorts (collectively, "the Cassitys") could and did camouflage the amount of funds deposited into the trusts and could and did siphon these funds out of the trusts. Among other things, the Trustee Defendants failed to establish control of the insurance policies that grew to represent over 90% of the principal of the trusts and ceded back to NPS control of the records relating to the individual consumers' interests in the trusts. Also, because they had no baseline records against which to verify premiums due, premiums paid, lapses of policies for non-payment, or loans made against policies that diminished their cash surrender value, the Trustee Defendants failed to perform their accounting responsibilities.

In 2008, the Texas Department of Insurance placed NPS, Lincoln, and Memorial into receivership. A Special Deputy Receiver ("SDR") was appointed to operate and eventually liquidate the companies. Together with the SDR, the state life and health insurance guaranty associations of forty-seven states developed a plan to provide coverage for the insurance policies issued by Lincoln and Memorial. Since the liquidation, these guaranty associations have been paying death benefits under the insurance policies issued by the two insurance companies and will continue to do so until the last insured person dies. Upon the death of a pre-need consumer, a guaranty association pays death benefits to a funeral home and both the funeral home and a representative of the deceased consumer assign any causes of action they may have related to the policy to the guaranty association.

### B) Plaintiffs

Plaintiffs to this litigation are the SDR of NPS, Lincoln, and Memorial (collectively, the "Receivership Entities"), certain state insurance guaranty associations, and the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA"). NOLHGA, a voluntary association of all the state life and health insurance guaranty associations, is a Plaintiff to the litigation as an assignee (for collection purposes only) of the claims of twenty-eight of its member guaranty associations.[2]   Thirty-five guaranty associations are participating in the

---

[2] These life and health insurance guaranty associations are: Arizona, Colorado, District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.

litigation, with NOLHGA representing all but seven—Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas—which are named Plaintiffs in the case.

### C) The Trustee Defendants

Each of the Trustee Defendants agreed to allow its trust department to be used as the named trustee of one or more of the trusts that are the subject of this lawsuit.  Mark Twain Bank ("Mark Twain"), Mercantile Bank ("Mercantile"), Allegiant Bank ("Allegiant"), Marshall & Ilsley Trust Company ("M&I") and Southwest Bank (collectively, the "Missouri Trustee Defendants") all agreed to do so for the Missouri-based trusts.  This included NPS Pre-Need Trust IV, which was the largest of the pre-need trusts, and is generally representative of the trust succession among the Missouri Trustee Defendants.  Bank of America, American Stock Transfer and Trust Company ("AST"), Comerica Bank and Trust ("Comerica") (collectively, the "Iowa Trustee Defendants") agreed to allow their trust departments to be used as the named trustee for the NPS Iowa Pre-Need Trust.[3]

### D) The Beneficiaries of the NPS Trusts

The fundamental principle of a trust is that one person holds property for the benefit of another or others.  The trustee, as the name suggests, is the person entrusted with the corpus of the trust as well as any additions to the original corpus.  The trustee has legal title to all the trust property, with the condition that it does not hold title in its own right, but only as the trustee of that particular trust and only for the benefit of the person or persons for whose benefit that trust was established.

Recent claims by a number of the deposed bank employees to the effect that NPS was "the beneficiary" of the trusts are clearly incorrect and contradict and undermine the very reasons for the trusts' existence.  Pursuant to Chapter 436 of the Missouri statutes, which governed pre-need sellers during the relevant period, NPS would not have been permitted to offer pre-need contracts in Missouri unless it had established trusts conforming to the explicit terms of the statute and unless the named trustees were at all times banks or trust companies.  Unlike a typical grantor or maker of a trust, NPS did not put its own money or property into the trusts.  The entire corpus of the trust came from consumers who were buyers of pre-need contracts sold by NPS.

There can be no question that the consumers who purchased pre-need contracts are beneficiaries of the NPS trusts.  Consumers are defined as beneficiaries in Chapter 436 and in Section 523A of the Iowa Code, which governs pre-need sellers in Iowa.[4]  Section 436.005(1) of Chapter 436 specifically defines "Beneficiary" as "the individual who is to be the subject of the disposition and who will receive funeral services, facilities or merchandise described in a

---

[3] M&I was also a named trustee of the NPS Iowa Trust, but will be referred to solely as a Missouri Trustee Defendant for purposes of simplicity.
[4] All references to Chapter 436 of the Missouri Revised Statutes and to Section 523A of the Iowa Code are to the statutes in effect during the relevant period.

preneed contract." Section 523A.102(2) defines "Beneficiary" as "any natural person specified or included in a purchase agreement, upon whose future death cemetery merchandise, funeral merchandise, funeral services, or a combination thereof are to be provided under the purchase agreement." The trust agreements here all state that they are governed by the respective laws. Trust Agreements Article VII.[5] They also define "Beneficiary" as "the person designated in writing by the Owner of a Funeral Agreement as the person agreed to be furnished thereunder and either the person designated as his successor in the Funeral Agreement or (if there is no such designation) his legal representative." Trust Agreements ¶ 1.5.

These conclusions should have been obvious to any trained trust professional who took the trouble to simply read the trust agreements and applicable laws.

## IV) SUMMARY OF OPINIONS

The record in this case is replete with pervasive and reckless breaches of fiduciary duty committed by the Trustee Defendants which allowed and enabled the Cassitys unfettered access to hundreds of millions of dollars of consumer funds that should have been safeguarded in trust. Had the Trustee Defendants conducted the required due diligence before agreeing to accept the NPS trusts, they would have realized they were incapable of properly administrating the trusts and safeguarding the trust assets, and, at a minimum, they would have discovered the potential for the Cassitys' misuse of consumer money.

After acceptance of the business, the Trustee Defendants managed the trusts in a manner wholly inconsistent with the duty of care owed to the beneficiaries. Among other things, the Trustee Defendants failed to maintain title, possession, and control of the assets. They all failed to monitor disbursements made out of the trusts as they were explicitly mandated to do by the statutory prescriptions actually written into the trust agreements.

The Trustee Defendants also failed to maintain adequate books and records of the interests of each of the consumers. None of these trustees independently developed or maintained records of funds contributed to the trusts. With respect to successor trustees, it is incomprehensible that the Trustee Defendants did not demand to see the records of the prior trustee detailing the interests of the individual consumers. Once agreeing to take over as a successor, a new trustee should and is entitled to, in effect, draw a line that defines what is known as the inventory value, or responsibility value, at the beginning of the new trustee's stewardship. The accounting for the performance of the prior trustee's stewardship begins with its own responsibility value and ends with the value at the time of turnover. In failing to obtain this benchmark data, the Trustee Defendants breached the standard of care.

---

[5] Multiple copies of the Trust Agreements were produced in discovery and entered as exhibits during depositions. With respect to the Trust Agreement governing Trust I and Trusts III-V, please see Exhibits 24, 155, and 287. A copy of the Trust Agreement governing Trust II can be located at USBANK000043. Exhibits 520 and 674 are copies of the NPS Iowa Pre-Need Trust Agreement.

As a result of not knowing individual consumer interests, each of the Missouri Trustee Defendants was rendered incapable of making the single calculation necessary to restrict payments of income to NPS. Instead, each blindly and repeatedly followed NPS' instructions to transfer funds from the trust despite their fiduciary duty not to do so without making the calculation prescribed by Chapter 436. By allowing repeated distributions to NPS and other Cassity-controlled entities, which they could have and should have refused to do, the Missouri Trustee Defendants allowed further erosion of the very corpus they were engaged to protect.

Robert Lock's testimony and the documents supporting it clearly describe the situation that led him to conclude as far back as 1992 that the trustees' responsibilities were being totally ignored. *See* Ex. 7452. This dereliction of trustee duties enabled literally thousands of transactions through which the Cassitys were able to divert money deposited for the protection of consumers to other Cassity-controlled enterprises and even for the personal use of the Cassity family members for luxury homes, private jet travel, and other personal extravagances. The conduct and attitude of the Trustee Defendants represented a total abrogation of fiduciary responsibility and accountability.

Additionally, certain Trustee Defendants failed to alert their successors to problems with the trusts, ensuring that the Cassitys would be able to continue using the trusts to defraud consumers. As a consequence of the Trustee Defendants' failure to conform their conduct to the standard of care in the trust industry and to the standards and rules imposed upon them by the specific pre-need statutes, the Cassitys were able to continue to misuse and manipulate trust funds for their own purposes, which ultimately caused the Plaintiffs' damages.

## V) THE TRUSTEE DEFENDANTS FAILED TO CONDUCT PROPER DUE DILIGENCE

It is a fundamental principle in the trust industry that trustees are required to conduct reasonable due diligence before accepting a trustee appointment. In every bank and trust company with trust powers, this responsibility starts with the Board of Directors. They, in turn, delegate authority and responsibility to a Trust Committee to ensure that the bank or trust company understands exactly what it is undertaking when it agrees to perform in a fiduciary role as trustee of other peoples' money.

This due diligence requirement is often memorialized in formal bank and trust policy, which includes "Know Your Customer" rules as well as new account acceptance policies. The purpose of these policies is to ensure, among other things, that banks are familiar with the potential customer and the source of the trust funds. *See, e.g.,* Ex. 510 at 888. New account acceptance policies also assist a bank in determining whether it has the resources, knowledge, and controls to serve as trustee of the particular assets that will form the corpus of the trust. *See, e.g.,* Ex. 214 at 906; Ex. 515. Every Trustee Defendant but two produced a policy manual and every one of the manuals produced includes acceptance policies. *See, e.g.,* BOA-001069; CBT-001648; Ex. 214; NCB-018522; USB 001488.

7

Prior to accepting a trust, it is imperative that a trustee fully understand the purpose of the trust, the nature and extent of the assets for which it is taking responsibility, and the number and interests of all the parties for whose benefit it will agree to be a fiduciary. Each aspect of this pre-acceptance review affords the careful bank with the opportunity to ask pertinent questions and to establish a clear understanding of what the trust will require of the bank in terms of capabilities, capacity, control and oversight:

1. Technical and specialized **capabilities** in trust administration, operations, and investment, including the applicable law under which the trust must be administered;

2. Its operational **capacity** to handle and control transaction volumes of the types required, including interfaces with the associated securities exchanges, depositories, and other services required by different types of assets;

3. Its ability to reduce the assets under its stewardship to its custody and/or **control**, including its ability to perfect title, establish dominion over assets not physically in its custody, and provide appropriate servicing, accounting, valuation and tax functions relative to all assets; and

4. Its ability to provide prudent fiduciary **oversight** required to protect the interests of those for whose benefit a trustee is required in the circumstances.

A trust department may not agree to take on business it is not properly equipped to handle in order to accommodate another business line and thus compromise its standards. Once a trusteeship is accepted, the trust department must adhere to the fiduciary standards under which the trusts must be governed and it must strictly observe its own bank's trust policies, which should facilitate compliance with applicable law and the terms of the trust agreement. It constitutes a clear violation of the duty of loyalty to place the beneficiaries' interests at risk in order to accommodate the bank's desire for other revenue.

Even before they became trustees of the NPS pre-need trusts, the Trustee Defendants failed to perform proper due diligence and, because they ignored what was required to discharge their fiduciary duties, the Trustee Defendants improperly accepted the NPS pre-need trusts without having the experience and capability to handle these accounts. If the Trustee Defendants had fulfilled their due diligence responsibilities and rejected the NPS trusts, the Cassitys' scheme would have come to a halt.

8

### A) MARK TWAIN/MERCANTILE

Mark Twain Bank ("Mark Twain") executed its first trust agreement with NPS on February 22, 1989. USBANK000043. The agreement governed Trust II, which transferred to Mark Twain in March 1989 from United Missouri Bank ("UMB") in Kansas City. SDR0242202.

Eight months before Trust II transferred to Mark Twain, UMB convened a meeting of bank officers to discuss concerns that had developed regarding NPS' reporting methods and income distributions from the trusts. UMB developed a plan of remediation and communicated its concerns to NPS, in person and by writing, seeking agreement to modify the manner in which NPS was reporting. UMB expressed in a letter that it must "faithfully adhere to its responsibilities as a fiduciary" and "income disbursement would not resume until it could be confirmed that the aggregate market value of the assets held in the trust had been restored to the required level." SDR0002211. Shortly thereafter, NPS began seeking a new trustee. *See* SDR0127103.

Nothing in the record indicates that Mark Twain investigated why NPS was looking for a new trustee, communicated in any substantive way with UMB, or assessed whether Trust II was adequately funded under Chapter 436. The record shows that even in its first overture to NPS, Mark Twain's president, Stanley Miller, misunderstood the business he was bidding on by calling it a custody account and quoting a flat fee of $5,000 without even knowing what the account involved. *Id.* Later, Mark Twain's "New Account Acceptance Sheet" simply listed the value of the "trust" as approximately $10 million with that same anticipated fee of approximately $5,000. Ex. 590 at 906. The only "Special Considerations" listed on the sheet relate to the provision of monthly account statements. *Id.* Likewise, the "Administrative Check List" merely states that "[a]ll income from holdings to be transferred to subaccount monthly," *id.* at 905, and makes no reference to any of the statutory or trust agreement requirements, including the need to assess and calculate the aggregate market value of the trust.

It is important to note that had Mark Twain officers simply asked to see the original trust agreement with UMB that created Trust II, they would have instantly recognized the complexity of this trust and the nature of the transactions they would have to handle. They also would have been able to see that there were substantial differences in the UMB agreement and the agreement governing Trust II. Most importantly, the UMB agreement properly recognizes the level of recordkeeping and control required in order for the trustee to properly execute its fiduciary duties, over and above any investment responsibilities. *See* SDR0102875 at 878.

There is no evidence that Mark Twain or any of the Trustee Defendants looked into the reputation of NPS or its owners or management, which is a requirement of typical Know Your Customer policies. *See, e.g.,* Ex. 510. If they had, they could have discovered that NPS' founder, Doug Cassity, had been convicted of fraud. *See* SDR0026217. Mark Twain also could

have discovered the various relationships among Cassity-controlled entities, including the relationship between NPS, Lincoln, and Memorial. There is evidence in the record that Mark Twain later knew of the relationship between NPS, National Heritage Foundation, and National Heritage Enterprises. *See* Ex. 288; U.S. Bank Sources of Information to Educate 30(b)(6) Witness (Jostrand).

The record reflects that Mark Twain's trust department was a relatively "small shop," *see* Moellenhoff Dep. 72:2-4, and the acquisition of a $10 million account would have represented a significant increase in business. *See also* U.S. Bank Sources of Information to Educate 30(b)(6) Witness (Miller) (stating that Mark Twain had $80 million in assets under management in 1988). Additionally, the bank was interested in developing its relationship with NPS and recognized there were "additional account possibilit[ies]". Ex. 590 at 906. Less than six months after the bank received Trust II, NPS transferred Trust III to Mark Twain. *See* SDR0244179. NPS and Mark Twain also entered into loan agreements under which NPS assigned Mark Twain distributable income from the trusts. *See* Exs. 588 and 589.

These loans raise a serious question of conflict of interest for the bank. On the one hand, as trustee, the bank was obligated to perform the statutory test prescribed in Chapter 436 before approving the distribution of income from the preneed trusts to NPS. Under the terms of the loan agreements, the bank was given an assignment of that very income. This created an incentive for the bank to approve income distributions so that the bank would be paid money owed to the bank by NPS. This should have raised yet another red flag.

Despite the presence of significant red flags during its administration of Trusts II and III, Mark Twain agreed to act as trustee of Trust IV in 1994. Trust IV's creation was the result of a Consent Judgment entered between NPS and the Missouri Attorney General's Office in February 1994. That judgment required NPS to establish a separate trust for all of its new pre-need business. Ex. 289.

Mark Twain's "New Account Acceptance Sheet" for Trust IV does not mention the Consent Judgment. Ex. 316 at 512. Other documents, however, show the bank was aware of the litigation leading to the Consent Judgment. On April 5, 1993, John Zieser, Vice President of Mark Twain, signed a receipt for a $14,285,193 million debenture bond and security agreement between NPS and Mark Twain, as trustee of Trusts II and III. Ex. 314. The agreement references the name of the case and states that NPS "promises to pay" the amount of the debenture "when and if the company is ordered to do so by a valid and final order of the Circuit Court of Cole County." Ex. 295.[6] Approximately two months after the agreement was signed, a Mark Twain trust officer signed an affidavit connected to the litigation at the request of NPS. Ex. 312; Barton Dep. 167:17.

---

[6] Notwithstanding the apparently contingent nature of the alleged obligation, Mark Twain (and all successor trustees) declared that the debenture had a "market value" of $14,285,193.

10

The NPS lawsuit also received media attention in the St. Louis press. In March 1993, the St. Louis Post-Dispatch ran an article titled: "Missouri Sues Clayton Company, Calls Burial Plan Underfunded by Millions." Ex. 857. The article noted that, according to the allegations in the State's complaint, "the company trust account used for depositing customers' payments may be more than $13 million short of the amount required by the state." *Id.*

There is evidence in the record that Mark Twain was aware of this publicity and considered resigning as trustee. *See* Ex. 317. Rather than doing so, however, it agreed to serve as trustee of an additional NPS trust, Trust IV. Over the course of the next four years, Mark Twain claimed in its trust documentation that Trust IV's value had grown to over $30 million, consisting mostly of insurance policies bought through Lincoln, the life insurance company owned and controlled by the Cassitys. SDR0245054. Had Mark Twain had simply declined this additional NPS business, the Cassitys would have been prevented from selling new pre-need contracts in Missouri until they found another trustee willing to accept the business. This would have proven extremely difficult because a prudent trustee doing proper due diligence would not have accepted this trust.

In June 1997, Mark Twain merged with Mercantile. On July 17, 1998, Randy Sutton removed Mercantile as trustee of the NPS trusts and "direct[ed] that the trust assets be transferred to Allegiant Bank." Ex. 307. In accordance with Mr. Sutton's request, Mercantile worked with Allegiant to ensure that the trust assets were moved, as well as to provide "anything that . . . a trustee gives to a successor trustee to continue on with the account." Moellenhoff Dep. 272:12-22. Yet, despite being fully informed of the Consent Judgment since at least the early 1990s, Mercantile made no effort to inform Allegiant of the consent judgment. And as Richard Markow, president of Allegiant Trust Company, testified, had he known about the Consent Judgment, he would not have agreed to accept the NPS accounts. Markow Dep. 248:12-25-249:1-10.

**B) *ALLEGIANT***

Allegiant's official relationship with the Cassitys began in January 1998 when a $2,250,000 loan was issued by Allegiant Bank to Forever Enterprises ("Forever"), a Cassity-controlled company. Ex. 626. Allegiant Bank's due diligence prior to issuing this loan revealed that a "significant trust relationship" could be developed with Forever. Exs. 148 and 149. As a result, Allegiant Bank and the Allegiant Trust Company made a joint "Financing and Trust Services Proposal" to Forever in December 1997. Ex. 145. This joint proposal was issued to Forever Enterprises as part of an effort to "cross-sell" Allegiant's banking and trust operations and to increase the amount of assets administered by Allegiant's trust department. *See* Markow Dep. 125:17-126:19, 138:1-17. Forever accepted Allegiant's joint proposal, and two of its trust accounts, Hiram Cemetery Endowed Care Trust and Mason Securities Association Trust were transferred to Allegiant in February 1998. SDR0101604; SDR0237969.

11

John Meek, an Allegiant Bank loan officer, worked with Richard Markow, President of Allegiant Trust Company, in preparing and presenting the Joint Financing and Trust Services Proposal. Markow Dep. 99:25-100:13. Together, they presented Allegiant Bank's loan committee with detailed information regarding the business operations, corporate structure, and financial stability of all the Cassity companies. *See, e.g.*, Ex. 149. Richard Markow did not share this information with Allegiant's Trust Committee prior to its voting to accept the NPS trusts several months later.

The Allegiant Trust Committee voted to accept appointment as successor trustee of the NPS trusts on or about June 15, 1998. *See, e.g.*, National City Bank 005789; National City Bank 012925. At that time, Allegiant's trust charter had only been active for about 10 months. Markow Dep. 67:20-68:10. Neither Allegiant nor any of its employees had any previous experience working with pre-need trusts. Markow Dep. 89:6-14. Allegiant's trust department was admittedly tiny and administered only $2.2 million in assets prior to receiving the NPS trusts. Markow Dep. 76:17-25.

At the time they voted to accept the NPS trusts, no member of Allegiant's trust committee had prior experience working in a trust department, serving on the trust committee, or evaluating and voting on whether to accept a pre-need trust. *See* Markow Dep. 304:18-305:5. In this sense, none of the members were even minimally equipped to even pose fundamental questions regarding the investment, administrative, and operational requirements of these trusts.

Richard Markow presented the NPS trusts to the Allegiant Trust Committee in June 1998, using primarily information documented on an Allegiant "New Account Pre-Acceptance Risk Checklist." *See, e.g.*, Ex. 261; Markow Dep. 307:19-309:8. The asset information included on this checklist was generic in nature and the Allegiant Trust Committee voted to accept the NPS trusts without having access to critical details relating to the NPS trusts' assets. For example, the Allegiant Trust Committee voted to accept the NPS accounts without considering: (1) that NPS and Lincoln were affiliated companies; (2) the terms of the pre-need contracts (3) the premium terms and future premium requirements of the trusts' life insurance policy assets; (4) the cash values of the trusts' life insurance policy assets; (5) whether the trusts' life insurance policy assets were whole life or term; (6) how many life insurance policies were associated with the NPS trusts; (7) the recordkeeping requirement; and (8) whether Allegiant would be taking physical possession of the policies.

Overall, Allegiant's trust committee was presented with insufficient information to determine whether the bank had the resources and capabilities to administer the assets of the NPS trusts. Without knowing, for example, that there were in excess of thirty-thousand life insurance policies associated with the trusts, it was not possible for the committee to evaluate whether Allegiant would be capable of maintaining control of these policies. Further, without information related to the life insurance policies' premium terms, the committee had no way of assessing whether Allegiant's staffing and systems could adequately track the policies' premium

12

requirements or whether the trusts possessed sufficient cash and liquid assets to fund any future premium liability. A proper evaluation by the Allegiant Trust Committee would have revealed that the trusts were underfunded and Allegiant lacked the resources and capabilities to properly administer the accounts.

Although Richard Markow and Herbert Morisse, the designated administrator of the NPS accounts, knew that Chapter 436 and the NPS trust agreements set forth various administrative requirements for the trustee of the NPS trusts, they did not confer with in-house or outside counsel regarding the nature or scope of these requirements. Morisse Dep. 349:15-19. There is no evidence that the Allegiant Trust Committee was informed that Chapter 436 and the NPS trust agreements required Allegiant to account for deposits made into the trusts for each individual pre-need consumer and to track the sum of those deposits for purposes of calculating income distributions. As a result, the committee voted to accept appointment as trustee of the NPS trusts without properly evaluating whether Allegiant had the resources and capabilities of administering the accounts in accordance with the law and governing agreement.

Allegiant also failed to properly perform adequate due diligence on NPS as a client. Prior to accepting the NPS trusts, Allegiant did not know the affiliation between NPS and Lincoln despite the fact that Lincoln life insurance policies made up the bulk of NPS trust assets. Markow Dep. 146:14-20. Allegiant neglected to obtain any ratings analysis of Lincoln and it does not appear Allegiant performed any research into NPS and its owners. Markow Dep. 156:11-157:20. Even a minimal inquiry would have revealed that NPS and the State of Missouri were involved in a lawsuit in the early 1990's and a Consent Judgment had been entered between the two parties. It also would have revealed that Doug Cassity, NPS' principal founder, was a convicted felon.

Despite not being properly informed regarding critical aspects of the NPS trusts and not being equipped to handle these accounts, Allegiant notified Mercantile of its acceptance of appointment as successor trustee of the NPS trusts in July 1998. USBANK000022. The following month, NPS Pre-Need Trusts I-IV transferred to Allegiant, and Trust V transferred to Allegiant in March 1999. Exs. 62 and 263; SDR-D1-360207; SDR0104254; SDR0110332. After approximately six years at Allegiant, the NPS trusts moved to Bremen Bank in 2004. Exs. 28, 51, 53; BBT010170; BBT010133.

### C) M&I /Southwest

In 2005, NPS appointed M&I as successor trustee to Bremen Bank for the NPS trusts. Exs. 7157 and 7158; MITC000298. The transfer of the trusts occurred as a result of a previously established lending relationship between Forever and Southwest Bank. In December 2002, Southwest Bank issued its first loan to Forever Network, a subsidiary of Forever. Ex. 74. The lending relationship eventually grew into a series of loans to Forever Network, Forever, and members of the Cassity family, totaling more than $10 million. Postel Dep. 125:11-16.

In 2004, M&I opened a new branch in St. Louis, housed at the Southwest Bank building. Roberts Dep. 17:19-18:7.  Although M&I had operated for years in Milwaukee, it had not had a trust presence in St. Louis prior to that time.  At the outset of its operations, M&I's St. Louis office had only five officers and two assistants.  Pam Roberts was the sole trust administrator for the new branch.  *Id.* at 20:1-15.

At the time she was hired, Ms. Roberts had no experience in the pre-need trust industry beyond "overhear[ing] some people talking about" it.  *Id.* at 16:13-23.  In fact, no one in the St. Louis branch had experience handling pre-need trusts at the time.  *Id.* at 78:14-17.  Given the size and complexity of these trusts – involving multiple parties, frequent disbursements, and trust corpus consisting of thousands of insurance policies – agreeing to take on these trusts without *any* relevant experience was wholly inappropriate.

In September 2004, based on a referral from Andy Schoeck, a Southwest banking officer, several representatives of M&I visited the NPS/Forever offices to pitch their trust services. Roberts Dep. 71:25-73:6.  Ms. Roberts testified that Mr. Schoeck "suggested that we talk to the Forever/NPS relationship to try and strengthen the relationship that he had with the existing client on the bank side."  *Id.* at 43:23-44:2.  Five months later, Ms. Roberts sent a letter to Howard Wittner and Mike Butler discussing the prospective "Forever Enterprises/NPS Relationship."  Ex. 216.

Under M&I's policy manual, "[b]efore accepting a fiduciary account, the Trust Company shall review the prospective account to determine whether it can properly administer the account."  Ex. 214 at 906.  M&I's due diligence review of the NPS and Forever pre-need trust accounts appears to have been limited and consisted primarily of looking at trust statements, possibly requesting legal review of the trust agreement and statutes, and possibly reviewing the assets of the trusts.  Ms. Roberts testified specifically that M&I did not contact Mr. Markow at Bremen Bank regarding the trust accounts, Roberts Dep.120:18-22, and did not review the financial stability of Lincoln in deciding to accept the trusts, *id.* at 122:4-12.

There is conflicting testimony as to whether a full legal review of the NPS trusts was conducted by M&I.  Ms. Roberts testified that M&I's "internal legal staff [specifically Victor Schultz] had checked the laws and the various statutes of the states involved."  *Id.* 105:25-106:2; *see also* 91:23-92:6.  Mr. Schultz, however, testified that although he did some legal review for the endowed care accounts and would have reviewed the pre-need trust agreements, he has no recollection of reviewing the pre-need statutes.  Schultz Dep. 18:4-10; 28:6-22; 30:12-23; 31:16-32:12; 32:16-33:16; 36:22-37:3; 42:11-43:5; 57:22-58:4; 66:19-67:8.  He specifically testified that "as trust counsel, the limit of [his] involvement with the NPS pre-need accounts is [he] would have seen the proposed trust agreements."  *Id.* at 39:24-40:6.  He further testified that he did not do "an extensive analysis of 436" and was not aware prior to his deposition that Chapter 436 requires "keeping track of the amount deposited in the trust by each individual."  *Id.* at 35:18-36:2-7.

14

As to the life insurance policies that were trust assets, Ms. Roberts testified that M&I did not "perform any due diligence on any aspect of those life insurance policies." Ms. Roberts claimed that such a review of the trust assets was "unnecessary." Roberts Dep. 128:5-11. Ms. Roberts agreed that that M&I's trust committee "did not undertake any additional due diligence to understand" the evidence of insurance listed as an asset of the NPS pre-need trusts. *Id.* at 237:18-238:5.

With respect to due diligence regarding NPS as a client, Pam Roberts testified that M&I relied on the due diligence done by Southwest Bank and did no additional analysis of NPS as a client. She stated that "Andy Schoeck had handled the due – due diligence of the company and the corporation, so the bank had already accepted the client and done the due diligence in that respect." *Id.* at 106:4-7. In her view, the Southwest Bank due diligence related to its lending relationship with Forever and Forever Network satisfied the Know Your Customer requirements as to NPS. *Id.* at 106:19-107:15. However, even if it were appropriate for Ms. Roberts to rely on the lending side of the bank for the required due diligence, it does not appear that NPS was ever itself a loan customer of the bank.

Following receipt of information about the trusts, M&I held a new business committee meeting in May 2005 involving Ms. Roberts, David Pisarkiewicz, John Graney, Dino Cannella, and Tony O'Connor. M&I 30(b)(6) Dep. 95:2-17; *see also* Ex. 220 at 125. At that meeting, Ms. Roberts and Mr. Pisarkiewicz recommended against accepting the NPS and Forever accounts. Ms. Roberts testified that this was because, based on the meetings they had with NPS and Forever, they were not "sure that we had enough information to be able to feel we could develop a good relationship with a potential customer." *Id.* at 95:18-96:13. Ms. Roberts felt that they had trouble getting feedback from NPS and Forever. *Id.* at 97:18-98:17; *see also* 98:20-22 ("There was a wall there. . . . there wasn't a lot of give and take."). Ms. Roberts and Mr. Pisarkiewicz voted against accepting the trusts, and Mr. Graney and Mr. Cannella voted to accept the trusts. Mr. O'Connor, as head of the trust department, broke the tie and voted to take on the trusts because "[h]e didn't want to pass up the revenue." *Id.* at 102:7-103:5.

Based on the documents and testimony, M&I's acceptance of the NPS trust appears to be a case in which the lure of garnering new business and sustaining an existing lending relationship made the trust company overlook the fact it would be taking on fiduciary responsibility for accounts it was not properly equipped to handle. M&I also did not do sufficient due diligence to discover that the trusts consisted of dubious assets, such as life insurance policies issued from an NPS-affiliated company, a World Service group term policy, and approximately $500,000 in a hedge fund managed by David Wulf. M&I's conduct not only violated standards of care in the trust industry, but contravened its own trust manual.

15

### D) THE IOWA TRUSTEE DEFENDANTS

#### i) BANK OF AMERICA

Bank of America ("BOA") and NPS entered into discussions regarding the NPS trusts in June 2002. *See* Exs. 516 and 518. In mid-July, BOA Relationship Manager and Assistant Vice President Kurtis Tull attended a meeting at NPS' offices with Randy Sutton and Jim Crawford. Tull Dep. 28:24-31:7, 30:12-13; BOA's Answer to SDR Interrogatory No. 5(i). At the time, Mr. Tull was under the mistaken impression that BOA would become the new trustee for Trust IV, the largest of the NPS trusts. *See* Tull Dep. 89:20-25; Ex. 815. Tull also believed the NPS account would operate as a custody account in which NPS could withdraw funds as it pleased. *See* Tull Dep. 31:22-32:1, 71:14-23, 77:15-17.

Although the record shows Mr. Tull conducted some research into NPS, *see* Ex. 512, he failed to meet his due diligence requirements. For instance, BOA's Know Your Customer policy specifically requires that information be obtained regarding "the reputation of the owners and management" of a company and "the customer's financial resources, including the source of funds." Ex. 510 at 888. Mr. Tull failed to conduct either of those inquiries. Tull Dep. 146:2-147:24; *see also* BOA-000145 (uncompleted Know Your Customer form). In addition, Mr. Tull did not believe BOA needed to know the laws governing pre-need contracts in Iowa nor did he ever undertake to read such laws. Tull Dep. 125:21-23, 171:18-23, 172:13-16. While BOA had some sections of Section 523A in its file, key portions of the statute relating to trustee responsibilities were missing. *See* Ex. 525.

It also appears that BOA simply allowed NPS to use its Missouri Trust agreement without substantial amendment. *See* 518. On July 2, 2002, Mike Dowling, a BOA regional trust executive, sent an email to Mr. Tull expressing various concerns he had with the proposed Iowa Trust agreement. Ex. 518 at 827. Mr. Dowling specifically commented on paragraph 2.3 of the proposed agreement, which related to ownership of trust assets, and suggested that the paragraph also refer to BOA as having "Custody" of the trust assets. *Id.* According to Mr. Dowling, having physical custody of trust assets was a "drop dead issue." *Id.*

Despite recognizing this important obligation, BOA failed to incorporate Mr. Dowling's suggestions into its final trust agreement and never took custody of the insurance policies purchased by the Iowa Trust. The Iowa Trust Agreement signed by BOA states that the agreement is "made and intended to be performed within the State of Missouri and shall be governed by the Missouri law applicable to Prearranged Funeral Agreements." Ex. 520 at 518. This is different from the Iowa Trust Agreement produced by Comerica, which refers to the Iowa pre-need statute as the governing law. Ex. 674 at 199. Strangely enough, both agreements are signed by Mr. Tull and Catherine Rubin, the BOA trust administrator. Ex. 520 at 518; Ex. 674 at 199.

16

BOA has taken the position that because the Iowa Trust was administered in Missouri and held the funds of Iowa pre-need consumers, both Iowa and Missouri law apply. BOA 30(b)(6) Dep. 167:14-168:1. It is highly unusual for a trust to be governed by the law of two jurisdictions, *see id.* at 199:14-17, and even more unusual for a bank trustee to agree to this arrangement without either obtaining clear language specifying the intent of the grantors or a legal opinion on which law must be followed if there is a conflict. At a bare minimum, Mr. Tull and Ms. Rubin should have sought clarification.

Despite having a policy against the acceptance of pre-need trusts, *see* Ex. 522, BOA officially agreed to accept the Iowa Trust on September 10, 2002, one day after the trust agreement was signed by Mr. Tull. Ex. 521 at 675; Ex. 520 at 520. Although BOA knew about the affiliation between NPS and Lincoln prior to this acceptance, *see* Ex. 512, it did not perform a ratings analysis of Lincoln until January 2003. *See* Ex. 650. Shortly after doing so, BOA resigned as trustee of the Iowa Trust in February 2003. Ex. 534. BOA's prompt resignation is indicative of its failure conduct proper due diligence on the front end of the relationship.

Approximately five months after BOA resigned as trustee, the Iowa Trust transferred to Security Trust Company. SDR-FBI122125. In December 2003, Security Trust Company was purchased by AST. AST00127. It is unclear whether AST examined the Iowa Trust during this acquisition. AST 30(b)(6) Dep. 141:8-13. If AST had performed such an examination, it should have discovered that it was not properly licensed in Iowa to serve as trustee. After becoming aware of this fact in February 2004, AST resigned as trustee of the Iowa Trust. *See* Exs. 890 and 895. AST did not report this issue to the authorities and continued to serve as trustee for another five months. Exs. 895 and 898.

After AST's resignation, David Bowman, a Merrill Lynch investment advisor, contacted a Comerica representative and told him that "his client 'Forever Enterprises' would like to open a Trust Fund for [Forever's] funeral insurance department [NPS] for $1 million" because NPS' "current trust company is not licensed in the state where [its] account is domiciled." Ex. 666. This information was relayed to Janis Dudek, a Comerica trust officer. *Id.* Ms. Dudek then began a two-month series of correspondence with NPS, AST, and NPS' attorney Jean Maylack.

In mid-April 2004, Dudek penned an internal memorandum regarding NPS and the Iowa Trust. The memorandum started by giving background information on Forever, which she described as a company that "buys, issues, and manages life insurance and annuities through its subsidiaries, chiefly Lincoln Memorial Life Insurance Company ["Lincoln"]." Ex. 670. Ms. Dudek added that "[m]ost of [Lincoln's] premiums are derived from the issuance of insurance policies to fund prearranged funeral contracts sold primarily by its affiliate [NPS]." *Id.* If Comerica became successor trustee, Ms. Dudek instructed that it "would reflect the insurance policies as an asset" and "[t]his asset would be valued monthly by the client." *Id.*

17

Missing from Ms. Dudek's memorandum was an investigation into the financial health of Lincoln, the purpose of the trust, and Comerica's capacity to handle the account. Similarly, Ms. Dudek's "due diligence" checklist only relayed basic information on NPS, such as its physical address and one sentence regarding the nature of its business. Ex. 669. Nowhere on the checklist was there information describing the assets of the trust or providing an assessment of the same. In both her memorandum and correspondence, Ms. Dudek displayed overall lack of understanding regarding Comerica's role as trustee, which she interpreted to consist simply of "reflect[ing] insurance policies as an asset." Ex. 670; *see also* Ex. 681 (May 2004 email stating "that the Bank will only mirror [account] activity"). A trustee's duties, however, extend far beyond its obligations to keep adequate records of account transactions.

Comerica, like all of the Iowa Trustee Defendants, also failed to perform a proper legal review prior to accepting the Iowa Trust. Under Iowa law, a trustee of a pre-need funeral trust is prohibited from "invest[ing], directly or indirectly, in a seller's business operations." Iowa Code § 523A.203(6)(c). Any reasonably capable trust officer reading this statute would have been alerted to the affiliation between NPS and Lincoln would have determined that more questions needed to be asked. Scrutiny by any of the Iowa Trustee Defendants would have precluded NPS from obtaining a trustee for the Iowa Trust and prevented the losses sustained by Plaintiffs.

Overall, it appears from the record that the Iowa Trustee Defendants failed to comprehend the actual nature of the account and failed to understand the fiduciary duties they owed the beneficiaries of the trust.

## VI) THE TRUSTEE DEFENDANTS VIOLATED THEIR FIDUCIARY DUTIES IN ADMINISTERING, OPERATING, AND MANAGING THE NPS TRUSTS

A bank trust department, through its officers and employees, is obligated to know and meet its fiduciaries duties in the administration, operation, and management of the trusts it accepts. Trustees are fiduciaries, and as such, have fiduciary duties. These duties are uniformly taught in national trust schools as well as state and regional trustee training and continuing education programs. Interwoven in these industry standards and routinely communicated to trust officers are the legal principles underlying a trust department's fiduciary duties to beneficiaries. As Justice Cardozo explained, "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928).

As fiduciaries, the Trustee Defendants owed numerous duties to the beneficiaries of the NPS trusts. For instance, throughout their tenure as trustees, the Trustee Defendants had to exercise reasonable care and skill in administering the trusts. *E.g.* Restatement (Second) of Trusts § 174. The Trustee Defendants were also obligated to maintain control of the trust property and to preserve the assets in the trust. Trust Agreements ¶ 3.1; Restatement (Second) of Trusts §§ 174-75. When trustees delegate any of their authority to an agent, they still have a

18

duty to supervise that agent. Restatement (Second) of Trusts § 171 comment k. Additionally, trustees are also required to know and follow the law applicable to their conduct, including statutes, case law, and regulations which govern the respective banks in their fiduciary activities.

Upon receipt of the trust corpus, each Trustee Defendant also had an obligation to examine the corpus to ensure the assets were sufficient to meet the trusts' liabilities. To the extent there was any underfunding, the trustee had an obligation to cure the problem. *See* Restatement (Second) of Trusts § 223 ("A trustee is liable to the beneficiary for breach of trust, if he . . . knows or should know of a situation constituting a breach of trust committed by his predecessor and he improperly permits it to continue . . . .").Below are just some of the duties the Trustee Defendants violated throughout their tenures as trustees.

### A) Failure to Protect, Preserve, Control, and Hold Trust Assets

The trust agreements between NPS and the Trustee Defendants specifically provide that the trustee must "protect and conserve the Trust corpus through the management, investment and reinvestment of the Trust property." Trust Agreements ¶ 3.1; *see also* Restatement (Second) of Trusts § 176 (trustee must use reasonable care and skill to preserve the trust property); Barton Dep. 20:15-17 (recognizing duty to preserve trust assets); BOA 30(b)(6) Dep. 102:8-14 (acknowledging duty to safeguard trust funds for pre-need consumers). Even when a trustee is not actually making the investment decisions for a trust, it has duties to protect and conserve the assets of the trusts through its management, administration, and oversight. Likewise, even if a truly independent qualified investment advisor is appointed by a pre-need seller, multiple Trustee Defendant witnesses and documents establish that a trustee must nonetheless provide oversight to ensure that trust investments are reasonably prudent. *See, e.g.*, Harlan Dep. 75:23-77:5; BOA 30(b)(6) Dep. 104:19-105:23, 108:9-109:12; Ex. 60 at 985; *see also* Mo. Rev. Stat. § 436.031(2) ("In no case shall . . . [trust] assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in.")

Related to the Trustee Defendants' duty to protect and conserve the trust corpus is the requirement that a trustee take reasonable steps to obtain and keep control of assets belonging to the trust. *See* Restatement (Second) of Trusts § 175. The duty to maintain control of trust property is an important aspect of prudent trust administration and asset protection. Chapter 436 specifically states that even if an independent qualified investment advisor is appointed, "[i]n no case shall control of [trust] assets be divested from the trustee." Mo. Rev. Stat. § 436.031(2). Similarly, under Iowa law, a pre-need trustee is required to "hold [pre-need] funds for the designated beneficiary until released." Iowa Code 523A.202(1). The trust agreements also require the trustee to "hold" trust corpus. Trust Agreements ¶ 3.1.

Here, the Trustee Defendants agreed to relinquish control of the trust assets to the Cassitys, thereby knowingly abandoning their fiduciary duties to monitor those assets and thwarting the statutory scheme designed to require pre-need sellers to place the assets within the

19

control of the bank. Similarly, the Trustee Defendants allowed trust funds to be used to purchase life insurance from a company owned by the Cassitys, making it possible for the Cassitys to manipulate those assets to serve their own interests. Overall, the record shows an abysmal abdication of true control by the Trustee Defendants. Despite their ability and duty to say "no" to any instruction they thought to question, the banks never took any action to stop the Cassitys. If they had, the fraudulent scheme would have been stopped in its tracks.

Below is a series of examples of how each Trustee Defendant knowingly and willfully relinquished control of trust assets and failed to preserve, protect, and conserve these assets.

#### i) MARK TWAIN/MERCANTILE

The Mark Twain/Mercantile era marked the beginning several fraudulent schemes used by the Cassitys – and facilitated by the Trustee Defendants – to siphon funds out of the trusts and deplete trust assets. This included improper distributions, use of a wholly-owned life insurance company, policy loans, and the issuance of large debentures by NPS. The pattern of these transactions shows a reckless failure on the part of Mark Twain and Mercantile to fulfill their fiduciary responsibilities in protecting and controlling trust assets. Mark Twain and Mercantile also became aware of significant red flags while they were trustees, yet they continued to allow the Cassitys to control and manipulate trust assets while ignoring their fiduciary obligations to monitor and preserve these assets.

##### (1) Improper Distributions

Mark Twain's disregard for its fiduciary obligations was documented early in its tenure as trustee by Robert Lock and his firm McBride, Lock & Associates ("McBride Lock"). In 1992, McBride Lock conducted an examination of NPS at the request of the Missouri State Board of Embalmers and Funeral Directors. Ex. 7452. At the time, McBride Lock had conducted dozens of such examinations for the purpose of determining compliance with Chapter 436 and had presented multiple seminars on the meaning of and compliance with Chapter 436. Lock Dep. 24:6-10. McBride Lock concluded that the NPS trusts were underfunded in excess of $13 million. Ex. 7452 at 441. As previously mentioned, this underfunding was reported by the St. Louis press, *see* Ex. 857, and there is evidence in the record the Mark Twain was both aware of this negative publicity and internally considered terminating the trusts, *see* Ex. 317.

McBride Lock included in its 1992 report a section entitled "Trustee Responsibilities." Ex. 7452 at 472. The firm correctly noted that "[t]hrough the fiduciary relationship with NPS, the trustee has a responsibility to ensure that the deposits made to, and distributions from, the trust are appropriate." *Id.* According to the report, Mark Twain was not meeting this responsibility by, among other things, making loan payments out of the trust even though the trust was funded at a level below the sum of deposits that was required to be held in trust. *Id.* McBride Lock concluded, and I concur, that Mark Twain was "not meeting their fiduciary responsibility in holding, administering and distributing such deposits in trust as established by

20

Chapter 436 RSMo." *Id.* Mark Twain's "significant breach of responsibility" also extended to pre-need contract cancellations, and McBride Lock "detected a lack of control procedures of the seller's records which [it] assume[d] extend[ed] to the trustee level." *Id.* This same lack of control procedures was perpetuated in the transference of these trusts to successor trustees and thereby continued throughout the tenures of all the Trustee Defendants following Mark Twain.

### (2) *Use of Wholly-Owned Life Insurance Company*

In its "New Account Acceptance Sheet," Mark Twain described the assets of the trusts as "Treasury Issues." Ex. 590 at 906. In 1991, however, the asset mix began to include life insurance policies, which would soon become the predominate asset in the trusts. *See* Ex. 853 at 369. There is no evidence that Mark Twain did any type of assessment of the quality of this new asset nor did it determine whether it was capable of handling such an asset on a large scale. At minimum, Mark Twain (as well as the successor Trustee Defendants) should have asked: (1) What is required to bring these policies under its control and legal title?; (2) What, if any, special processes, procedures and accounting systems are required to maintain and service the policies?; and (3) What systems are necessary to accurately establish and maintain the records? The answers to these questions would have revealed that Mark Twain did not have the capability to properly administer the NPS accounts.

On June 13, 1991, Mark Twain, on instruction of Randy Sutton, virtually emptied out the Trust III account by sending money to a bank in Dallas without any indication as to how the account should be credited and without receiving any asset in return. SDR0244349. Mysteriously, three month later, Trust III received in approximately $10 million "units" of Statesman National Life Insurance. Ex. 853 at 369. These transactions should have raised red flags with Mark Twain, and Mark Twain should have asked questions as to: (1) whose money was being used to purchase the insurance, (2) what was actually being purchased, *i.e.* what is a "unit" and how is it valued and (3) what was the history, reputation, affiliations, and financial strength of the insurance company. If Mark Twain had done minimal investigation into Statesman, it would have discovered that Memorial had conducted business with Statesman via reinsurance treaty. Specifically, Statesman had signed a reinsurance agreement with Memorial in 1989 in which Statesman agreed to cede to Memorial 100% of Statesman's liability under all insurance policies issued or renewed by Statesman. SDR0093398. In exchange, Memorial received all premiums for policies written by Statesman and assumed all premium and renewal commissions. *Id.* In effect, these so-called assets were obligations of Memorial, the wholly-owned Cassity subsidiary, not those of Statesman.

Memorial officially acquired Lincoln in March 1992, *see* SDR0130435, and NPS began using trust funds to purchase Lincoln life insurance policies in October 1992. Ex. 855 at 37; Barton Dep. 138: 12-17. Mark Twain's October 1992 statement for Trust II shows that the trust received ambiguously described "615 units" Lincoln life insurance policies at a reported value of $1,442,047.67. Ex. 855 at 37. Joann Barton, the Mark Twain trust administrator at the time,

21

testified that Mark Twain did not any ask questions regarding the purpose of this purchase, which was inherently different from previous transactions in the trust. Barton Dep. 138: 19-25. She also could not recall looking into the reputation of Lincoln or its industry ratings. *Id.* at 77:23-78:5. As with the Statesman transaction, Mark Twain should have at least asked the three questions mentioned above and conducted an inquiry as to the purpose of this transaction.

Allowing trust assets to be placed in a life insurance company owned by the Cassitys gave them total control and access to the policies, making it possible and foreseeable that they would manipulate the assets to serve their own interests. Mark Twain also permitted and set in motion the practice of policy mismatching, *i.e.* permitting funds from paid-in-full NPS pre-need contracts to be used to purchase Lincoln life insurance policies requiring installment payments over a period of years. Mark Twain and Mercantile knew or should have known policy mismatching was occurring while they were trustees.[7]  For instance, Mercantile received wire transfer forms expressly showing money was being transferred to Lincoln for the purpose of "monthly renewals." *See, e.g.*, Ex. 298 at 139. Policy mismatching continued throughout the lifespan of the trusts and allowed the Cassitys to use the trust funds for other purposes, such as funneling trust money to other Cassity-controlled entities.

Additionally, Mark Twain or Mercantile never took custody or control of the life insurance policies they reflected as assets of the trusts. *See* Barton Dep. 77: 3-9; Harlan Dep. 55:8-56:7; Botkin Dep. 134:21-135:3.[8]  In the trust industry, standard practice requires a trustee to establish dominion and control over all assets, whether or not they actually can be reduced to physical possession by the trustee. In fact, the tradition of using banks and trust companies as trustees derives from the fact that such entities, above others, have secure vaults and recordkeeping systems which make them ideal choices for this role. If custody must be delegated to an agent, the trustee must use due diligence in selecting an agent who is qualified to do the required safekeeping and associated recordkeeping, such that the trustee may independently validate and verify that true control is being maintained in the trustee's behalf.

Here, Mark Twain and Mercantile failed to exercise control over the policies and allowed NPS to serve as custodian of the policies. As discussed more below, this fell below the standard of care and constituted a breach of their fiduciary duties.

---

[7] Mark Twain and Mercantile should have asked about the nature of the policies at the outset. Mark Twain trust officer, John Zieser stated in his deposition that he didn't remember "asking a question like that" with respect to Trust IV policies. Zieser Dep. 143:1-7.

[8] In addition, up until 1994, Mark Twain did not even receive the proceeds of the insurance policies of which it was purportedly the owner. *See* Ex. 591 at 609. In my opinion, it was wholly improper for Mark Twain to agree not to receive the proceeds of trust-owned insurance policies.

### (3) *Awareness of Check Kiting*

In November 1993, Patrick Jostrand, Senior Vice President at Mark Twain, sent a series of letters announcing the closing several bank accounts associated with NPS, National Heritage Foundation, and National Heritage Enterprises because the "compan[ies] ha[ve] not conducted [their] banking activities in a manner which we feel is appropriate." Ex. 288. Mr. Jostrand suspected the companies were engaged in check kiting, which is the illegal practice of a company or individual "moving money rapidly around between accounts at various financial institutions and writing checks while [the company or individual] ha[s] the benefit of the float, but [the company or individual doesn't] actually have sufficient funds to cover the checks." U.S. Bank 30(b)(6) Dep. 116:10-25, 119:12-120:1. Although check kiting is "serious concern" for a bank, *id.* at 117:6-8, Mr. Jostrand did not communicate his suspicions regarding NPS and its affiliates to the trust department. U.S. Bank Sources of Information to Educate 30(b)(6) Witness (Jostrand). Mr. Jostrand stated that he was unaware of the NPS trusts and would have been prevented from communicating this information because of the "Chinese Wall" between the trust department and the retail side of the bank.

Several bank witnesses mention the notion of a "Chinese Wall" as if it was an impenetrable and impermeable barrier between the trust department and the lending side of the bank. The term, however, is being misconstrued and needs to be explained.

The concept of a "Chinese Wall" between a bank's trust department and its lending side began in the 1960's when trust departments in large banks found themselves in a potential conflict situation. The Securities and Exchange Commission ("SEC") rules pertaining to trading in marketable securities prohibit anyone from trading in registered securities on the basis of material, non-public, insider information. Since many big banks were lenders to publicly traded companies, their lending officers and credit analysts were routinely in possession of material information about the companies' strategies and finances before the same became public. Knowledge of this information would be very valuable to persons trading shares and other securities of these public companies.

While the lending sides of banks were privy to insider information, trust departments were investing the money held in thousands of trust accounts. The SEC and bank regulators agreed that a rule was needed to prohibit the transfer of insider information about public companies from credit and loan areas of the bank to the investment side of the trust department so that non-public, inside information would not be permitted to influence investment decisions in trust and investment accounts handled by the banks.

Trust departments also have an obligation to keep confidential personal information obtained by persons in the trust department about trust customers and their families. This information is not supposed to be shared with anyone not entitled to know the information in the context of the trustee relationship. A limited "Chinese Wall" between the lending side of the

bank and the trust department thus not only prevents the transfer of insider information to a trust department, but also the transfer of non-public confidential personal information to the lending side of the bank.

In everyday dealings in banks of all sizes, it is common for officers of both lending and trust departments to meet socially, and even to meet together with customers who are served by both sides of the bank. The testimony in this case shows frequent exchanges of introductions and even joint meetings with customers and prospective customers by officers of the two sides of a bank. There were a number of instances in which public or non-confidential information was available to one side of the bank but was not shared with the other. There should have been no prohibition against sharing such information, and it should have been shared with the trust officers because of their fiduciary obligation to protect the interests of the beneficiaries.

Here, Mr. Jostrand should have shared his concerns regarding check kiting with Mark Twain's trust department. By sharing such information about the questionable conduct of NPS, he would have alerted the trust department to the possibility that similar conduct by NPS was a possibility with respect to the pre-need trusts. In so doing, Mr. Jostrand might have helped prevent the damage done by NPS.

### (4) *1994 Monitoring by McBride Lock*

In 1994, after the Consent Judgment was entered between NPS and the Missouri Attorney General's Office, McBride Lock was assigned to monitor NPS. As part of this monitoring, McBride Lock interviewed John Zieser, a trust officer at Mark Twain, regarding the NPS pre-need trusts. Ex. 591. The fact that a court-appointed monitor was interviewing a member of Mark Twain's trust department represented a huge red flag that should have resulted in a comprehensive investigation by Mark Twain of that proceeding and its findings regarding the subject trusts.

During the interview, Andy Feldman, a McBride Lock auditor, specifically asked Zieser whether the bank had received and reviewed the Consent Judgment. Ex. 591. Zieser responded: "No, should we have it?" *Id.* at 606, 608. The answer to this question should have been an unequivocal yes. Zieser not only should have requested the Consent Judgment, but also should have reviewed the judgment, informed his supervisors, and set up procedures to ensure compliance with the judgment.[9] Additionally, since this kind of development was such an unusual occurrence in regard to a trust account, a reasonably prudent trust officer in these circumstances should have been prompted to ask fundamental questions such as: (1) What was the reason for the examination?; (2) Had there been any examinations in the past?; (3) What were the results?; (4) Did McBride Lock have any past or present concerns regarding NPS' business

---

[9] Remarkably, Zieser could not remember in his deposition whether he requested a copy of the Consent Judgment or not. Zieser Dep. 196:15-19.

24

operations?; (5) Did McBride Lock have any past or present concerns regarding the administration of the NPS trusts?

Zieser's answers to Feldman's questions reinforce my previous conclusions by showing his general lack of knowledge regarding the trusts and the lack of procedures put in place by Mark Twain to preserve and protect trust assets. Specifically, Zieser did not know basic information regarding the purchase of insurance policies and premium payments made by the trusts. *See id.* Mark Twain did not receive premium bills from Lincoln and did not have procedures in place to ensure premiums were paid on a timely basis. *See id.* When asked when withdrawals were allowed from the trusts, Zieser responded that "NPS dictate[s] adjustments." *Id.* at 609. Zieser's answers led Lock to conclude that Mark Twain "merely provide[s] a bookkeeping function since no restriction of trust assets distribution are evident." *Id.* at 608. Moreover, "the bookkeeping is very limited since deposits are not detailed by contract holder." *Id.*

As part of its examination of NPS, McBride Lock also interviewed David Wulf ("Wulf") of Wulf, Bates & Murphy ("Wulf Bates"), the purported investment advisor for the NPS trusts. Mr. Wulf reported that NPS that made the decisions on when and what types of insurance policies to buy. He specifically stated that he "receives a report from NPS which details all of the policies he is suppose[d] to buy on a monthly basis." Ex. 3249. Wulf had no knowledge regarding premium payments and was also unsure as to what types of withdrawals could be made from the trusts. *Id.* From their conversations with Wulf, McBride Lock concluded that Wulf "[was] not acting independently of NPS in making investment decisions." *Id.* Likewise, in a formal report to the Cole County Court, McBride Lock stated: "The trustee and investment advisor are performing their functions at the primary direction of NPS." Ex. 3560. Based on my review of the record, I concur that there was reckless abdication of the trustee's fiduciary duty evidenced throughout this period of the bank's stewardship.

### *(5) Failure to Prevent Policy Loans*

During their trusteeship, Mark Twain and Mercantile improperly allowed policy loans to be taken on life insurance policies that were assets of the NPS pre-need trusts. By doing so, they failed to properly protect and preserve trust assets. As conceded by several former Mark Twain trust officers, policy loans deplete the value of insurance policies, which in turn depletes the principal of the trusts. *See, e.g.,* Moellenhoff Dep. 244: 3-15.

Mark Twain and Mercantile, like the other Trustee Defendants, knew or should have known policy loans were being taken on Lincoln life insurance policies that were assets of the trusts. This is true for several reasons: (1) they could and should have taken custody of the policies; (2) they could and should have obtained the cash value of the policies and done proper recordkeeping; (3) they could and should have known policy loan deposits were inconsistent with ordinary deposits into the trusts, including the lack of documentation accompanying such

25

deposits; (4) they could and should have known the source and purpose of each transfer into and out of the trusts; (5) they could and should have known about the reduction in value by doing proper income calculations under Chapter 436 and the trust agreements; and (6) they could and should have been aware of the suspicious nature of these policy loan transactions.[10]

Certainly, the policy loans were not investments by the trusts. Instead, Mark Twain and its successors allowed a third party that did not own the policies to borrow trust assets without any security. The loans were unsecured as to the trust and in fact divested the trust of title to the policy.

### (6) Issuance of Debentures

There were some large dollar debentures issued by NPS during the years that Mark Twain and Mercantile held the trusts. *See, e.g.*, SDR0107610. Most of these debentures were related to roll-overs transactions, which occurred when a funeral home agreed to transfer its existing pre-need contracts to NPS. These debentures were improper for several reasons: (1) they allowed funds to be retained by NPS in violation of Chapter 436; (2) they did not earn interest and are not secured by physical assets or collateral; and (3) they are not reasonably prudent investments.

Mark Twain also reported as lost a $14 million debenture that was an asset of the trust. Ex. 290. The debenture was known by the bank to be missing from its custody, and one trust officer, Matthew Harlan, noted that the bank went on for eighteen months asking NPS for it without effect. *Id*; *see also* Harlan Dep. 86:21-22. Harlan did not explain why the bank did not insist on its production immediately. When a substitute document was tendered to the bank in lieu of the original, the substitute left out the information regarding the litigation, *see* Ex. 600B, yet the bank made no effort to verify that the substitute was appropriate. This is yet another instance of the bank simply taking what it was told by the Cassitys as gospel and making no effort whatsoever to understand what was transpiring in the trusts. It illustrates the total abdication of fiduciary responsibility that the bank knowingly permitted the Cassitys to stall them for eighteen months about a $14 million asset when the bank could have refused to follow any instructions to remit one dollar from the account until the debenture was produced.

### ii) ALLEGIANT

The fraudulent scheme that began during the Mark Twain/Mercantile era not only continued, but expanded under Allegiant's watch as trustee. Some aspects of the scheme that were facilitated by Allegiant's conduct included: (1) failure to obtain custody of trust assets through execution of "Custody Agreements;" (2) failure to oversee disbursements; and (3) failure to protect the value of trust assets.

---

[10] In some cases, a large policy loan deposit would be transferred into the trust and the bank would be asked to distribute the same amount out of the trust within a day or two of the incoming wire. *See, e.g.*, Ex. 305.

26

### (1) *Failure to Obtain Custody of Trust Assets Through Execution of "Custody Agreements"*

In late 1999, Allegiant and NPS drafted several Custody Agreements relating to the life insurance policy assets of the NPS and Forever Enterprises pre-need trusts. Exs. 22, 126, 182, and 620. These Custody Agreements were executed by NPS/Forever, Allegiant, and Wulf, Bates & Murphy on or about November 1, 1999 and served to memorialize the system that started while Mark Twain was trustee whereby NPS maintained custody and control over the trusts' life insurance policies.

The terms of the Custody Agreements specified that NPS (or Forever), in its role as Custodian, "agrees to hold and keep safely all life insurance policies owned by the Trustee as investments in the Trusts [and] shall receive any life insurance policies purchased by the Investment Advisor." *See, e.g.,* Ex. 126 at p.2. The Agreements further provided that NPS (or Forever) would take on the responsibility of keeping and maintaining "records, accountings and other information relating to the policies held in the Trusts, as well as all of the records, accountings and other information required to be kept and maintained by the Grantor of the Trusts under Chapter 436 R.S.Mo." *Id.* at p.1.

Allegiant violated its fiduciary obligations by drafting and signing these Custody Agreements, for three reasons. First, Allegiant cannot contract out of its duty and responsibility to maintain custody of trust assets, without proper due diligence and oversight. Second, the terms of the Custody Agreements conflict with Chapter 436 requirements that the trustee maintain control over trust assets. And third, the Agreements designate NPS as an agent for Allegiant for purposes of fulfilling Allegiant's responsibilities under Chapter 436 and the NPS trust agreements.

### (a) *A Fiduciary Cannot Improperly Contract Out of Its Obligations.*

As trustee of the NPS trusts, Allegiant was required to maintain control of trust assets. This is especially true of the life insurance policies, as these policies made up a substantial majority of the trusts' assets.

While a fiduciary may delegate its authority to a third party under particular circumstances, the fiduciary must ensure this third party's independence and still remains ultimately responsible for the third party's actions. And here, not only were NPS and Forever not independent parties, but also they clearly had the most to gain from fraud, which the trustee had an obligation to prevent.

In light of Allegiant's failure to maintain custody of the NPS trusts' assets, Allegiant needed to monitor and track all pertinent details relating to the policies through an alternative system in order to maintain control over the assets. At a minimum, for all life insurance policies associated with the NPS trusts, Allegiant should have monitored the following information for

27

each individual policy in order to maintain control over the policies: (1) cash surrender value; (2) policy loan history; and (3) a premium schedule consisting of premiums paid to date, future premiums owed, and a schedule of when future premium payments were due.

For example, on April 27, 2000, Allegiant booked a World Service Life Insurance Company group term policy with a face value of $13,522,337.35 as an asset of Trust IV. Ex. 572. But there is no evidence that Allegiant inquired into the nature or purpose of this policy, requested information relating to the policy's premium terms, or obtained a copy of the life insurance policy. Despite taking no steps to confirm whether premiums were paid on the group term policy or to maintain control over the asset, Allegiant carried the policy as an asset of Trust IV with an identical $13,522,337.35 "market value" every month from April 2000 to May 2004 when the asset was transferred to Bremen. *See, e.g.,* Ex. 572; SDR0084983; SDR0090540. Had Allegiant had custody of this purported $13.5 million asset, Allegiant would have learned that the policy was renewable on a monthly basis and that the original $13.5 million face value of the policy was related to an outstanding policy loan balance on Trust IV life insurance policies.

Allegiant never received physical possession of the trusts' insurance assets. Further, Allegiant declined to keep track of any information necessary to verifying the NPS trusts' life insurance policies, and instead relied on a monthly report received from NPS which included only policy numbers, names of the insured, and face values of the policies. *See, e.g.,* Ex. 466. Allegiant also took no steps to independently verify that it held title to the life insurance policies. This failure to maintain control over the life insurance policy assets of the NPS trusts violated Allegiant's fiduciary duty to do so.

Further, it is my opinion that Allegiant's duty and responsibility to maintain custody and control of trust assets could not be contracted away, especially not to pre-need sellers. By attempting to delegate its custodial responsibilities to NPS and Forever, Allegiant failed to satisfy its fiduciary obligations and breached its duty to the beneficiaries of the trust.

### (b) The Custody Agreements Violated Chapter 436.

The Custody Agreements memorialized a system previously employed by Allegiant and its predecessor Trustee Defendants that granted NPS, rather than Allegiant, control over the trusts' life insurance policy assets. The terms of the Custody Agreements dictated that NPS would be the party maintaining both custody of the policies and the records and accountings relating to the policies. Pursuant to these terms, Allegiant took no identifiable action and made no discernible effort to establish and maintain control over the NPS trusts' life insurance policy assets. Allegiant did not receive or even review a single Lincoln life insurance policy during its six-year tenure as trustee. Morisse Dep. 119:21-120:11 Conversely, like its predecessor Trustee Defendants, Allegiant simply relied on a report received from NPS every month detailing a list of all policies associated with the NPS trusts and a letter on Lincoln letterhead stating that the

28

trusts were shown as the owners and beneficiaries of such life insurance policies to constitute control over the assets. Morisse Dep. 391:18-392:6. This system, which permitted Allegiant to leave the insurance policies under the sole control of NPS and Forever, was in clear violation of Chapter 436, which requires that a trustee maintain control of trust assets  Mo. Rev. Stat. § 436.031(2).  Yet, Allegiant agreed to allow self-interested parties to physically control the assets. And because Allegiant never saw or reviewed the policies, it was unable to ensure that title was vested in the trusts.

Further, Chapter 436 clearly was designed to protect Missouri pre-need consumers from the misappropriation of funds by pre-need sellers.  Yet, in flagrant violation of this intent, Allegiant permitted a sizeable majority of trust assets to be held and controlled by these very pre-need sellers – NPS and Forever.  And in my opinion, by failing to review or verify the use of the insurance assets while under the sellers' control, Allegiant violated the intent of chapter 436, and therefore its fiduciary obligations.

### (c) Designating NPS and Forever as Allegiant's Agents Was Improper.

The terms of the Custody Agreements resulted in NPS acting as an unpaid agent of Allegiant. NPS' responsibilities pursuant to the terms of the Custody Agreements included: (1) holding and keeping safe all life insurance policies associated with the NPS trusts; (2) maintaining books and records relating to the trusts' life insurance policies; (3) liquidating life insurance policies and distributing the resulting proceeds upon the occurrence of a cancellation of a pre-need funeral contract; and (4) liquidating life insurance policies and distributing the resulting proceeds upon the occurrence of a death of a pre-need funeral contract purchaser.  Each of these is the responsibility of the trustee.  By allowing NPS to claim it was going to take responsibility to accomplish these tasks, Allegiant improperly abdicated its trustee responsibilities, in violation of its fiduciary duties.

When designating any agent to act on its behalf, a trustee must monitor that agent to confirm the agent's duties are being performed in accordance with the agreement.  But here, there is no evidence that Allegiant took any steps whatsoever to confirm that NPS was holding and keeping safe the trusts' assets or was maintaining proper books and records.  Since it had no base records of its own of the individual interests of the beneficiaries, Allegiant had no means of auditing the records of its agent.

The Custody Agreements designated four NPS employees—Angie Hall, Lisa Kaleps, Nekol Province, and Randall Sutton—to be responsible for the performance of NPS's duties under the Agreements.  With the exception of Mr. Sutton, who signed the Custody Agreement on behalf of NPS, there is no evidence that the other NPS employees were even aware of the existence of the Agreement or their duties outlined therein.

Leaving the insurance policies under the control of NPS and Forever violated Allegiant's fiduciary obligations.  Under no circumstances should these companies have been entrusted with

29

these policies.  Neither Forever nor NPS was in the business of safely holding assets for other trust companies.  Even more troublingly, Forever and NPS each had a direct financial motivation to improperly handle the insurance assets.

Further, Allegiant designated as its agent parties who had interests adverse to those of its beneficiaries.  Under Chapter 436, the establishment of a trust was required before NPS could sell pre-need contracts precisely because a trustee was needed to safeguard the interests of the beneficiaries from the acts or insolvency of NPS.  Allegiant should have foreseen this conflict of interest and declined to appoint NPS and Forever as its agents.  Nevertheless, like the other Trustee Defendants, Allegiant actually turned over all control of the assets, records of ownership, and accounting for the details about whose money was being used for what purposes, back to NPS and the Cassitys.  Simply put, the bank turned over the keys to the vault to the person with the most to gain from emptying the vault.

### (2) *Failure to Oversee Disbursements*

In late 1999, Herbert Morisse drafted a letter for David Wulf's signature authorizing Allegiant to take direction from NPS on a series of functions relating to the NPS and Forever Enterprises Pre-Need Trusts ("Delegation Letter").  This Delegation Letter was signed by David Wulf on behalf of Wulf Bates on or about November 5, 1999.  *See* Ex. 185.  Allegiant, using this language drafted by Herbert Morisse, relied on the Delegation Letter as its direction and authorization to:

> Distribute any cash, securities or other assets from any of the above referenced trust accounts in accordance with *any directions* received by Allegiant Bank by fax, telephone or in person from a principal, officer, employee, agent or representative of Wulf, Bates & Murphy, Inc. *or National Prearranged Services, Inc.*

*Id.* (emphasis added)

By drafting and following this Delegation Letter, Allegiant knowingly and willingly entered into an agreement authorizing Allegiant to distribute proceeds from the NPS trusts solely at the direction of NPS.  This agreement continued a practice that was highly improper – and a breach of fiduciary duties – because it is in direct violation of Chapter 436 and the NPS trust agreements.

Per the terms of chapter 436 and the NPS trust agreements, either the trustee or an independent qualified investment advisor shall be responsible for "investment decisions."  *See* Mo. Rev. Stat. § 436.031(1), (2); Trust Agreements ¶ 2.2.  However, nowhere in either chapter 436 or the trust agreements is anyone other than the trustee given discretion to oversee distributions from the trust.  Indeed, both Chapter 436 and the trust agreements obligate the trustee only to distribute trust principal under three limited circumstances:  (1) death of a

30

beneficiary; (2) cancellation of a pre-need funeral contract by the owner; and (3) cancellation of a pre-need funeral contract by the seller. Trust Agreements ¶ 3.2; *see* Mo. Rev. Stat. § 436.031(1).

Nevertheless, during its tenure as trustee, Allegiant allowed NPS to direct wire transfers out of the NPS Pre-Need Trusts with no apparent justification or supporting documentation evidencing that the transfers were related to death claims or cancellations. Representative examples of transfers of trust principal issued by Allegiant to NPS unrelated to death claims or cancellations include these transactions, which total over $4 million:

- $1,027,463.22 wire from NPS Pre-Need Trust IV to NPS on February 1, 1999;
- $1,069,263 wire from NPS Pre-Need Trust IV to NPS on April 4, 2000;
- $812,995.58 wire from NPS Pre-Need Trust IV to NPS on April 19, 2001;
- $100,000 wire from NPS Pre-Need Trust IV to NPS on March 29, 2002;
- $1,400,000 wire from NPS Pre-Need Trust IV to NPS on December 2, 2003; and
- $677,129.46 wire from NPS Pre-Need Trust IV to NPS on April 2, 2004.

Additionally, Allegiant also wired millions of dollars from the NPS Pre-Need Trusts to Cassity-controlled companies totally unrelated to investments. The following transactions serve as representative examples of wire transfers that were issued from the NPS trusts to or for the benefit of NPS affiliates for which the trusts received no promissory notes or repayments in return, which total another $7 million:

- $711,344.92 wire from NPS Pre-Need Trust IV to NPS Agency on June 30, 1999;
- $2,611,978.55 wire from NPS Pre-Need Trust IV to Memorial on September 29, 1999;
- $663,753.11 wire from NPS Pre-Need Trust IV to NPS Agency on September 1, 2000;
- $112,000 wire from NPS Pre-Need Trust IV to Forever on January 7, 2002;
- $1,800,000 wire from NPS Pre-Need Trust IV to Memorial on December 11, 2002;
- $250,720.75 wire from NPS Pre-Need Trust IV to Texas Forever on December 17, 2002;
- $215,000 wire from NPS Pre-Need Trust IV to Lincoln Heritage Corporation on July 18, 2003;
- $52,530 wire from NPS Pre-Need Trust IV to Hollywood Forever on January 23, 2004;
- $582,592.60 wire from NPS Pre-Need Trust IV to Forever Marin on March 23, 2004.

Also, Allegiant wired money to and from NPS Pre-Need Trust IV to various Cassity-controlled companies for which no promissory notes or repayments were received by the trust until well after Allegiant had resigned as trustee. Because Allegiant allowed these companies to siphon these funds away from the trust without requiring that promissory notes or some form of

asset be provided to Trust IV in return, these proceeds were never repaid in full to the trust. The following transactions serve as representative examples of wire transfers issued by Allegiant to Cassity-owned companies for which promissory notes and repayments were not received by the trust until well after Allegiant's resignation as trustee, which total over $4.7 million:

- $150,000 wire from NPS Pre-Need Trust IV to Texas Forever on November 25, 2002;
- $2,000,000 wire from NPS Pre-Need Trust IV to Lincoln Memorial Services on January 8, 2004; and
- $2,600,000 wire from NPS Pre-Need Trust IV to Lincoln Memorial Services on January 15, 2004.

At no point did Allegiant attempt to ensure that these distributions complied with the law or the trust agreements. Indeed, Allegiant believed that it "was not in a position to second guess" the directives that it received, Morisse Dep. 206:20-22, and provided that, if "the direction came in the form of the fax direction," Allegiant would ensure that the funds were "wired as directed." *Id.* at 208:5-8.

While Allegiant may not have exercised authority over "investment decisions," per se, it was bound as a fiduciary to ensure that distributions from the trust were proper. This power lies at the heart of a trustee's obligations – exercising independent judgment and control on behalf of beneficiaries over trust assets. *Cf.* Mo. Rev. Stat. § 436.031(2) ("The trustee shall exercise such judgment and care . . . [as] men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs . . . . "). And by refusing to exercise this oversight, Allegiant allowed the trust corpus to be pillaged by the pre-need sellers, in violation of Allegiant's fiduciary obligations. Hence, in my professional opinion, Allegiant failed to use in performance of its duties the care and diligence employed by a reasonably competent trust administrator. Nothing in Chapter 436 or the trust agreement gives the investment advisor the authority to direct distributions of either principal or income or to delegate those rights to the pre-need seller.

Furthermore, even if Allegiant could cede this authority to the investment advisor – which it could not – Allegiant was at least obligated to ensure that the directives were coming, in fact, from David Wulf. However, by accepting the purported "Delegation Letter," Allegiant consented to accepting directions from "Wulf, Bates & Murphy, Inc. *or National Prearranged Services, Inc.*" Ex. 185 (emphasis added). And so long as David Wulf's name appeared on the CC'd line of the wire transfer form, Allegiant never took a single step to confirm that David Wulf actually was directing the outgoing wire transfers or that he was even receiving the wire transfer forms. *See* Morisse Dep. 205:16-25.

David Wulf's testimony demonstrates that NPS employees Randy Sutton and Angie Hall were the parties responsible for directing most or all wire transfers out of the NPS trusts while Allegiant was trustee. Wulf Dep. 436:7-9. And Mr. Wulf agreed that he "did not typically learn

32

that the wire had taken place until after it occurred." *Id.* at 436:15-17. Allegiant would have known this had they made the most rudimentary of efforts to verify Mr. Wulf's authority before complying with unilateral directives from Mr. Sutton and Ms. Hall. However, Allegiant did not "discuss[] with Wulf, Bates & Murphy regarding review of the fax notice received by anyone internally in the bank." Morisse Dep. 357:22-24.

Allegiant had an obligation to oversee distributions made from the trust. It is my opinion that it did not do so. And the purported "Delegation Letter" simply documents Allegiant's failure to pay attention to what was actually going on.

### (3) Failure to Protect Value of Trust Assets

Part of a trustee's fiduciary obligation to protect the trust corpus is to ensure that trust value is not dissipated through unnecessary indebtedness. Allegiant's failure to (1) prevent tens of millions of dollars in policy loans; (2) ensure that trust assets were prudently invested; and (3) prevent or secure trust debentures fell below this obligation, under the circumstances.

#### (a) Failure to Prevent Unnecessary Policy Loans

NPS borrowed millions of dollars against the life insurance policy assets of the NPS trusts during the period in which Allegiant served as trustee. *See, e.g.,* Morisse Dep. 614:25-615:10. Allegiant's employees acknowledged – and I agree – that such loans decrease the amount that will be paid out on an insurance policy upon death. *See id.* at 586:24-587:5; Markow Dep. 654:4-9.

Richard Markow, President of Allegiant Trust Company, admitted under oath that NPS taking hundreds of thousands of dollars out of trust assets via policy loans "could potentially be a red flag." Markow Dep. 349:14-350:9. Also, the loans were being taken by the pre-need seller, who had an interest in taking money from the trusts. Given the highly suspicious nature of these loans, Allegiant should have made further inquiries. Yet, Allegiant saw no need to do any investigation into these loans; they simply paid the loan amounts as directed by the Cassitys. *See* Morisse Dep. 577:7-13; Markow Dep. 147:20-23.

Even if Allegiant were unaware of the policy loans, it received ample notice that policy loan proceeds were being transferred into and out of the NPS trusts. For example, NPS routinely sent wire transfer forms and other documents to Allegiant which clearly identified policy loans as the description for funds moving through the trusts. *See, e.g.,* Exs. 190, 191, 187, 3437 at 267. Allegiant also would have known policy loans were being taken against the trusts' assets had the trustee properly: (1) received and monitored the cash values of the Lincoln policies on a month-to-month basis; (2) reviewed and documented the purpose for incoming deposits made to the NPS trusts; and/or (3) reviewed and documented the purpose for outgoing transfers of funds issued from the NPS trusts. Yet, as has been discussed, Allegiant did not require proof or

33

explanation to support any disbursement request, nor did it independently keep records regarding the policies. Given the "red flags" associated with these transactions, this was inexcusable.

Had Allegiant taken proper steps to maintain control over these life insurance policy assets, Allegiant would have easily recognized the existence of the policy loans. However, Allegiant made no efforts to put into place safeguards to prevent loans from being taken against trust life insurance assets. *See* Markow Dep. 192:20-193:4. In my opinion, this fell below the level of care required of trustees in the industry.

### (b) **Failure to Prevent Improper Transactions**

A trustee is obligated to protect the trust corpus by using reasonable efforts to ensure that trust assets are not being fraudulently depleted. In addition to policy loans, I have identified at least three other instances in which Allegiant should have recognized that trust assets were being used fraudulently. This included: (1) investments made in NPS-affiliated stock; (2) purchases of Forever stock at clearly inflated prices; and (3) owning insurance assets by a wholly-owned insurance company. Given Allegiant's experience with NPS and Forever, Allegiant should have been suspicious of these transactions. By failing to raise any questions about the propriety of these transactions, Allegiant did not use reasonable efforts to protect the trusts' corpus.

### (i) *Investments in NPS Affiliate Stock*

When Allegiant's tenure as trustee of the NPS trusts began in August 1998, NPS Pre-Need Trust IV held no investments in NPS affiliates other than the trust's Lincoln life insurance policies. However, two months after Allegiant's trusteeship began, Allegiant allowed a large portion of Trust IV's marketable securities to be liquidated, and the resulting proceeds were used to purchase stock in NPS affiliates. For example, between October 1998 and November 1998, Trust IV purchased over 250,000 shares of NPS affiliate stock using nearly $1,600,000 in proceeds obtained through liquidating the few marketable securities that were held in the account. *See* SDR0103846 at 857-860.

Allegiant continued to allow Trust IV to purchase stock in NPS affiliates over the next six years, and in May 2004 Allegiant transferred 359,100 shares of NPS affiliate stock to Bremen. However, when the stock was transferred to Bremen in May 2004 it was worth only $2 per share. *See* BBT009242 at 250; WUD046204; WUD046205; WUD022860. However, the Trust IV statement listed these shares as having a value of $6.025 per share. *See* BBT009242 at 245.

Allegiant was required to ensure that Trust IV's assets were prudently invested in its role as trustee. In August 1998, when Allegiant took over as trustee of NPS Pre-Need Trust IV, Allegiant should have evaluated the risk associated with the lack of diversification of Trust IV's asset portfolio. This asset allocation, which consisted of 96.4% of all Trust IV assets being in the form of Lincoln life insurance policies, should have been an area of concern to Allegiant.

34

Even more concerning to Allegiant should have been the investment of trust assets into entities that were closely affiliated with NPS. Because the NPS trusts were set up to shield the beneficiaries' money from NPS' potential insolvency or misconduct, Allegiant should never have permitted the assets to be invested in subsidiaries of NPS. This was tantamount to deliberately thwarting the statutory purpose of the trust.

### (ii) Purchases of Stock from Forever Enterprises at Inflated Prices

In November 1999, Forever Enterprises opened a custody account at Allegiant and funded the account using $3 million borrowed from Lincoln. SDR0237328. Herb Morisse was the account administrator and was aware that Lincoln served as the source of the $3 million that had been deposited into the Forever Enterprises Custody Account. *See* AB_003-001977.

In November and December 1999, Forever Enterprises purchased various securities in the custody account using the $3 million borrowed from Lincoln. *See, e.g.*, SDR0237328. A year later, however, Forever realized a significant loss on many of these securities held by Allegiant in the custody account. At this point, in November 2000, Forever Enterprises began selling these securities to NPS Pre-Need Trust IV. As representative examples:

- On December 1, 2000, Sutton and Brent Cassity directed Allegiant to transfer 2,500 shares of Dell common stock from the Forever custody account to Trust IV in return for $124,837.50. AB_003-001272 at 298. On the same day, December 1, 2000, Allegiant permitted Trust IV to purchase these 2,500 shares of Dell from Forever for $124,837.50. AB_003-001630 at 705; AB_004-001986 at 2043. Although Trust IV was directed to purchase these Dell shares from Forever at a price of $49.93 per share, the shares had a market value of only $18.44 on December 1, 2000. The resulting loss to the trust was $78,725.

- Two weeks later, on December 14, 2000, Allegiant permitted Trust IV to purchase 5,000 shares of Conseco common stock from Forever for $100,150. Although Trust IV was required to purchase these Conseco securities at $20 per share from Forever, the shares had a market value of only $13.18 as of December 31, 2000 according to Allegiant's trust statements. AB_004-001986 at 2017. The resulting loss to the trust was $31,800.

- On December 20, 2000, Allegiant permitted Trust IV to purchase Forever's 7,500 shares of E-Trade Group stock for $202,968.75. AB_003-001630 at 705. Although Trust IV was forced to purchase these E-Trade Group shares for $27 per share, the shares had a market value of only $7.25 on December 20, 2000. The resulting loss to the trust was $148,125.

- On December 28, 2000, Allegiant permitted Trust IV to purchase Forever's remaining 2,500 shares of E-Trade Group common stock for $67,656.25. AB_003-001630 at 701.

35

Although Trust IV was required to purchase these E-Trade Group shares for $27 per share, the shares had a market value of only $7.47 on December 28, 2000. *Id.* The resulting loss to the trust was $48,825.

By directing these four, highly improper transactions, the Cassitys looted Trust IV of a total of $370,475 with the assistance and acquiescence of Allegiant.

Since 2001, Allegiant knew that Forever – the seller of the stock – and NPS – the pre-need seller – were affiliated. *See* Morisse Dep. 185:3-8. Yet, it raised no concerns over the high chance of self-dealing associated with these transactions. In my experience, a reasonably prudent investor would not have permitted such investments, given the circumstances.

Even more shockingly, Allegiant administered both the custodial account from which the stocks were being sold and the purchasing trust. Indeed, the same Allegiant employee administered each. If anyone was in a position to know the circumstances of the transactions – that it followed a significant loss in the value of the same stocks held in the custody account – it was Allegiant. A simple review of the statements of each account would have been sufficient to raise concerns about the sales prices of the stocks. Yet, Allegiant did not take these most rudimentary of actions.

Given the close affiliation, a prudent trust administrator would make some attempt to independently value the stock. But Allegiant did not do this, instead choosing to blindly rely on NPS' valuation. In an era of instantaneous internet access to stock trading values, this failure to take any action to value these stocks is inexcusable. It is my professional opinion that a reasonably prudent trustee – which Allegiant was duty-bound to be – would have made some effort to ensure that trust assets were not being squandered through stock trades that were less than arm's length.

As a general rule, bank trustees are under extremely strict rules that prevent so-called "crossing trades" from being conducted between accounts for which the bank is trustee. Under certain circumstances, there may be instances in which one trust may need to sell the shares of Company X to raise cash and another trust may at the same time be buying shares of Company X. Such trades are allowed if, and only if, the independent decisions are prudent in both accounts, AND if, and only if, the bank permits the sale of shares from one trust to another at a price which demonstrably injures neither trust, the crossed trade is permissible. In such circumstances, the trustee must document that the price used was either the average price for the trading day, or the closing price, which both trusts could have obtained in the open market.

The fact that Allegiant permitted the Cassitys to direct trades at non-market prices without such safeguards is itself a serious breach of fiduciary duty owed to the pre-need beneficiaries. By allowing the Cassitys to direct these trades, Allegiant breach of fiduciary duty ultimately resulted in a loss of $465,679.73 to Trust IV. *See* NCB-001910 at 930; NCB-002154 at 170; NCB-001822 at 854; AB_004-000431 at 447. That the trades were accomplished in

36

every case to the benefit of Cassitys and to the detriment of the NPS trusts is a gross violation of the duty of care.

### (iii) Use of Wholly-Owned Life Insurance Company

The NPS Pre-Need Trusts purchased more Lincoln policies during Allegiant's period as trustee than during any other trustee era. When Allegiant accepted NPS Pre-Need Trust IV from Mercantile in August 1998, Mercantile reported the value of Trust IV's Lincoln policies as supposedly $48 million. SDR0245389. In May 2004, Allegiant transferred what it claimed to be over $131 million worth of Trust IV Lincoln life insurance policies to Bremen. SDR0084983.

At the most fundamental level of oversight, Allegiant should have questioned the concentration in any one insurance company, let alone in a Cassity-controlled company. Lincoln was either poorly-rated or not even rated by most prominent insurance ratings services between 1998 and 2004. *See* Exs. 650 and 3474. However, nothing that I have reviewed suggests that Allegiant ever reviewed a single ratings service in an effort to investigate Lincoln's ratings or financial stability. *See* Markow Dep. 156:11-157:25. In light of the fact that Lincoln life insurance policies made up the bulk of the trusts' assets during Allegiant's tenure as trustee, Allegiant should have performed *some* type of investigation – however minimal – into Lincoln's reputation, financial condition, and/or industry rating to confirm the lack of diversification of trust assets and purchase of Lincoln policies would not have a negative impact on the policyholders and the trust beneficiaries.

Further, Allegiant's trust employees learned at some point in or before 2001 that NPS and Lincoln shared common ownership and control. *See* Ex. 146; Morisse Dep. 185:3-8. Allegiant should have recognized the common ownership and control of NPS and Lincoln was a red flag. This common ownership and control made it foreseeable to Allegiant that the Cassitys would have access to the life insurance policies and could potentially have the ability to manipulate the policies' terms. Allegiant should have recognized the potential danger to the trusts' beneficiaries as a result of the affiliation between NPS and Lincoln and taken *some basic* precautionary measures to protect the beneficiaries' interests. However, Allegiant failed to take even the simplest of remedial steps to protect the trusts' beneficiaries upon learning that NPS and Lincoln shared common ownership and control, including taking physical custody of the trusts' life insurance policies.

Allegiant, as trustee of the NPS trusts, was required to ensure that the trusts' assets were prudently invested. Allegiant failed to meet this requirement by permitting the vast majority of all Missouri consumer money deposited into the NPS trusts to be invested in Lincoln policies. By allowing the trusts to invest almost exclusively in NPS' poorly-rated and affiliated life insurance company rather than requiring diversification of trust assets, Allegiant failed to properly protect and preserve the trust assets. Allegiant also failed to take proper precautions upon learning of the affiliation between NPS and Lincoln to protect the interests of the trusts'

37

beneficiaries.   Doing so was wholly inexcusable by industry standards and clearly violated Allegiant's fiduciary obligations.

### (c)   Failure to Properly Respond to the Use of Debentures

Even where a fiduciary may not have portfolio management responsibility, it has a duty to see that the assets are suitable to the purpose of the trust.   For this reason, a trustee is responsible for collecting principal and interest that would come due from debentures that are trust assets.   However, in my opinion, according to the record reviewed, Allegiant's conduct failed to meet this professional obligation.

There is no evidence that Allegiant took any steps to understand the nature or purpose of the debentures held in the NPS trusts at any point during its tenure as trustee.   That NPS essentially funded the trust with its own I.O.U's should have been a red flag.   Despite receiving and signing many of these debentures, there is no evidence that Allegiant questioned this practice or even understood what was taking place.   Allegiant, therefore, facilitated this scheme by assisting NPS in the creation and booking of new certificates of debenture as assets of NPS trusts.   NPS was supposed to be adding cash received from consumers.   Instead, Allegiant allowed them to add unsecured debt of NPS.

Additionally, Allegiant allowed the trust to accept funds that were "rolled over" to NPS. While NPS was required by law to deposit these funds into the trusts, between 1998 and 2004 it was commonplace for NPS to fail to deposit these funds in the trusts and instead issue debentures for their value.   Allegiant made no objection to this practice.

These practices clearly did not comply with the trustee's statutory obligations to "accept all deposits" as required under Missouri law.   *See* Mo. Rev. Stat. § 436.031(1).   Thus, NPS withholding money owed to the trust violated Chapter 436.   Therefore, Allegiant, in allowing this practice, violated its fiduciary duty to ensure all trusts were administered legally.

Further, even if NPS could have "funded" the trusts through indebtedness – which I do not agree with under the circumstances – Allegiant did not require NPS to secure this increasing indebtedness.   Permitting the pre-seller to fail to fund the trust – as Chapter 436 and the trust agreement require the seller to do – without making *any* attempt to determine if anything backed up this obligation left a substantial portion of trust assets at the whim of the NPS' desire to pay. This risk was recognized by Allegiant's own banking department which declined to extend loans to Forever – NPS' close affiliate and sister company – during this same time. *See* Morisse Dep. 224:22-225:4.

Once again, the fundamental reason for the very existence of the pre-need trusts was thwarted by the trustee whom the statute intended to be the guardian of the beneficiaries' interests. The trustee permitted the seller of pre-need contracts to borrow money from the trusts without any security and without so much as an inquiry into the propriety of this kind of

transaction. Not only does it fail to meet even a minimal test of a fiduciary's duty, it constitutes willful negligence in the failure to protect the assets and the interests of all of the beneficiaries.

### iii) *M&I/SOUTHWEST* (COLLECTIVELY, "M&I")

Like the other Trustee Defendants, M&I utterly failed to protect, preserve, control, and hold trust assets during its tenure as trustee. Among other things, M&I (1) allowed investment in a Cassity-controlled life insurance company, (2) failed to obtain custody or control of trust assets, and (3) failed to ensure that debentures owned by the trusts were secured or repaid.

### (1) *Use of Wholly-Owned Life Insurance Company*

M&I accepted fiduciary responsibility of the various trusts at issue in this litigation, which had a purported market value of approximately $220 million. Pisarkiewicz Dep. 127:10-12. Of this $220 million in supposed value, $207 million was held in life insurance policies, representing 94% of the total. *Id.* at 127:13-15. All of these policies were Lincoln life insurance policies.

M&I knew that Lincoln, the insurance company that supposedly was insuring much of the trusts' assets, was intimately involved in Forever and NPS. Two M&I banking employees, Dino Cannella and Andrew Schoeck, each knew that Forever, NPS, and Lincoln all were owned by the same parent company. *See* Cannella Dep. 96:6-11; Schoeck Dep. 33:24-34:9. Indeed, in January of 2005, Southwest Bank created an "Existing and Proposed Financing" memorandum for "Forever Network, Inc.," which included a chart of Forever's business relationship with Lincoln and NPS. Ex. 76 at 1, 5. This memorandum was circulated and discussed extensively by the members of the bank's influential loan committee. Schoeck Dep. 70:1-71:2. And in particular, the bank's loan committee was aware during M&I's trusteeship that Lincoln and its parent Memorial "wr[o]te the policies which fund prearranged funeral contracts sold by [NPS]." Ex. 76 at 5; Schoeck Dep. 73:3-8. Thus, the banking side of M&I's affiliated operation clearly knew that Lincoln, and its parent Memorial, were both deeply intertwined with Forever and NPS and selling policies to supposedly independently back Forever and NPS trust assets.

M&I argues that its trust administration employees did not – and could not – have known about the relationship among Lincoln, Memorial, Forever, and NPS. Yet, M&I is unable to explain why this is the case. *See also* Section (VI)(A)(i)(3) *above* (discussing the limited purposes of the so-called "Chinese Wall"). In actuality, Southwest Bank's 30(b)(6) witness testified that no policy prevented M&I's banking side from sharing relevant information with its trust administration side. Southwest Bank 30(b)(6) Dep. 117:18-118:4. This is wholly consistent with the true nature of the so-called Chinese Wall discussed above.

Further, cross-selling of banking services is encouraged in the banking industry, as are discussions between bankers and trust administrators about prospective trust accounts. Roberts Dep. 37:25-38:8. And Ms. Roberts, who served as an M&I compliance officer, recognized that

39

there was nothing wrong with the banking side talking to the trust side about a prospective trust account. *Id.* at 38:9-19. Indeed, Ms. Roberts understood that sharing of information actually enhanced M&I's ability to "serve [its] customer, [and] help make their lives easier [and] better." *Id.* at 39:20-40:6. In short, the sharing of basic client information, such as the relationship among Lincoln, Memorial, Forever, and NPS, was a "benefit to both the client and … the bank [and] trust company." *Id.* at 40:7-8.

Ms. Roberts was aware that M&I's trust administration side (i.e. M&I Trust Company) had clients with banking relationships with M&I's banking side (i.e. Southwest Bank). *Id.* at 37:13-16. In fact, Andy Schoeck, M&I's banking employee, actually "suggested that [M&I's trust administration side] talk to the Forever[-]NPS relationship to try and strengthen the relationship that he had with the existing client on the bank side." *Id.* at 43:23-44:2. And, as previously discussed, M&I's trust side waived its customary due diligence and "know your client" processes as to the trusts at issue because M&I's banking side "had done the due diligence" and had "already made the determination." *Id.* at 107:2-15.

M&I as a collective institution clearly knew that all but 6% of the trust assets were being "insured" by companies that were financially intertwined with Forever and NPS. No prudent trustee would permit such concentration in any investment. Furthermore, M&I customarily shared information between its banking and trust administration side. Had M&I's trust administration side performed its due diligence – or asked to see the documents produced as a result of the bank side's due diligence – the impropriety of the relationship would have been obvious. Failing to perform even the most basic pre-acceptance review does not absolve M&I of its fiduciary responsibilities.

### (2) *Failure to Take Custody and Control of Trust Assets*

M&I recognized, in M&I's own words and actions, that a trust must have custody and control of trust assets. M&I acknowledged that, as trustee, it was the owner of the trust assets, including the insurance policies. M&I 30(b)(6) Dep. 137:23-138:5. Further, Ms. Pamela Roberts, the M&I administrator of the trusts, believed that M&I had a responsibility to care for the trust assets. Roberts Dep. 226:19-22. And Ms. Roberts believed that M&I "could only take care of the assets that [M&I] had control over." *Id.* at 227:9-10.

Despite these obligations, M&I and its employees freely admitted that it neither attempted to obtain, nor actually obtained, custody or control of the principal assets, the insurance policies. *See, e.g.,* M&I 30(b)(6) Dep. 231:13-15; *id.* at 234:12-15; Roberts Dep. 203:7-9. Nothing suggested that M&I could adequately receive these assets upon assuming its fiduciary duties. The prior trustee did not transmit the insurance policies to M&I, despite it being standard practice for a trust company to transfer all of a trust's assets to its successor.

M&I understood how to control trust assets properly, and it had numerous ways to do so. At the time it managed the trust assets, M&I was a participant in the industry's central securities

depository for actively traded securities, Depository Trust Company. *See* BMO Harris Bank 30(b)(6) Dep. 154:10-23. DTC hold trillions of dollars worth of assets in its secure vault and provides daily reconciliations to all its members. Even in those cases where sending the asset to the depository was either unnecessary or impossible, M&I still secured the physical asset – including life insurance policies – by depositing them in a safety deposit box or on-premises vault. *Id.* at 155:16-156:2. Thus, M&I had both the custom and the ability to secure physical assets. Yet, it unjustifiably failed to do so here.

Furthermore, M&I policy required trust administrators to obtain "custody of all . . . insurance policies over which [M&I] acts as a fiduciary or agent."[11] *Id.* at 69:9-17; Ex. 214 at 69. While M&I's company policy specified a method for seeking an exception to this requirement, the record is devoid of any attempt by the trust department to obtain an exception, nor is there any record of a formal decision of management to grant such an exception. Instead, it appears that, as a matter of convenience, the trust administrator created an undocumented, unstudied, and unreliable exception to the requirement of trust department control of the assets. This was incongruous with M&I's professional obligations as a fiduciary. It was incumbent on M&I to establish control of the insurance policies. By failing to do so, M&I failed to meet industry standards, violated its own policy, and did not satisfy its fiduciary obligations.

M&I's apparent acceptance of the Custody Agreement and the Delegation Letter violated its duties. It appears that the bank made no effort to determine the appropriateness of the delegation, whether it was permitted under the law and whether NPS had correctly, competently or honestly performed under the agreements.

### (3) *Failure to Ensure that Debentures Owned by the Trusts Were Secured or Repaid*

It is a routine responsibility of a fiduciary to properly service debt instruments held in a trust, whether they be actively traded notes and bonds or unique debt instruments owned by the trust. Hence, it is a trustee's responsibility to establish and adhere to a process for anticipating principal and income payments that are associated with the debt instrument and to monitor actual payments. This obligation was understood by M&I employees. *See* Pisarkiewicz Dep. 164:6-19. And M&I employed people with expertise in promissory note valuation, and had the operational mechanism in place, *see* BMO Harris Bank 30(b)(6) Dep. 149:13-17, for this reason

Nevertheless, M&I shirked these obligations and failed to collect payments on trust debentures. For example, after assuming fiduciary responsibility for the trusts, M&I determined that a $14 million debenture in one of the trusts lacked both an amortization schedule and an interest payment cycle. Roberts Dep. 169:7-12. When Ms. Roberts attempted to locate an

---

[11] While BMO Harris's 30(b)(6) witness tried to assert that this bank policy was limited to insurance policies held in Irrevocable Life Insurance Trusts ("ILIT"), no such limitation appears in the bank's policy manual. BMO Harris Bank 30(b)(6) Dep. 77:8-78:7.

41

amortization schedule, in order to determine interest owed to the trust, Randy Sutton of Forever and NPS declined to provide a schedule. *See id.* at 175:15-19. Instead, Mr. Sutton unilaterally determined how much interest was owed to the trust. *See id.* at 175:15-176:9. Given the size of the notes and the fact that these transactions were not arm's length, M&I recognized that there were "red flags" that indicated that the promissory notes were "inappropriate investments." M&I 30(b)(6) Dep. 268:15-269:9. However, M&I made no attempt to independently determine either the principal or the interest owed to the trust – conduct that M&I bank-side employee Dino Cannella agreed was "unacceptable." Cannella Dep. 189:1-4. It is my opinion that this falls below the standard required of a trustee in the industry.

M&I's failure to meet its fiduciary obligations are not limited to the amortization schedule. Even after Mr. Sutton unilaterally determined what was owed on the debenture, he declined to send this amount to the trust. Instead, he made a "phantom payment" by asking M&I just to "assume" that he sent the interest owed to the trust. Roberts Dep. 177:8-12. While this practice may be used when the sole beneficiary and debtor are the same, this procedure was inappropriate here. As has been discussed, several "red flags" made M&I aware of irregularities associated with the debentures, which should have motivated M&I to require cash payments to secure the value of the trust. Also, the purpose of the trusts was to secure money from pre-need funeral contracts. Hence, NPS and Forever were not the only parties with an interest in the corpus in the trust. Allowing the Cassitys to thwart the clear purpose of the trust through "phantom payments" was wholly inappropriate under these circumstances.

Even more egregiously, M&I was aware while it was trustee that the $14 million debenture was "completely unsecured;" yet, M&I "made no attempt to figure out if there was anything backing up" the debenture. M&I 30(b)(6) Dep. 298:20-299:1. Especially once NPS failed to pay the debenture when it was due, *see* Pisarkiewicz Dep. 319:15-19, M&I should not have permitted such a large percentage of the trust's assets to be unsecured.

The unreasonableness of M&I's actions is compounded by M&I's repeated internal evaluations of the Forever trusts, many of which determined that the types of investments in these accounts were "inappropriate for th[o]se trusts." M&I 30(b)(6) Dep. 261:16-21. Hence, M&I was on notice that there were potential problems with the investments in the trusts.

*iv)* **THE IOWA TRUSTEE DEFENDANTS**

Like the Missouri Trust Agreements, the Iowa Trust Agreement requires the trustee to protect, preserve, control, and hold trust assets during its tenure as trustee. Iowa Trust Agreement ¶ 3.1. Yet, during their trusteeships, the Iowa Trustee Defendants utterly failed to do so. In particular, all of the Iowa Trustee Defendants failed to establish control over trust assets and allowed trust funds to be used to purchase insurance policies from a Cassity-controlled company in violation of Iowa law.

42

### *(1) BANK OF AMERICA*

BOA was the first Iowa Trustee Defendant to purchase Lincoln policies using funds from the Iowa Trust. Although BOA's internal policy manual required the bank to book all assets purchased by the trust, *see* BOA-004735, BOA never recorded the Lincoln policies as assets on its trust statements or took custody or control of the policies purchased by the trust. SDR0241369; BOA 30(b)(6) Dep. 49:3-10, 56:4-56:7. The record shows that BOA believed that NPS, and not the Iowa Trust, was the owner of the policies. BOA 30(b)(6) Dep. 60:14-16. Overall, it appears from the records examined, that BOA never understood the purpose of the trust, why the Iowa pre-need statute required a bank trustee, or that its role as trustee was intended to protect the beneficiaries' interests against those of the pre-need seller.

Evidence of the latter purpose is clear in the Iowa Pre-Need Statute, which prohibits a trustee from "invest[ing], directly or indirectly, in a seller's business operations." Iowa Code § 523A.203(6)(c). BOA should have know it was doing so because it had in its possession a June 28, 2002 print-out from the NPS website stating that NPS is "affiliated with Lincoln Memorial Life Insurance Company, a 35-year-old business." Ex. 512. BOA also had a corporate organizational chart dated September 17, 2002, which illustrated the common ownership of NPS and the two insurance companies. Ex. 511. Another organizational chart in BOA's possession contained descriptions such as "NPS receives insurance commission on business" and "NPS makes 20% for overhead [and] commission for insurance policy." *Id.*

Owing primarily to the commission and cost-sharing agreements as well as the intertwined nature of the companies, *see, e.g.,* SDR0055990, NPS clearly profited from the trust purchasing Lincoln policies. The record shows that the Cassitys depended on NPS' exclusive purchasing arrangement with Lincoln to keep the fraudulent scheme running. Although BOA knew about the relationship between the companies and their interdependence, it continued to purchase Lincoln life insurance policies, and in my opinion, breached its fiduciary duties.

In December 2002, NPS and Forever executives approached BOA about the possibility of it serving as trustee for other NPS and Forever funeral and cemetery trusts, including the Missouri Pre-Need Trusts. Ace Rowley, a Regional Trust Executive, subsequently wrote Bruce Talen, a Senior Vice President, that "we must proceed carefully here" and "can only accept this business if all of our partner's [sic] (including risk management, legal and tax) sign off on us doing so." Ex. 530. Handwritten notes produced by BOA (presumably related to this potential acquisition) have statements—such as "writing preneed in Austin" and "own 2 insurance companies in Austin"—showing inquiries were made into the Cassity-companies. Ex. 532 at 132.

In January 2003, BOA's Life Insurance Resource Center conducted a rating analysis of Lincoln and Memorial. *See* Exs. 532 and 650. Mr. Tull reported the results of the analysis to Mr. Talen in a January 22, 2003 email stating that "[n]either one of the companies are rated by

43

Moodys, Best or Standard and Poors because of their small size." Ex. 650. Mr. Talen responded that "[t]his seems to be going the wrong way" and he "didn't think we should spend any more time" on the deal." *Id.*

The implications of these assessments were clear. One week later, BOA made the decision not to accept the new business and decided to resign as trustee of the NPS Iowa Trust. On January 28, 2003, after receiving news regarding the decisions, Mr. Tull wrote Mr. Talen and another BOA executive requesting more information regarding the decisions. Mr. Talen wrote back that both decisions were based on "the assets of the trust – life insurance policies issued by NPS' captive 'too-small-too-rate' life insurance company – and an inability to get comfortable with the administrative duties of the trust." Ex. 533. He added that "[t]he moral of the story here is that when you are asked to step in as successor trustee of a $130 million trust, one of the first questions should be 'how is it and how will it be invested?'" *Id.* Five days later, BOA resigned as trustee of the NPS Iowa Trust. Ex. 534.

Mr. Talen hit the nail on the head in his email about the due diligence that should be performed by BOA. This due diligence, however, was not performed until after the first trust business had been booked and BOA had assumed fiduciary responsibility that it later sought to terminate.

### (2) AST

Upon becoming trustee of the Iowa Trust, AST continued the practice of allowing trust funds to be used to purchase Lincoln life insurance policies and never obtained custody of the policies. AST 30(b)(6) Dep. 268:18-23. AST should have known that purchasing these policies constituted an investment in NPS' business operations because, among other things, AST was appointed registrar and transfer agent for Lincoln Heritage Corporation ("LHC"), the predecessor to Forever, in June 1998. SDR-FBI062319. AST continued in this role after LHC changed to Forever and was the registrar and transfer agent for Forever during the period it served as trustee for the Iowa Trust. *See* Ex. 901 at p.11. By serving in this role, AST had access to SEC filings and other documents showing the relationship between NPS, Lincoln, and Memorial. For example, LHC submitted a Registration Statement to the SEC in 1998 which described the affiliations between NPS and the two insurance companies. Ex. 877. The Registration Statement specifically noted that NPS received commissions from the issuance of Lincoln and Memorial life insurance policies. *Id.* at p.9.[12]

AST's involvement in the administration of the trust and oversight of trust transactions was even more limited than Bank of America. Rather than depositing new business funds into trust, NPS would make deposits directly into an account at Merrill Lynch in the name of the trust. SDR-FBI040821; SDRA0136550. Likewise, all transfers of trust funds came from the account rather than from trust. *See, e.g.,* Ex. 894. This procedure effectively deprived the

---

[12] An AST representative even visited the NPS offices in December 2003. *See* Ex. 880.

trustee of any control over deposits to and disbursements out of the trust in flagrant violation of the letter and intent of the trust agreement. On an ongoing basis, Randy Sutton instructed Merrill Lynch to wire trust funds to Lincoln to purchase life insurance policies or to pay renewal premiums. AST was not copied on the wire forms and merely reflected the transactions on their trust statements as unspecified transfers from the "Merrill Lynch Money Market Fund." *See, e.g.,* Exs. 892 and 894. AST produced no documents related to insurance in its document production.

Evidence of AST's limited to almost non-existent role in the management of the trust can also be seen in an April 2004 email between Scott Giuliano and Janis Dudek. Mr. Giuliano served as AST account administrator and Ms. Dudek was a trust officer for Comerica. Ex. 685. After being approached by NPS about the possibility of Comerica becoming trustee of the Iowa Trust, Ms. Dudek contacted Mr. Giuliano to get information about the trust's administration. *Id.* In reference to a question from Ms. Dudek concerning new business deposits, Mr. Giuliano responded that "new money coming in from a client . . . will probably go out to buy a policy," but "[t]he accounting of that stuff is handled at NPS." *Id.* Likewise, he explained that the management of cash within the Merrill Lynch account was "[left] to the broker and [we] just report on what they show us." *Id.*

Mr. Giuliano's email is a stark demonstration of both a lack of knowledge and a seeming indifference to the trust, the trustee's responsibilities, and even the trust's day-to-day operation. At one point, he specifically stated that AST did not receive enough information from Merrill Lynch's "daily download" to understand the activity in the account. *Id.* Mr. Giuliano referred Ms. Dudek to Merrill Lynch for specific questions and told her in a later conversation that AST "'never' compiled" the annual financial institution report required under the Iowa Pre-Need Statute, *see* Iowa Code § 523A.205. CBT-000920. From her communications with Mr. Giuliano and NPS employees, Ms. Dudek concluded that Comerica's only responsibilities as trustee would be to "mirror the activity" in the Merrill Lynch account and record insurance information provided by NPS. *See* CBT-000076.

Based on my professional knowledge and experience in the trust industry, AST is one of the dominant providers of corporate trust and agency services to issuers of debt and equity securities in the United States. It is surprising that it exhibited such a lack of understanding of the pre-need trust in its care, and such disinterest in the responsibilities it undertook. A simple review of the terms of the trust agreement and the Iowa pre-need statute should have alerted AST to the true nature of the trust and the fiduciary responsibility AST undertook when it agreed to serve as trustee.

### (3) COMERICA

As with the other Iowa Trustee Defendants, Comerica allowed trust funds to be used to purchase Lincoln life insurance policies and never obtained custody of the policies. Comerica

45

30(b)(6) Dep. 159:11-160:7.  Comerica knew of the affiliation between NPS and Lincoln prior to becoming trustee.  In March 2004, Wittner, Spewak, & Maylack sent Comerica a fax attaching a 2003 Rosenthal Packman report.  Ex. 671.  The report notes that NPS, Lincoln, and Memorial were affiliates and that the majority of pre-need funds collected by NPS were used to purchase life insurance policies from Lincoln or Memorial.  *Id.* at 287.  More importantly, the report specifically states that "[t]he primary source of revenues [for NPS] is the commissions collected from the remittance of insurance premiums to the affiliated insurance companies." *Id.* at 289.  It explains that when NPS purchases insurance policies from Lincoln or Memorial, the companies "pay [NPS] commissions on the policies purchased." *Id.* at 290.

Like AST, Comerica also had access to the public SEC report filed by Forever in December 2003, which describes various management, cost-sharing, and commission agreements between NPS, Forever, and the insurance companies.  Ex. 879 at p.19.  By reviewing this report, Comerica could have easily deduced that the trust's investment in insurance policies constituted an indirect investment in NPS' business operations.  Nevertheless, Comerica allowed the trust to purchase Lincoln life insurance policies in violation of Iowa law.

Like AST, Comerica simply "mirrored" trust transactions on Merrill Lynch account statements and recorded insurance information supplied by NPS.  This process was memorialized in an internal account information sheet, which instructed that "each month Merrill Lynch (ML) will send us a statement reflecting monthly activity" and "[w]e need to mirror this." CBT-000134 at 135.  It also noted that "[e]ach month Mike Robinson will supply us the value of the Life Insurance Policies" and the information "will be emailed to us as a PDF file identified as TRmmyy.PDF." *Id.*

In sum, none of the Iowa Trustee Defendants appears to have truly understood the nature of the trust, the rights of the beneficiaries, or the reason a trustee was required by the law to stand between the seller of pre-need contracts and the consumers whose money was used to fund the trust.  None of them seems to have known, or even cared, that they were obligated to behave as fiduciaries.  While it may be that in the case of AST and Comerica, the reason for this indifference was that they simply relied on what was done by their predecessor, it is not an excuse for them breaching their fiduciary duty to the beneficiaries to whose interests they were totally blind.  M&I similarly breached its fiduciary duties as trustee of the Iowa Trust, including its purchase of Lincoln life insurance policies in violation of Iowa law.

### B)  *Failure to Maintain Title*

Under both the Missouri statute and the trust agreements, the Missouri Trustee Defendants were required to maintain title to the trust assets.  Chapter 436 requires that "title to all investment assets shall remain with the trustee." Mo. Rev. Stat. § 436.031(2).  This requirement is tied to the provision in the trust agreements that the "trustee retain ownership of trust assets." Trust Agreements ¶ 2.3.  In addition, the agreements provide that when the trust transfers to a successor trustee, "[t]he former Trustee, upon receipt of acceptance in writing of the Trust by the

46

successor Trustee, shall execute all documents and do all acts necessary to vest the title of record in any successor Trustee." Trust Agreements ¶ 4.5.

The Missouri Trustee Defendants failed to maintain title to the trust assets. The Cassitys' widespread practice of taking policy loans against policies held by the trusts divested title from the trusts and placed it with Lincoln, another entity within the Cassity consortium. Allegiant had in its possession forms that specifically stated that as consideration for policy loans, "all rights title and interest in this policy are hereby assigned to [Lincoln] as sole security for the repayment of the loan with interest." *See, e.g.,* National City Bank 072374; National City Bank 074367. This should have put Allegiant on notice that it could not allow policy loans on the policies it held in trust. Instead of exercising heightened vigilance to ensure that no policy loans were issued, Allegiant allowed funds to be transferred into and out of the trust that were clearly labeled as policy loans. *See, e.g.,* Exs. 190, 191, 187, and 3437 at 267. Similarly, and as detailed above, the other Missouri Trustee Defendants should have known about the policy loans occurring during or prior their tenure as trustee and should have taken steps to ensure that they were complying with their obligation to maintain title. The Missouri Trustee Defendants would have known about the loans (there is evidence that one did know about the loans) had they bothered to take possession of these trust assets and related documentation.

As with so many of the other duties the Missouri Trustee Defendants failed to follow, if the Missouri Trustee Defendants had been minimally attentive to this duty—as they were required to be—they would have uncovered much, if not all, of the fraudulent scheme. The Cassitys' reliance on policy loans and the divesting of title from the trusts was all information available to a trustee conducting reasonable vigilance of its trust accounts. The Missouri Trustee Defendants' failure to take steps to ensure that they maintained title was thus another essential element which enabled the fraud.

### C) *Failure to Maintain Adequate Records*

A trustee must maintain clear and accurate records with respect to its administration. *See* Restatement (Second) of Trusts § 172. Chapter 436 similarly provides that "[t]he trustee of a preneed trust shall maintain adequate books of account of all transactions administered through the trust and pertaining to the trust generally." Mo. Rev. Stat. § 436.031(5); *see also* Mo. Rev. Stat. § 456.8-810.1 (2005) (same). The trust agreements entered by NPS and certain Trustee Defendants, and adopted by the remaining Trustee Defendants, also state that the "Trustee shall at all times maintain accurate books and records reflecting all transactions in any way pertinent to the Trust." Trust Agreements ¶ 4.3.

To maintain adequate records, a trustee must know what is in the trust and, if there is more than one beneficiary, the trustee must keep track of each beneficiary's interest. Maintaining such records was essential here because the pre-need trustee was statutorily limited as to what it could distribute in principal and income to the pre-need seller. With respect to trust

47

principal, the trustee of a Missouri pre-need trust may only "distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract" upon delivery of the "provider's receipt." Mo. Rev. Stat. § 436.045. In order to properly do so, the trustee must track what has been deposited into the trust for each consumer and what, if anything, has since been either paid in or disbursed for the beneficiary's account.

None of the Missouri Trustee Defendants kept records of the amount deposited into trust for each pre-need consumer nor did they make any effort to verify that the requested distributions, in fact, were "equal to all deposits made into the trust for the contract." *Id.* Joann Barton, a Mark Twain trust administrator, expressly admitted that Mark Twain did not keep records of the amounts deposited into trust for each contract holder. Barton Dep. 145:17-146:8. Likewise, a document outlining the procedures used by Mark Twain to administer the NPS accounts fails to mention receiving deposit information for individual pre-need consumers. Ex. 318. Christina Moellenhoff, in an administrative memorandum to her supervisor, does not mention that Mercantile received any individual deposit information. Ex. 297.

Similarly, Herbert Morisse conceded in his deposition that the only records Allegiant kept with respect to individual consumers were the "monthly printouts" it received from NPS. Morisse Dep. 332:23-333:14. Those printouts, however, contained information regarding the face value of life insurance policies and did not track the amount deposited into trust for each pre-need consumer. *See, e.g.,* Ex. 466. The two values were quite different, a fact that should have been obvious to Mr. Morisse had he requested the necessary deposit information and complied with the requirements of Chapter 436.

M&I policies made clear that "[n]o disbursement may be made from an account without the appropriate authority in the document . . . and trust law to make the disbursement." Ex. 560 at 17; BMO Harris Bank 30(b)(6) Dep. 102:18-103:11. Yet, M&I also admitted that it made no effort to ensure that trust distributions were, in fact, legally permissible. *See* Roberts Dep. 333:5-334:2. Nor could it – M&I had "no clue" how many consumers had their money in the trusts. *Id.* at 163:12-18. And regardless, M&I never intended to track payments by individual consumers because NPS never provided "any detail for any payments made by consumers." *Id.* at 161:15-17. Hence, M&I policy required it to follow constraints on disbursement authority: statutory and trust agreement requirements. By failing to follow these constraints, M&I also failed to follow its own policies, impermissibly leaving the trust corpus unguarded.

Additionally, nothing in the record indicates that any of the successor Trustee Defendants ever received a list of beneficiaries and the amounts paid in for them, or paid out for their benefit, prior to the date on which the successor Trustee Defendants took over as trustee. As one trust officer said in her deposition, "*I had no starting point.*" Roberts Dep. 273:20-21 (emphasis added). This was a clear violation of the trustee's duty to control trust distributions because, when it was directed to pay out a sum of money for the provision of funeral services, it had no

48

possible way to determine what amount may have been paid in prior to the time of that trustee's stewardship. In other words, the successor trustee had no base record upon which to rely.

When disbursing pre-need funds, the Trustee Defendants had no idea whether or not funds had already been disbursed for a pre-need consumer or whether or not that individual had been previously reported deceased and another funeral already paid for in his or her name. Because the Trustee Defendants failed to obtain information for any of the thousands of beneficiaries of these trusts, they had no way of knowing whether or not someone else's money was used by the Cassitys to pay for that funeral in whole or in part. Multiply this lapse by literally hundreds of such payments a year and it is obvious even to a casual observer that the trusts were totally out of control.

A part of the duty to maintain adequate records includes the duty to correctly value the trust assets. It appears that each Trustee Defendant accepted whatever face value NPS provided for an alleged asset without any due diligence as to its market value. Nevertheless each trustee monthly published a representation of "market value" for the alleged trust assets. The use of the term "market value" on each trust statement was a deliberate misrepresentation in that it purports to reflect that the trustee complied with its obligation to determine market value and drastically overstated the real market value of the assets in question.

### D)  Failure to Comply with Statutory Limits on Income Distributions

Under Chapter 436, when a consumer dies, the trustee is only permitted to pay the pre-need seller "an amount equal to all deposits made into the trust for the contract." Mo. Rev. Stat. § 436.045. Any income made from investing those deposits—whether the investment was in a CD, common stock, or a life insurance policy—could not be paid out to the seller unless the trust was adequately funded to permit income distributions.

Income distributions could be made to the pre-need seller only if the "distribution would reduce the aggregate market value on the distribution date of all property held in the pre-need trust, including principal and undistributed income, below the sum of all deposits made to such trust." Mo. Rev. Stat. § 436.031(3). In other words, every time a Missouri Trustee Defendant distributed income to NPS, the trustee was required to calculate (1) the aggregate market value of all property held in the trust, and (2) the sum of all deposits made to the trust.

All the Missouri Trustee Defendants failed to observe these statutory requirements. First, even though they were only allowed to distribute the deposits that that had been made on behalf of a particular consumer when that consumer died, the Missouri Trustee Defendants routinely paid to NPS the full face value of the life insurance policy backing the contract. So, for example, if NPS deposited $4,000 for Mr. Smith into the trust, and the Trustee purchased a $5,000 life insurance policy, the Trustee would pay NPS $5,000 on the death of Mr. Smith, rather than the $4,000 to which NPS was entitled. The additional $1,000 was required to be treated as income, subject to distribution only if the Trustee completed the calculation required by the statute. Each

49

of these payments was a violation of the Missouri Trustee Defendants' duties under the statute, and depleted the total amount of assets held by the trust.

Even more remarkably, as previously noted, the Missouri Trustee Defendants did not even keep track of individual consumers' deposits. Even though the Missouri Trustee Defendants were only permitted to distribute the sum of all deposits made on a consumer's contract when that consumer died, the Missouri Trustee Defendants did not even know what that amount was. In light of this remarkable dereliction of duty, the Missouri Trustee Defendants were thus literally unable to pay the amount required by statute when a consumer passed away, because the Missouri Trustee Defendants did not even keep track of what amount it had to pay or what funds were actually available to be paid.

The Missouri Trustee Defendants' failure to keep track of consumers' deposits also meant that they were unable to perform the income distribution calculation required by Chapter 436. Chapter 436 requires the Missouri Trustee Defendants to know the sum of all deposits, as well as the market value of all assets in the trusts. The Missouri Trustee Defendants did not know either. Herb Morisse stated that Allegiant treated the *face* value of the life insurance policies as the *market* value of the life insurance policies. Morisse Dep. 339:2-4. Although the Missouri Trustee Defendants were obligated to become knowledgeable about the unique asset of life insurance that made up the majority of these trusts, one does not have to have any sophisticated knowledge about life insurance to see that Mr. Morisse's statement is absurd—a $5,000 multi-pay policy for which only $100 in premiums have been paid would be booked as worth $5,000. Taking face value as market value also fails to account for the possibility that policy loans have depleted the market value of the policies. Also, in the absence of records, the trustees did not even know if the policies were term policies, having little or no cash value.

The Missouri Trustee Defendants' failure to ever perform this income distribution calculation allowed the Cassitys' scheme to continue. Had the Missouri Trustee Defendants performed the calculation, they would have found that the market value of the assets in the trusts (i.e. life insurance policies) were less than the sum of all deposits in the trusts. In other words, if any of the Missouri Trustee Defendants had done what they were obligated to do, at any point in their respective trusteeships, they would have, on their own, found that the trusts were underfunded by millions of dollars. This knowledge would have forced a prudent trustee to take action, including immediately terminating any activity in the trusts until further notice from the trustee, and under the circumstances in this case, would likely have resulted in the freezing of the pre-need trust accounts, forcing the Cassity scheme to come to an immediate halt.

### E) *Wulf, Bates & Murphy*

Multiple Trustee Defendant witnesses admitted in their depositions that by agreeing to be the named trustee of the NPS trusts, their bank or trust company became a fiduciary with respect to the NPS trusts. *See, e.g.,* Harlan Dep. 72:19-73:2; BOA Dep. 30(b)(6) 45:24-25-46:1. As

50

fiduciaries, trustees have at least three separate areas of duties, commonly described in banks as administrative duties, operational duties and investment duties. *See* Harlan Dep. 73:10-20. Even when a bank does not have investment decision-making responsibility, such as investment research and portfolio management, it retains other investment duties and continues to have administrative and operational duties.

A trustee must know and understand the investment goals of the trust. For example, Allegiant's trust manual includes a policy requiring the Trust Committee to review "the investment objective of the account to determine appropriateness." Ex. 60 at 985 (Policy No. 1.01, Procedure No. 5(f)(2)(c)). Allegiant's manual was based on a policy manual from Midwest Trust Company, Morisse Dep. 56:10-57:5, and this particular policy is a standard duty and provision in trust manuals. Although no trust manual was produced by U.S. Bank for Mark Twain, Mark Twain's "Administrative Check Lists" and "Account Acceptance Sheets" indicate that an initial review of the trusts was performed by an internal investment officer and information on investment objectives was provided to the Trust Committee. Ex. 316 at 512, 517; Ex. 590.

Additionally, trustees must ensure that investments are prudent and must regularly and routinely monitor the performance of investments. A trustee is not absolved of all of this responsibility simply because there is an outside investment advisor. For instance, under its trust manual, Allegiant's Trust Committee was required to review its trust accounts to determine, among other things, if growth in the account was appropriate, if the risk tolerance and assets allocation was appropriate, and if the account's liquid assets were sufficient to meet distributions and required account reserves. Ex. 60 at 985 (Policy No. 1.01, Procedure No. 5(f)(2)). Allegiant also generated monthly portfolio review statements for the NPS trusts. Ex. 186. Similarly, even though an investment advisor had supposedly been appointed for the NPS trusts, members of Mark Twain's portfolio review group would annually review the portfolio of the trusts. *See* Harlan Dep. 35:24-36:1. Mark Twain's Administrative Check List and Account Acceptance Sheet for Trust II also describe the investment authority for the account as "shared." Ex. 590.

All of the investment oversight duties and practices mentioned above are consistent with Chapter 436 and with the NPS trust agreements, which incorporate governing Missouri or Iowa law. Chapter 436 requires that an investment advisor be both qualified and independent from the pre-need seller. *See* Mo. Rev. Stat. § 436.031(2). It also provides that even if a truly independent qualified investment advisor is appointed, "[i]n no case shall . . . [trust] assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." *Id.* A trustee must also retain control over trust assets, *see id.*, and has the responsibility to control distributions out of the trusts. *See id.* at § 436.031(1).

At least one of the Trustee Defendants has claimed that the independence required of the investment advisor was independence from the trustee bank, not independence from the pre-need seller. National City Bank 30(b)(6) Dep. 374:8-22. A reasonable trustee reviewing Chapter 436

51

would recognize that the statute is intended to protect consumers from pre-need sellers by inserting a trustee into the relationship. Accordingly, the Trustee Defendants should have been aware of their obligation to protect consumers from abuse or incompetence by the sellers. If any of the Trustee Defendants truly believed that the statute required that the advisor be independent from the bank, that belief was not reasonable. The fact that at least one bank claims to have held such a belief creates serious questions about the reasonableness of its conduct when it supposedly deferred to instructions from the so-called investment advisor.

Some of the Trustee Defendants assert that Mr. Wulf, the purported investment advisor for the NPS trusts, directed the investment management activity, and the Trustee Defendants had no responsibility beyond following his instructions. The Trustee Defendants, however, had the same fiduciary duty to the beneficiaries as any trustee does, whether or not it has the responsibility to perform the portfolio management function. A trustee must determine if the asset mix is appropriate to the trust in question. A trustee must also monitor and assess such attributes of the trust portfolio as diversification and concentration, even if it is not specifically responsible for investment decisions. This requirement is consistent with Chapter 436 which specifically provides that "[i]n no case shall . . . [trust] assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." Mo. Rev. Stat. § 436.031(2).

Even before they became trustees of the NPS trusts, the Trustee Defendants had an obligation to investigate Wulf, the purported "independent investment advisor" for the trusts, to see who he was and what was his relationship with NPS. Even a casual inquiry by the Trustee Defendants would have revealed that Wulf was not independent from NPS and assertions of his independence are not credible. According to the transcript of his trial testimony in his criminal case, Mr. Wulf demonstrated that, far from being independent of NPS, 90% of his time was spent working on the Lincoln and Memorial investment accounts. *United of States of America v. Wulf,* Trial Tr. Vol. XII, p.16, August 21, 2013. In addition, a small portion of his time was spent on NPS Trust IV. *Id.* Therefore, over 90% of his time, and his income derived from the investment management business, came from Cassity-controlled companies. In addition his firm rented space in the same building as NPS, and he and his partner and their families were covered by the medical insurance plan of NPS. *Id.* at 68

Mr. Wulf also testified in his May 1, 2014 deposition, that he did not recommend the use of insurance policies as investments and that he did not direct the transfer of money to purchase policies or pay premiums. Wulf Dep. 439-441. This is contrary to his testimony in the criminal trial, but consistent with his two interviews with McBride Lock in 1994, during which Wulf specifically stated that that he "receives a report from NPS which details all of the policies he is suppose[d] to buy on a monthly basis." Ex. 3249. Day-to-day requests for wire transfers in and out of the trust also came from NPS and not Wulf.

52

In any event, whether Mr. Wulf was involved in investment decisions did not relieve the Trustee Defendants of their duties unrelated to portfolio management, including controlling principal and income distributions. Regardless of who was responsible for making investment decisions for the trust, the Trustee Defendants were still obligated to preserve the trust assets, keep adequate books and records, and comply with other duties under the governing statutes and trust agreements. Each of the Trustee Defendants failed woefully to meet any of these basic trustee obligations.

## VII)   TRUSTEE DEFENDANTS MERCANTILE, ALLEGIANT, BANK OF AMERICA AND M&I FAILED TO DISCLOSE KNOWN PROBLEMS WITH THE NPS TRUSTS

One of the most fundamental duties of a trustee is the duty of loyalty to trust beneficiaries. A trustee is also "under a duty to the beneficiary to use reasonable care and skill to preserve the trust property." Restatement (Second) of Trusts § 176. Trustees possess these duties until all trust assets are transferred to a successor trustee. And in connection with these duties, a trustee must communicate known facts that are reasonably necessary to ensure that the beneficiaries' interests in trust assets are protected. *See id.* at § 173 comment d.

In my opinion, Mercantile, Allegiant, and Bank of America breached their duties of loyalty and to preserve trust property by failing to disclose known problems in the trust accounts. And under the specific circumstances presented in this case, M&I violated these same duties by failing to raise concerns over the successor trustee's appointment, when that very trustee had grossly mismanaged the trusts in the past.

### A) *Mercantile, Allegiant, and Bank of America Failed to Disclose Problems In Trust Accounts*

A trustee is in the best position – and, in fact, is obligated – to monitor transactions involving trust assets. In doing so, trustees gain an intimate familiarity with trust assets that goes far beyond account statements. Indeed, in my experience, institutional knowledge of a trust regularly has an impact on the value of trust assets. For example, trustees learn over time what blend of assets best serves the purposes of the trusts, and trustees often oversee asset allocation with this in mind. By not having this knowledge, a trustee may be less equipped to manage trust assets, and the trust likely will suffer as a result.

Here, a number of the Trustee Defendants failed to alert successor trustees to known problems with the NPS trusts. This knowledge would have brought these problems to the successor trustee's attention more quickly, allowing the successor trustee to take more rapid action to protect trust assets.[13]   A reasonably prudent trustee operating under similar

---

[13] The fact that no successor trustee took steps to remedy problems in the trusts does not alter my conclusion. A trustee's fiduciary duties, which continue unabated until the assets are transferred, are not impacted by the decisions taken by a successor trustee. Thus, a trustee's affirmative violation of its fiduciary obligations is not excused by a successor trustee's subsequent breach of these same duties.

circumstances either would have disclosed the information, in order to protect the trust assets, or would have sought court direction on how to otherwise protect the assets during the transition. By failing to do either while they still had a fiduciary obligation to protect trust assets, Mercantile, Allegiant, and Bank of America failed to satisfy their fiduciary duties.

### 1. *Mercantile*

In part because of suspicious transactions occurring while Mark Twain was trustee, NPS entered into a Consent Judgment with the Missouri Attorney General's Office. U.S. Bank 30(b)(6) Dep. 54:12-55:16. Mark Twain knew about the Consent Judgment by 1994, at the latest, as a bank officer was informed of the Consent Judgment by McBride Lock during their monitoring efforts. *See* Ex. 591.

On July 17, 1998, Randy Sutton of NPS sent a letter to Mercantile removing the bank as trustee of the NPS trusts. Dep. Ex. 307. At no point before or during the transfer of the trust assets to Allegiant did Mercantile inform Allegiant about the Consent Judgment. Mercantile also did not inform Allegiant about the court-ordered monitoring required by that judgment.

Mercantile had ample opportunity to inform Allegiant of the existence of the Consent Judgment. Christina Moellenhoff, the Mercantile trust administrator for the NPS trusts, had multiple conversations with the new Allegiant trust administrator about "providing documents to [Allegiant] or anything that . . . a trustee gives to a successor trustee to continue on with the account." Moellenhoff Dep. 272:12-22. Yet, Mercantile chose not to inform Allegiant of the Consent Judgment.

The Consent Judgment was highly relevant to protecting trust assets. By failing to comply – or aiding NPS in failing to comply – with the Consent Judgment, the trustee could open the trusts' assets to liability from third parties, as well as additional legal action. And at worst, this could have lead to the ultimate seizure of the trusts' assets.

Because knowledge of the Consent Judgment was important to properly protecting trust assets, it is my professional opinion that a reasonably prudent trustee would have informed its successor of the Consent Judgment before relinquishing control of the trusts' assets. By failing to do so under the circumstances, I believe that Mercantile violated its fiduciary obligations.

### 2. *Allegiant and National City Bank*

As has been discussed, Allegiant knew or should have known of various irregularities in administration of the trusts during its trusteeship that materially impacted the trust assets. These included:

- Tens of millions of dollars being wired out of the trusts by NPS to itself and related entities, with no apparent justification or documentation, *see above* Section (VI)(A)(ii);

54

- NPS borrowing millions of dollars against the life insurance policy assets of the trusts during the Allegiant trusteeship, *see above* Section (VI)(A)(ii); Morisse Dep. 614:25-615:10;

- Liquidation of a large part of Trust IV's marketable securities in order to purchase stock in NPS affiliates, *see above* Section (VI)(A)(ii);

- Purchase of stock from a custodial account owned by NPS's sister company, at high-above-market prices, *see above* Section (VI)(A)(ii);

- Investment of a predominant percentage of the trusts' value in life insurance policies from a company that was wholly-owned by NPS's parent, *see above* Section (VI)(A)(ii); and

- Failure to secure debentures owned by the trust and issued by NPS. *See above* Section (VI)(A)(ii).

On November 19, 2003, Allegiant and National City Bank ("NCB") entered into an "Agreement and Plan of Merger," which set out the process by which NCB would merge with Allegiant. Ex. 124, at 1. Less than a month later, Mr. Kantra – NCB's Integration Leader – traveled to St. Louis to meet with the Allegiant trust staff and personnel and "begin the process." Kantra Dep. at 68:14-17; *see* Ex. 570. Four days later, Mr. Kantra circulated a memorandum summarizing the meeting for his supervisor. *See* Ex. 570. Mr. Kantra informed his supervisor and multiple members of the NCB Integration Team committee that Allegiant was "losing big money" on "[t]heir largest trust account," and "the potential fiduciary liability is huge." *Id.* at 1-2. The memorandum concluded that NCB "will likely look to exit this relationship." *Id.* at 2.

As the months progressed, NCB continued with its due diligence, which raised progressively more red flags with regards to the trusts. *See* Kantra Dep. 102:11-103:7. The "National City Wealth Management" document, which was created by Mr. Kantra, marked the risk associated with the pre-need trusts as "extremely high." Ex. 568, p.3; *see* Kantra Dep. 149:14-152:23. And Mr. Kantra was concerned this risk potentially could extend to "the individual account owners" as well. Kantra Dep. 128:10-14.

Mr. Kantra's concerns were confirmed when Jan Sackley, the head of NCB fiduciary risk management, noted that the trusts "could potentially have been a way to launder money." Sackley Dep. 256:1-3. For these reasons, NCB knew that it would seek – and did seek – a successor trustee during the due diligence process. Kantra Dep. 143:8-17; 156:5-8. Yet, even this did not ease NCB's concerns, as Allegiant was the trusts' fiduciary during the due diligence process, *see id.* at 135:12-15, and NCB was "urgen[tly]" attempting to determine if this opened NCB up to future liability." Brantley Dep. 83:19-84:1.

In late February 2004, a group of NCB officials – including Ms. Sackley – conferred with Mr. Morisse at Allegiant regarding the NPS trusts. According to notes of the "Pre-Need Meeting," Sandra Brantley, a member of NCB's legal department, informed Allegiant that NCB was concerned that Allegiant never was informed of the details of the insurance policies or the

55

purchasers of the pre-need contracts.  Ex. 130, p.1.  And of particular note, Ms. Sackley asked –
and discovered – during the due diligence process that NPS was a business affiliate of Lincoln.
*See* Sackley Dep. 326:8-327:7.

Rather than addressing any of these problems, however, Mr. Morisse sought out a
successor trustee, specifically Bremen Bank ("Bremen").  Markow Dep. 608:1-9.  At the time,
Bremen was a very small bank with only $30 million to $40 million in assets under management
and two employees.  *Id.* at 601:9-17, 602:17-19.  The two employees were, Richard Markow,
who had formerly been at Allegiant, and Sylvia Stuart, a trust administrator.  *Id.* at 602:17-19.
Mr. Markow conceded during his deposition that he had no knowledge on how to administer the
NPS accounts, leaving Ms. Stuart to run the entire administration of the accounts.  *Id.* at 605:10-
25.

Within 30 days of Mr. Kantra's first meeting about the trusts in St Louis, NCB had
decided that it was going to refuse to accept the NPS.  And on January 15, 2004, Mr. Kantra
made this official by formally advising Allegiant that it must immediately close all the NPS trust
relationships by March 31, 2004, the legal closing date of the merger.  NCB-026299.  Allegiant
resigned as trustee of the NPS trusts right before it merged NCB, in May 2004.  NCB-003233;
NCB-003232.

Despite the concerns raised by both Allegiant and NCB, Allegiant never attempted to
inform its successor trustee of these very serious threats to the trusts' assets.  As discussed
previously, Allegiant had an affirmative duty to correct these problems while it was trustee.
However, *at very least*, Allegiant had an obligation to notify the successor trustee that these
problems existed, so that the successor trustee could take the remedial measures that Allegiant
had refused to take.  In my professional opinion, when a trustee's failure to inform its successor
of threats to trust assets, *especially* when the trustee refuses to take remedial measures itself, the
trustee violates its fiduciary duties.

It may have been true that Allegiant and NCB wanted to wash their hands of the trusts for
financial and legal reasons.  It also may have been true that disclosing these "red flags" would
have made it harder for the banks to relieve themselves of the trust's assets.  However, this does
not excuse Allegiant's breach of its fiduciary obligations.  A fiduciary must place the
beneficiaries' interests above its own.  And failing to do so does not relieve the trustee of its
obligations; indeed, in my opinion, it independently constitutes a breach of a trustee's duty to
avoid self-dealing.

Further, I do not believe that any lack of clarity about their duties absolves Allegiant or
NCB.  As discussed above, had Allegiant or NCB been unsure that it had the authority to resist
NCB's actions, it could have sought court direction.  Yet, it did no such thing.  A reasonably
prudent trustee cannot allow the complexities of these particular trusts – which Allegiant
believed itself capable of managing when it assumed fiduciary responsibilities – to hinder its

execution of its duties. For these reasons, I conclude that Allegiant and NCB failed to act as is required of a fiduciary.

### 3. *Bank of America*

BOA was well aware that the Iowa Trust was purchasing Lincoln insurance policies – indeed, it began the practice. BOA permitted this, despite possessing print-outs from the NPS website stating that NPS is "affiliated with Lincoln Memorial Life Insurance Company," Ex. 512, and corporate organizational charts showing the common ownership of NPS and the two insurance companies, including one noting that "NPS makes 20% for overhead [and] commission for insurance policy." *See* Ex. 511.

During its due diligence into the Missouri trusts during early 2003, BOA learned that Lincoln's life insurance policies were not prudent investments. In a January 22, 2003 internal email, BOA's internal Life Insurance Resource Center analyzed Lincoln and Memorial, concluding that "[n]either one of the companies are rated by Moodys, Best or Standard and Poors because of their small size." Ex. 650. In turn, this led BOA to conclude that Lincoln and Memorial were "NPS' captive 'too-small-too-rate' life insurance compan[ies]," and BOA had no interest in accepting trust assets consisting of life insurance policies form these companies. Ex. 533.

Noting that taking on the new trust assets "seem[ed] to be going the wrong way," and fearing being "held out to dry," Ex. 650, BOA declined to accept the Missouri and other related trusts offered to them by the Cassitys. Soon after, BOA also resigned as trustee of the NPS Iowa Trust and oversaw transfer of its assets to a successor trustee. Ex. 534. Nothing in the record suggests that BOA made any efforts to notify the successor trustee of what it had found about the trust's life insurance assets.

BOA's own employee says it best: "The moral of the story here is that when you are asked to step in as ... trustee of a $130 million trust, one of the first questions should be 'how is it and how will it be invested?'" Ex. 533. Yet, BOA clearly failed to do this. And having taken on unsafe trust investments, BOA had a fiduciary duty to remedy this. It could not simply unload the assets onto an unsuspecting trustee. But if BOA refused to protect the trust assets, it was *at the very least* under an obligation to notify the successor that the trust held potentially toxic assets. Given BOA's in-depth knowledge of both the risk posed by the life insurance policies and the presence *of these very policies* in the Iowa Trust, BOA could not shut its eyes to the risk. In my opinion, doing so in these circumstances fell below its fiduciary obligations.

### B) *M&I Failed to Disclose Personal Knowledge of the Successor Trustee's Inadequate Management of Trust Assets*

M&I inherited the trusteeship of the Cassity trusts from Bremen Bank ("Bremen"). After inheriting the trusts, M&I discovered that Bremen had managed trust assets in ways that did not

57

meet its fiduciary obligations and unduly risked trust assets.   For example, the trust administrator, Ms. Roberts, discovered that Bremen had failed to receive an amortization schedule with a $14 million debenture held by one of the trusts. Roberts Dep. 169:7-14.  One M&I employee called this conduct "unacceptable," Cannella Dep. 189:1-4, and M&I's 30(b)(6) witness concluded that such conduct was contrary to its "experience" with such debentures "across the board." M&I 30(b)(6) Dep. 273:1-7.  The debentures also were uncharacteristically large, given the overall assets of the trusts, and were not issues by a diverse group of companies – they were all NPS-affiliated entities.  *Id.* at 268:18-269:6.  Of even greater concern, Bremen was unable to provide "appropriate records showing that payments had been made in accordance with the nonexistent amortization schedules." *Id.* at 272:9-13; Roberts 314:13-20.

Additionally, M&I had concerns with the promissory notes that were trust assets. Once M&I "started to see . . . exactly what those notes looked like," they became quite "concern[ed]" with them. M&I 30(b)(6) Dep. at 266:16-20.  In particular, M&I had been unaware that NPS-affiliated entities had taken any money from the trusts, much less the "large amount[s]" that were taken out under Bremen. *Id.* at 267:2-11.

M&I also was aware of other practices by Bremen that threatened or violated a trustee's fiduciary obligations.  M&I knew that Bremen had failed to keep records of how much was deposited into trust accounts for each individual consumer. *See* M&I Trust Company 30(b)(6) Dep. 165:7-18.  Additionally, it knew that Bremen did not have control of the insurance assets that made up a large percentage of the trusts' assets. *See* Roberts Dep. 136:23-138:1.  The investment advisor with whom Bremen worked, David Wulf, showed open and unprofessional disdain to a trustee's authority to oversee and protect trust assets. *See id.* at 138:17-139:22.  And M&I believed that Bremen had first used the misleading phrase "evidence of insurance" on its account records, as a way to supposedly account for assets "without saying necessarily that it's held in [the] vault." *Id.* at 204:15-205:10.

In March of 2006, less than a year after accepting its trusteeship, M&I decided that it no longer wished to serve as trustee. *See* M&I 30(b)(6) Dep. 220:8-22.  After being informed by M&I, *see* Ex. 228, NPS appointed Bremen as successor trustee – the same bank from whom M&I had inherited the accounts. *See* M&I 30(b)(6) Dep. 293:24-294:1. Although Bremen and M&I employees spoke repeatedly during the asset transition process, M&I said nothing about the problems it has noticed in the trusts. *See id.* at 293:24-294:25.  Nothing in the record suggests that M&I ever raised these concerns with the trust beneficiaries or the Board of Embalmers and Funeral Directors.

A fiduciary is under no duty to ensure that a chosen successor is "best-suited" for the appointment.    Nevertheless, if a fiduciary independently possesses information strongly suggesting that a third party will put trust assets at risk, a fiduciary is obligated to – *at very least* – raise these concerns. *See* Restatement (Second) of Trusts § 173 cmt. d (A trustee must "communicate" all "material facts affecting the interest of the beneficiary" that the "beneficiary

58

needs to know for his protection in dealing with a third person with respect to his interest."). While the party with appointment authority may choose to ignore the fiduciary's information, at least the decision will be made with all relevant knowledge.

Under the circumstances presented here, I conclude that M&I breached its fiduciary duty to protect trust assets in its possession by not raising concerns about the assets returning to Bremen. During its brief tenure, M&I uncovered very serious mismanagement by Bremen that threatened trust assets. However, it said nothing to the trust beneficiaries about these concerns. It also chose not to seek court action to protect the trusts' assets, which it had the power to do. Given the extent of this mismanagement, as well as the high likelihood that it would continue after M&I transitioned the assets to Bremen, I believe that failing to say anything was wholly improper.

A fiduciary relationship is not akin to a standard commercial relationship in which each party generally is free to make decisions based on its own best interest. By accepting the role as a fiduciary to the NPS pre-need trusts, M&I obligated itself to act solely in the beneficiaries' best interests. That obligation neither stopped, nor was diminished, when M&I decided that it no longer was willing to serve as fiduciary. If M&I behaved as it did because it thought its own interests were best served by silence, then M&I clearly put self interest above the interests of the beneficiaries.

M&I did not choose Bremen as successor trustee. However, when a fiduciary has clear indications that the *very party* that will be appointed as successor trustee has mismanaged *the same trust assets* in the past, the fundamental duty of loyalty requires some action. And M&I made no attempt – at whatever level – to ensure that Bremen's appointment was prevented, despite with full knowledge of Bremen's past conduct. Therefore, under the particular circumstances here, I conclude that M&I violated its fiduciary obligations by remaining silent about Bremen's appointment as successor trustee.

59

# EXHIBIT A

## Edgar M. Coster

I began my career in the trust and financial services business as a law clerk in 1965 at the firm of Delatour & Miller in Brooklyn, New York while attending law school. In 1966, I joined **The Chase Manhattan Bank, N.A.** in New York as a personal trust administrator while attending law school. My career has involved broad and deep executive and consulting experience in the industry.

- 1969-1972: I served as a personal trust officer responsible for administering accounts of which the Bank was fiduciary, including decedents' estates and both *inter vivos* and testamentary trusts, as well as committeeships of incompetent persons. In this role, I also trained administrators to become trust officers.

- 1972-1974: As a second vice president, I served in a staff role responsible for supervising the evaluation of trust department personnel and wrote position descriptions for over one hundred separate functions in the trust department, including personal trust and employee benefit trust positions, custody, corporate trust and agency and investment management positions at both the managerial and professional level. I also established evaluation and compensation programs.

- 1974-1976: I was Division Executive responsible for all of Chase's custody accounts, which the bank administered for wealthy individuals, family offices, investment managers, and small, family-directed, non-profit entities.

- 1976-1977: I was Division Executive of the institutional custody division, responsible for all accounts administered for corporate and institutional customers including large national charities, private foundations, educational institutions and where the bank served as custodian, but not as trustee, of pension and employee benefit plans maintained by corporate, union and other sponsors.

- 1977-1979: I was head of the Central Marketing Group, responsible for the product development, pricing, marketing and sales of all trust services for individuals and for all fiduciary and agency for the entire trust department.

- 1979-1980: I was Division Executive in the Private Banking Group responsible for all financial services delivered to several thousand high net worth individuals in the personal trust, custody, investment management, tax and banking services. I served on the Personal Trust Committee and the Personal Trust Investment Committee, both accountable to the Trust Committee of the Board of Directors for supervision of all trust and investment activity.

Recruited to **Bankers Trust Company** in New York in 1981, I was responsible for the estate administration, custody, financial planning and cash transaction businesses of the Private Clients Group which served all high net worth individual customers of the bank, as well as groups of custody accounts managed by family offices and independent investment management firms. I also served as a member of the Banks' Personal Trust Committee and Trust Investment Committee.

In 1984, I started a consulting practice. Among other clients, I advised **Metropolitan Life Insurance Company**, later MetLife, on the requirements for establishing a trust company, including advice on the necessary functions and responsibilities of trust, custody and investment businesses, including professional staffing, training, systems, operations, controls and oversight mechanisms and regulatory compliance.

In 1986, I joined **IBJ Schroder Bank & Trust Company**, which had just been acquired by Industrial Bank of Japan. Among other duties at the bank I was responsible for all personal trust, investment and custody services, including client relations, operations and systems. I also served as special assistant to the President of the bank as liaison to senior members of IBJ's management team with respect to investment and trust services, which IBJ was expanding throughout its global enterprise, notably in Europe. I also served as chairman of the Trust Investment Committee for the bank, responsible for oversight of all

# EXHIBIT A

administrative and investment activities in fiduciary accounts and in agency investment accounts. {Increased assets from $5.2 bn to $7.1 bn and increased employee benefit fees by 45 %.}

In 1990 and 1991, as a senior consultant with Sterling Resources, among other assignments, I advised **NatWest Bank** on the sale of its corporate trust businesses in New York, and **MidLantic Bank** of New Jersey on the sale of its personal trust and custody business in Florida.

In February 1992, following the BCCI scandal of 1990-1991, I was recruited to First American Metro Corp. in Virginia to manage all trust businesses of the **1st American Bank, N.A.** in Washington, D.C. and **1st American Bank of Virginia**. As Executive Vice President of both banks I managed all trust, investment and custody business for all individual and institutional clients of the banks. Clients included prominent national union pension funds as well as foreign embassies and charitable foundations headquartered in Washington. I chaired the Trust Investment Committee and was an executive, non-director, member of the Board of Director's Trust Committee. Consolidated D.C. and Virginia banks onto the SEI platform. Instituted special client contact program to retain and increase business. I was personally responsible for direct liaison with regulators of the States of Maryland and Virginia and representatives of the Office of the Comptroller of the Currency for oversight of trust businesses until the sale of the bank to First Union Bank in 1993. {Staff of 93; Fees: $8 mm; Budget $6.9mm; Assets: $2.3 bn ($1.0 bn discretionary)}

From August 1993 through 2006, I was a consultant to banks, insurance companies, mutual fund and investment firms on a variety of matters involving the trust, investment and custody businesses, including but not limited to **Bankers Trust Company,** later acquired by **Deutsche Bank; Chase Manhattan Bank, Citibank, Depository Trust Company, OppenheimerFunds, Putnam Investments, SEI Investments and SEI Trust Company, State Street Bank and Trust Company and Merrill Lynch.** I served as a consultant to **State Street** with respect to the process of integrating the Deutsche Bank custody business acquired by State Street in January 2003, encompassing over $2 trillion in custody assets. In November 2005 I joined **BusinessEdge Solutions** in New Jersey as a senior consultant and subject matter expert in trust, investment and wealth management services, serving two nationally prominent institutional clients. I entered semi-retirement in early 2008 and remain available for short-to-medium term assignments.

From 2003, to the present I have served as subject matter expert in the trust business retained by law firms in Boston, MA, Cleveland, OH, Denver, CO, Philadelphia, PA and Wilmington, DE, with regard to litigation against leading commercial banks in claims arising out of the trust and custody business.

From 1980 through 1990, I served on the faculty of the **American Bankers Association National Trust School and Graduate Trust School,** for certificated programs in which trust officers and managers from all over the United States, state and federal regulatory examiners and trust professionals from several foreign countries are trained in trust practices. My specialty was marketing of trust, custody and investment services and in understanding how banks can best serve the requirements of individual and institutional clients. Since 1970, I have been a frequent lecturer on trust management and marketing at American Bankers Association, Bank Marketing Association and numerous state association and private conferences. I served on the faculty of the **ABA In-Bank Trust and Graduate Trust School** in 2005. Since 2011, I have been on the faculty of Kansas-Nebraska-Iowa Schools of Banking, Inc. **School of Trust and Financial Services** and **Advanced Trust Administration School**, teaching Compliance, Trust Accounting and Securities Processing. In 2014, I was retained by Iowa Bankers Association to conduct a seminar for trust administrative and operations staff.

I received a B.A. degree from St. John's University, New York, in 1965, and a **J.D.** degree from St. John's University School of Law in 1969. I am admitted to the Bar of New York State (1969), New Jersey (1994) and the Federal District Court (1994) but am officially retired from the practice of law. I currently serve on the Board of Trustees of the Masonic Charity Foundation of New Jersey and am Past President (2012-2013).

Edgar M. Coster, 27 Runnymede Road, Chatham, NJ 07928-1331 {201 320-1595}

EMC SME CV 2014

## EXHIBIT B TO THE EXPERT WITNESS REPORT

## OF EDGAR M. COSTER

## DOCUMENTS CONSIDERED IN FORMULATING EXPERT OPINIONS

1.  Documents and deposition testimony cited in the expert report of Edgar M. Coster

2.  Documents identified by Bates number in Attachment 1

3.  Pleadings:

    a.    Second  and Third Amended Complaints, with exhibits

    b.    Second Superseding Indictment (USA v. Sutton et al.)

    c.    Wulf Response to Motion for Stay

4.  Written discovery responses exchanged between Plaintiffs and Defendants American Stock Transfer and Trust Company; Bank of America, N.A.; BMO Harris Bank, N.A.; Bremen Bank and Trust Company; Comerica  Bank and Trust, N.A.; Marshall & Ilsley Trust Company, N.A.; Richard Markow, Herbert Morisse, National City Bank; PNC Bank, N.A.; Southwest Bank, an M&I Bank; and U. S. Bank, N.A.

5.  Deposition transcripts of the following witnesses:

    a.    Avella, Gino

    b.    Bank of America 30(b)(6)_Rubin

    c.    Barton, Joann

    d.    BMO Harris 30(b)(6)_Horstmeier

    e.    Botkin, Donna

    f.    Brantley, Sandra

    g.    Britson, Dennis

    h.    Buchanan, Pamela

    i.    Camilleri, Jeff

    j.    Cannella, Dino L.

1843729

k.     Comerica Bank 30(b)(6)_McClelland

l.     Crawford, James

m.     Davis, Donald

n.     Farrell, Kevin

o.     Francis, Don

p.     Glarner, Paul

q.     Hall, Angela A.

r.     Hayes, Shaun

s.     Hipskind, Robert

t.     Jurmanovich, Thomas

u.     Kantra, Albert

v.     Ketchum, Donald

w.     Lock, Robert

x.     Markow, Richard

y.     Marshall & Ilsley 30(b)(6)_Roberts

z.     Maylack, Jean

aa.     Meek, John M.

bb.     Missouri Department of Insurance 30(b)(6)_Nelson

cc.     Moellenhoff, Christina W.

dd.     Morisse, Herbert

ee.     NCB 30(b)(6)_Newell

ff.     Ommen, Doug

gg.     Pisarkiewicz, David

hh.     Rialti, Terry L.

ii.     Roberts, Pamela J.

1843729

| | |
|---|---|
| jj. | Sackley, Janice |
| kk. | Scannell, Katherine P. |
| ll. | Schmidt, Mary |
| mm. | Schoeck, Andrew |
| nn. | Schultz, Victor |
| oo. | Southwest Bank 30(b)(6)_ Cannella |
| pp. | Southwest Bank 30(b)(6)_Postel |
| qq. | Stamper, Richard |
| rr. | Steube, Paul |
| ss. | Stuart (Franklin), Sylvia |
| tt. | Talen, Bruce |
| uu. | Texas Department of Banking 30(b)(6)_Reese |
| vv. | Texas Department of Insurance 30(b)(6)_Kazi |
| ww. | Texas Department of Insurance 30(b)(6)_Saenz |
| xx. | Texas Department of Insurance 30(b)(6)_Slape |
| yy. | Tull, Kurtis |
| zz. | U. S. Bank 30(b)(6)_Mullen |
| aaa. | Weiss, Arthur |
| bbb. | Weiss, John |
| ccc. | Wittner, Howard |
| ddd. | Wulf, David |
| eee. | Zieser, John J. |

6. Transcript of criminal trial testimony of David Wulf

7. Excerpts and/or highlighted transcripts for the following witnesses:

    a.     Bank of America 30(b)(6)_Rubin

1843729

b.  BMO Harris 30(b)(6)_Horstmeier

c.  Botkin, Donna

d.  Brantley, Sandra

e.  Buchanan, Pamela

f.  Cannella, Dino L.

g.  Jurmanovich, Thomas

h.  Kantra, Albert

i.  Lock, Robert

j.  Marshall & Ilsley 30(b)(6)_Roberts

k.  Moellenhoff, Christina W.

l.  NCB 30(b)(6)_Newell

m.  Pisarkiewicz, David

n.  Roberts, Pamela J.

o.  Sackley, Janice (Vol. 2)

p.  Schmidt, Mary

q.  Schoeck, Andrew

r.  Southwest Bank 30(b)(6)_Cannella

s.  Southwest Bank 30(b)(6)_Postel

t.  Stuart (Franklin), Sylvia

u.  U. S. Bank 30(b)(6)_Mullen

v.  Weiss, Art

w.  Zieser, John J.

8. Exhibits for each of the depositions identified in paras. 5 and 7.

9. U. S. Bank Sources of Information to Educate 30(b)(6) Witness

1843729

EXHIBIT
# 4

**Jo Ann Howard & Associates, P.C. et al. v. Douglas Cassity et al.**

**U.S. District Court for the Eastern District of Missouri**
**Case No. 4:09-cv-01252-ERW**


**Expert Report of Don Fitzgerald**

Expert Report of Don Fitzgerald

     I have been retained on behalf of the Plaintiffs to testify on whether the Missouri Trustees acted in accordance with the custom and practice of the trust industry in St. Louis, Missouri when they accepted the NPS Pre-Need Trusts and administered the trusts. In my opinion, they did not, for the reasons set forth below.

     I am being compensated for my services at the rate of $250 per hour.

**Professional background**

     I have worked in the trust industry in St. Louis, Missouri for over forty years. For a number of years, I served as the National Director of Trust and Fiduciary Services at First Bank. Beginning in 1973, I served as a Trust Officer at the St. Louis Union Trust Company, one of the largest trust companies in the country. During my eight years there, I went through a management training program that gave me experience running a trust department, including extensive experience with the administration, operations, accounting, and tax areas.

     In 1981, I was asked to become the Senior Trust Officer in charge of the entire personal trust business at First Missouri Bank & Trust Company (now known as First Bank). The trust business there was new, and we had no accounts when I started in 1981. Over the course of the next thirty years (other than as listed below), I oversaw the growth of the department to holding over $3 billion in assets.

     In 1984, I accepted a position with Mercantile Bank in Springfield, Missouri as Senior Vice President/Senior Trust Officer. At that time, Mercantile had twice the trust business as First Missouri Bank & Trust. However, after less than one year, a medical emergency of a co-manager at First Bank compelled me to return to First Bank to keep their trust operations running.

     Upon returning to First Bank, I became the National Director of Trust and Fiduciary Services at First Bank. During my tenure, I served as the chairman of a number of committees, including the Trust Committee, the New Accounts Acceptance Committee, the Investment Committee, and the Unique Assets Committee.

     In 1987, I was offered the position of Supervisor and Director of Trust Services for the State of Missouri in state government. This role is the chief regulator of trusts in Missouri. After meeting with the governor, the director of finance, and a number of other high-level government officials, I agreed to accept the position. Right after that, I learned that the owner and chairman of the board of First Bank, Inc. intended to close the trust department at the bank if I did not return to run it, so I decided to withdraw my acceptance and return to First Bank.

Expert Report of Don Fitzgerald

I remained the head of all trust business at First Bank until 2010. In 2007 or 2008 I met with Brent Cassity and others when they sought to move the NPS Missouri preneed trusts to First Bank. Mr. Cassity stormed out of our meeting when I insisted that the First Bank trust department would have to hold physical custody of the policies. That meeting was my only personal exposure to NPS and the Cassitys.

In 2010, I left First Bank for a better opportunity. I am now employed as a registered investment advisor representative with AHM Financial Group, LLC, a registered investment advisory firm. I serve as the Wealth Advisor & Director of AHM Trust Advisory Services, where I provide investment advising services to trustees.

Throughout my career, I have continued my education and training in the trust industry. In addition to other continuing education, I attended seminars sponsored by the American Institute of Banking for eight years and received a certification from the National Trust School at Northwestern University in 1982. I am a registered investment advisor representative, a licensed life insurance agent in Missouri, and a registered tax return preparer with the IRS. For over twenty years, I also was a Certified Trust and Financial Advisor. I have not authored any publications in the last 10 years and have not previously testified as an expert.

**Facts and Data Considered**

In formulating the opinions contained in this report, I have relied on my experience and practice in the trust industry in St. Louis for the past forty years and my knowledge of the applicable custom and practice in the trust industry. In addition, I have considered the documents identified in Exhibit A to my report.

**Opinion**

1.      National Prearranged Services, Inc., ("NPS") a company controlled by the Cassitys and their cohorts (the "Cassitys"), sold pre-need contracts to consumers in Missouri. Under Missouri law, NPS could only sell pre-need contracts if it could find a bank to agree to be a trustee and hold 80% of the consumers' money in trust (the "NPS Trusts"). Through their hand-picked investment advisor, the Cassitys directed the use of trust funds to purchase life insurance policies from Lincoln Memorial Life Insurance Company ("Lincoln"), another company owned and controlled by the Cassitys. By agreeing to serve as Trustee over the NPS Trusts, and by ignoring their duties during their tenure as Trustee, the Missouri Trustees enabled the Cassitys to sell thousands of pre-need contracts, collect hundreds of millions of dollars of

Expert Report of Don Fitzgerald

consumers' money, and then move those funds in and out of those trusts without any trustee controls.[1]

2.    One of the most important duties of a trust officer is turning away business that poses significant risks to the trustee and to the beneficiaries. Having reviewed documents and deposition testimony in this case, and based on my own personal experience, I do not believe that any trustee that possessed a fundamental understanding of its duties and responsibilities would have accepted the NPS trusts.

3.    A reasonably prudent trustee must conduct an in-depth inquiry before accepting new business. In the course of that review, a trustee might conclude that it does not have sufficiently experienced staff to take on that particular account. Or, a trustee might conclude that the account simply poses too many risks and raises too many red flags to accept the account. Both of these rationales should have prevented the Missouri Trustees from accepting the NPS Trusts.

4.    When conducting this pre-acceptance review, a prudent trustee should ask a number of questions. A trustee should not, as Mr. Markow stated Allegiant did, conclude that it can just administer the trusts in the same manner that the previous trustee did. [Markow at 154:13-155:12.] Had the Missouri Trustees asked and followed up on these questions, the answers should have proven troubling to the Missouri Trustees and should have led to their refusal to accept the NPS business.

5.    Based upon my review of the record, I also believe that the Missouri Trustees breached their duties during their administration of these trusts. All of the Missouri Trustees have admitted that they were trustees with fiduciary duties while administering the trusts. [Zieser at 104:1-16; Markow at 231:24-232:13; Mullen at 297:13-20.] Even after the Missouri Trustees accepted the trusts (which they never should have done), the Trustees should have seen and reacted to many obvious red flags. In fact, the Trustees violated their own policy manuals by failing to take action in response to suspicious transactions.

6.    The suspicious activity in the trusts was not hard to find. It occurred repeatedly and was obvious from the many wire transfers coming into the trust departments. In my opinion, the Missouri Trustees had so many examples of suspicious activity while they were administering these trusts that their failure to even once stop and conduct a basic investigation into any of the transactions they were approving and executing makes their conduct shocking. Had the Trustees asked about any number of suspicious transactions, they could have easily seen that the consumer funds were manipulated and taken by the Cassitys. They made the conscious

---

[1] By "Missouri Trustees," I mean Mark Twain Bank, Mercantile Bank, Allegiant Bank, and M & I Trust Company/Southwest Bank.

Expert Report of Don Fitzgerald

decision not to ask questions.  It was a gross violation of the Trustees' duties to remain as the trustees in these trusts.  Each of them could have and should have resigned from these trusts immediately upon seeing the significant problems in the trusts.

**What kind of trusts are these trusts?  What laws and regulations apply to these trusts?**

7.      The NPS trusts are trusts specially set up by Missouri law to hold consumers' pre-need funds.  Any pre-need seller wanting to do business in Missouri was required to find a bank trustee to hold these funds.  If the seller could not find a bank trustee, the seller could not do business in Missouri.  Given that these are unique trusts governed by their own set of laws, a prudent trustee must satisfy itself that it understands its obligations under the trust agreements and the Missouri law.  If the trustee lacked experience with pre-need trusts, the trustee has to give consideration to whether it can accept the business in the first place.  A trustee should not take on a fiduciary obligation without fully understanding the scope of that obligation.  I am not aware of any evidence that any of the Missouri Trustees took the steps necessary to make sure they understood what the Cassitys were trying to do with the NPS trust accounts.

8.      There is no evidence that any of the Missouri Trustees possessed any substantial experience with pre-need trusts.  While prior experience with a particular kind of trust is not a prerequisite to accepting the business, the trustee must undertake the steps necessary to understand the duties and responsibilities required of it under the governing trust agreements and Missouri law before deciding whether it can accept the trust.  The Missouri Trustees failed to meet this obligation when they failed to investigate and/or ignored numerous warning signs.

9.      Prudent trustees also should request to see prior versions of any applicable trust agreements before taking on new business.  There is no evidence that any of the Missouri Trustees ever looked at the UMB trust agreement.  [SDR0423452.]  The trust agreement provided to the Missouri Trustees varied considerably from the UMB agreement.  If the Trustees had only looked at the UMB agreement and compared it to the trust agreements they were being shown, they would have noticed that the later trust agreements had looser recordkeeping standards, among other differences.  A prudent trustee would have recognized this as a potential red flag and would have investigated further to see if there were justifiable reasons for the changes to the trust agreement.

10.     Second, a trustee would have to become intimately familiar with Chapter 436, the law that sets forth the special duties and obligations of a trustee of a pre-need trust.  If the Trustee did not understand the statute, this would have required consulting with an attorney to fully understand this law.  At least as to M&I, this review of Chapter 436 was not done.  Although trust administrator Pam Roberts testified that she did receive guidance on Chapter 436 from M&I's counsel Victor Shultz, Mr. Shultz does not recall ever even reviewing the law.

4

Expert Report of Don Fitzgerald

[Roberts at 91:23-92:6; Schultz at 31:16-33:18.] M&I's decision to accept these trusts without understanding the applicable law does not conform with the custom and practice of the trust industry. Based upon my understanding of the Missouri Trustees' administration of these trusts, none of them understood their obligations under that law.

**Who are the beneficiaries?**

11.     A trustee also has a fundamental obligation to know who the beneficiaries are. Here, any reasonable trustee should have known that the consumers who bought pre-need contracts were the beneficiaries. The simplest reason for this is that they are identified as beneficiaries in the trust agreements. [USBANK000043; NCB001077; MITC000169; Morisse at 318:25-319:25.] The consumers are also beneficiaries of the trust for the simple and obvious reason that the money is held in trust for their benefit—to pay for their pre-paid funerals. In addition, when National City Bank evaluated the NPS trusts as part of its acquisition of Allegiant, National City concluded that the trusts created risks to the consumers "who actually invested their money in the pre-need funeral business." [Kantra at 128:7-131:14.]

12.     Because the consumers are beneficiaries, the Missouri Trustees were obligated to administer the trusts in the best interests of the consumers. They could not simply rely on NPS or its hand-picked investment advisor to make decisions on behalf of the trust. The Trustees should have evaluated whether to accept the trust business while keeping in mind that they owed fiduciary duties to the consumers whose money was held by the trusts.

**Who is the grantor?**

13.     "Know your client" is a fundamental principle trustees have to bear in mind at all times. This principle is taught in the national trust schools and all trust officers should be trained to know and follow this principle. It is also recognized in the trust policy manuals of the Missouri Trustees. [NCB-018522 at 5; MITC023733 at 69; USB 001488 at 21.] The Missouri Trustees' trust policy manuals are evidence of the standard trustee duties and responsibilities that they had to comply with. The Missouri Trustees failed to obtain even a basic knowledge of NPS prior to agreeing to accept these trusts.

14.     I have not seen any evidence that Mark Twain or any of the Missouri Trustees ever investigated NPS or its founder, Doug Cassity. If the bank had done so, it would have learned, among other things, that Mr. Cassity had been convicted of fraud on his clients and disbarred as a lawyer. [SDR0026217.] This would have been a huge red flag. Mark Twain also could have discovered the interrelationships between NPS and other Cassity-owned companies. The large number of other companies owned by the Cassitys would have been another

5

Expert Report of Don Fitzgerald

component that required additional investigation to ensure that protections against misuse of trust funds were in place. [Ex. 194.]

15.     The Allegiant Trust Committee was also in the dark about critical information about NPS when it voted to accept the NPS trusts. The Trust Committee did not know that NPS and Lincoln were affiliates, even though Lincoln policies were already the primary assets of the trusts. [Markow at 120:11-22.] National City asked about the relationship with Lincoln—as Ms. Sackley recognized, it was a routine question to ask. [Sackley at 326:8-327:1.] The Allegiant Trust Committee also says it was unaware of Doug Cassity's fraud conviction. [Markow at 246:14-24.] And the Trust Committee was unaware that NPS had been the defendant in a lawsuit brought by the state of Missouri and that the parties had entered a consent judgment in 1994. [Markow at 251:6-252:6.] The existence of the consent judgment is another red flag and would have had to be reviewed closely by the Trust Committee before agreeing to accept these trusts.

16.     M&I appears to have failed to conduct any due diligence on NPS prior to accepting the trusts. Ms. Roberts testified that M&I did not perform its own due diligence of NPS but instead relied solely on the due diligence performed by Southwest Bank in evaluating its lending relationship with NPS. [Roberts at 106:4-107:15.] This is not consistent with the custom and practice in the trust industry. The lending arm of a bank is not a fiduciary for the money of others. Regardless of the quality of the bank's evaluation of NPS, the trust department was unquestionably required to conduct its own due diligence of NPS and its owners. By failing to do so, M&I missed the obvious red flags discussed above.

**Are there unique assets in the trusts?  If so, do we have the necessary expertise to manage those assets?**

17.     One critical risk a trust department faces is in holding unique assets, such as life insurance policies. A trust department needs to take special care to ensure that it is properly set up to administer an account with unique assets. A prudent trust administrator will recognize that it does not have the necessary expertise to administer a unique asset and will refuse to take on the business. [Kantra at 185:24-186:11.] When National City Bank was reviewing Allegiant Bank as part of its acquisition of Allegiant, it identified the presence of insurance in the NPS trusts as a red flag. [Kantra at 141:8-20.] However, none of the Missouri Trustees engaged in adequate due diligence to assess these assets. They could have and should have consulted with life insurance agents to ensure they understood the Lincoln insurance policies and how they were being used as trust assets by the Cassitys.

18.     Although life insurance policies were not held by the trusts at the time Mark Twain became Trustee, the trust began buying policies during Mark Twain's tenure. By the time

6

Expert Report of Don Fitzgerald

Allegiant Bank took over as trustee from Mercantile, life insurance policies were the predominate assets of the trusts. [Morisse at 71:12-18.] There is not any evidence that I have seen that shows Mark Twain ever assessed the quality of those policies or considered whether its trust department had the necessary expertise to manage a large number of life insurance policies. In the custom and practice of the trust industry, when a trustee becomes aware of the purchase of a large amount of unique assets, the trustee has to investigate further and consider whether it is able to continue serving as trustee.

19.    Allegiant also breached its duties when it failed to conduct any meaningful investigation of the unique trust assets prior to accepting the trusteeship. The Trust Committee approved accepting the trusts without knowing the cash value of the life insurance policies; the premium obligations for the policies; whether the policies were whole life or term; the outstanding encumbrances (such as policy loans) on the policies; or even the number of life insurance policies held by the trusts. [Markow at 146:21-147:23.]

20.    M&I believed it was "unnecessary" to "perform any due diligence on any aspect of those life insurance policies." [Roberts at 128:5-11.] M&I's Trust Committee also "did not undertake any additional due diligence to understand" the evidence of insurance that was listed as an asset of the trusts. [Roberts at 237:18-238:5.] This grossly deviates from the customary obligations of a trustee to take possession of unique trust assets. The due diligence obligation is even more important when dealing with unique assets, and M&I should have taken steps to learn about the policies—what were their cash values; were they encumbered; did the trusts have custody and title of the policies; were the policies whole life; what was the life insurance company rated? This information existed and was available to M&I and all of the Missouri Trustees. M&I's failure to even look for or learn this information before it agreed to accept the trusts was unreasonable. This was true for all bank trustees.

21.    A trustee also has a duty to figure out how to value unique trust assets. This is especially important for pre-need trusts because the pre-need statutes require the trustee to calculate the value of the trust assets before distributing income. When a trustee does not have any expertise in valuing the unique assets, the trustee needs to find someone who does. There are consulting firms who have experience and are qualified to value life insurance policies for any trust department that lacks that experience. The Trustees here never valued these trust assets or asked anyone to help them to do so. Herb Morisse stated that Allegiant Bank treated the face value of the life insurance policies as the market value of the policies. [Morisse at 71:12-72:11.] So did the other Missouri Trustees. [U.S. Bank 30(b)(6) at 133:20-134:7; Roberts at 195:4-196:12.] This is obviously wrong. The Trustees should have known that they needed to request information about the cash surrender value on the policies or to bring in someone who understands life insurance policies to value the trust assets. The cash surrender value of each of the Lincoln policies was readily available. [Expert Report of Andrew Dalton.]

7

Expert Report of Don Fitzgerald

22.     Related to the duty of valuation is a duty to accurately report the market value of the trust assets. Each trustee appears to have accepted the face value of whatever alleged asset was presented—note, debenture, life insurance policy—as the market value and then stated that the face value was the market value on the monthly trust statements. I have seen nothing from NPS or Mr. Wulf that states that a particular asset has a specific "market" value. Instead, each trustee bank blindly parroted whatever number was provided to them. Specifically, I refer to the "face value" of the life insurance policies, the $13 million value given to the World Service Life group term policy and the valuations given the debentures. The Missouri Trustees' misrepresentation that the monthly statements gave the "market value" of the trust assets enabled the Cassity's scheme to go on far longer than it should have.

**How will I obtain control of the trust assets?**

23.     A trustee has to maintain control of the assets in the trust.   However, these Trustees never obtained control over the life insurance policies that were the trusts' principal asset.

24.     Mark Twain and Mercantile never took custody or control of the life insurance policies. [Barton at 77:3-9; Harlan at 55-56:8-25, 1-7; Botkin at 134-35:21-25, 1-3.] Up until 1994, Mark Twain did not even receive the proceeds of the insurance policies of which it was purportedly the owner. [Ex. 591 at 609.] These failures are inconsistent with the custom and practice of the trust industry.

25.     When Allegiant took over the NPS trusts, it did not obtain custody or control over the life insurance policies. [Markow at 188:17-190:18.] In 1999, Allegiant and NPS drafted several Custody Agreements that were supposed to allow NPS to maintain the life insurance policies that were supposedly owned by the trusts.  These agreements identified NPS as the "Custodian" of the trust accounts and stated that NPS "agrees to hold and keep safely all life insurance policies purchased by the Investment Advisor." [Ex. 182.] The Custody Agreements also supposedly granted NPS the responsibility of keeping "records, accountings and other information relating to the policies held in the Trusts." [Ex. 182.]

26.     It was improper and not consistent with the custom and practice of the trust industry to allow NPS to try to act as the custodian of these policies.  By allowing NPS to maintain custody and control over the trust assets, the Trustees were allowing NPS to use trust assets to buy life insurance policies issued by a Cassity-owned company, at the direction of NPS and its agents, and NPS was maintaining custody of the life insurance policies. The involvement of NPS at every step of this process created the potential for misuse of the consumer funds which should have been apparent to a prudent trustee.  In my opinion, no trustee exercising its fiduciary

8

Expert Report of Don Fitzgerald

duties could ever have agreed to the Custody Agreement, or allowed NPS to maintain custody of the trust assets and control those assets in this way. National City Bank, during its review of the NPS trusts, also realized the potential for manipulation of trust assets in this situation and got rid of the NPS trusts before its merger with Allegiant closed. [Sackley at 251:4-253:21; 256:4-18.]

27.    The Custody Agreements state that Allegiant maintained control over the trust assets, but that was simply not true. Allegiant never received or reviewed a single Lincoln policy during its time as trustee. [Markow at 499:23-500:12] Instead, Allegiant simply relied on a report from NPS that supposedly listed all the life insurance policies "owned" by the trusts. [Morisse at 117:12-120:11.] Mr. Morisse, who drafted the Custody Agreements, testified that he believed there were physical life insurance policies somewhere. He knew, however, that he had taken no steps to confirm this belief, and he did not learn until later that the policies did not physically exist but were only electronic. [Morisse at 118:4-120:11.]

28.    Allegiant also never took any steps to supervise or monitor the custodian of the policies. A trustee cannot simply give custody of the primary assets of the trust to a third party and never monitor that custodian's activities. But Allegiant never took any steps to ensure that the policies were being held and kept safely—in fact, Allegiant never even reviewed a single policy. If it had ever sought to exercise control over the policies or monitor the activities of NPS as Custodian, Allegiant could have learned of the existence of policy loans that had deprived the trusts of much of their value. [Markow 192:20-193:4].

29.    M&I also agreed to become trustee without ever taking custody of the life insurance policies. [Roberts at 203:7-9.] M&I never asked any questions about how it would obtain control over the trust assets, ensure that their value was represented, or even ensure that M&I would have title to the trust assets. [Roberts at 207:21-209:13.] These are all matters that should be investigated prior to accepting the trust business and M&I's failure to investigate violated their duties.

30.    The Missouri Trustees also failed to keep individual accounts for the various pre-need consumers whose money was being held by the trusts. This was essential for two reasons. First, the Trustees had to know how much money was deposited on behalf of a particular consumer so it knew how much to pay out when a death claim was made on behalf of that consumer. Second, the Trustees had to know the sum of all the deposits in the trusts prior to making any income distributions, pursuant to Chapter 436. By failing to keep track of this information on an individualized basis, the Trustees could not know how much it was permitted to pay out of the trusts. And for Mercantile, Allegiant, and M&I, their decision to accept the pre-need trusts without having this information available was a gross deviation from the custom and practice of the trust industry. The duty to track the money is a trustee responsibility and cannot be delegated to a third party such as Mr. Wulf or to the grantor, NPS. It is clear that no one—

9

Expert Report of Don Fitzgerald

trustee, grantor, or advisor—ever tracked this money.  Had the banks done their job and performed this expressly required work, the Cassitys would not have been able to loot the trusts.

31.     Each of the Missouri Trustees knew or should have known that there were major problems in the day-to-day administration of these trusts, and the make-up of the trust assets. Based upon the testimony, each of these Trustees administered the trusts in fundamentally the same way in that they wired money out of the trusts without any question about the purpose of these transfers.  [Moellenhoff at 210:7-25; 211:9-217:10; 220:9-224:3; 255:6-25; Markow at 159:9-16; Roberts at 314:1-13; 316:12-15.]  There were numerous examples of suspicious activities that were clearly red flags for the Trustees.  Examples include: (1) the World Services group term life insurance policy [Hipskind at 118:21-122:6]; (2) wiring funds from the trusts to other Cassity companies; (3) the existence of policy loans; (4) the mismatching between insurance policies and preneed contracts; (5) the alterations on the insurance policy applications; and (6) the extensive use of promissory notes to transfer money from the preneed trusts to other Cassity companies.

32.     The Trustees also had no knowledge about the actual value of the trust assets, yet they repeatedly issued trust statements claiming to list the market value of the insurance policies. All of the Missouri Trustees should have known that the trusts were underfunded.  None of the Missouri Trustees communicated this negative information about the trusts to the successor trustees, so that the mishandling of the trusts continued until 2008.  A reasonably prudent trustee armed with knowledge of the problems in these trusts should have sought court direction regarding the termination and/or transfer of the trusts to a successor.  This would have resolved any potential conflicts of interest that the Trustees may have faced between their role as fiduciaries to the beneficiaries and their interest in protecting themselves.  At a minimum, a prudent trustee should have alerted the successor trustee to problems in the trusts.  Under these circumstances, where there was substantial evidence of fraud, the Missouri Trustees' failure to warn their successors about the misconduct was unreasonable and permitted the Cassitys' fraudulent scheme to continue.

**Who is the investment advisor?  Who is the investment advisor representative?  What roles do they play?**

33.     Upon learning that the trusts had an investment advisor, the Missouri Trustees should have asked more questions, not fewer.  Who is the advisor?  Who is the investment advisor representative?  Is he truly independent of NPS?  Is he the one making the investment decisions for the trusts?  By investigating these matters at the outset, the Trustees would have learned that Wulf was actually dependent on Cassity companies for virtually all of his business. [Wulf Trial Testimony at 15:23-16:21.]  During National City's due diligence of the NPS trusts, National City employees knew to ask about the ties between Wulf Bates Murphy and NPS.

10

Expert Report of Don Fitzgerald

[Brantley at 69:19-71:12.] The Trustees also would have learned that he was not truly making investment decisions, but rather that those decisions were being made by the Cassity companies. [Expert report of Robert Lock; Jurmanovich at 188:19-189:18] Uncovering these facts would have given a reasonable trustee no choice but to immediately resign or decline the accounts.

34.    The presence of an investment advisor does not relieve a trustee of its fiduciary obligations to the beneficiaries. A trustee still has full discretion as to how it implements, if at all, the advice provided by the investment advisor. The trustee still has other obligations that it is not relieved of simply because of the presence of an investment advisor. For example, the trustee still has an obligation to understand and monitor the investment strategy and performance, to maintain the books and records of the trust, and to maintain control over the trust assets. The Missouri preneed statute also requires that the trustee perform certain calculations before distributing income. In addition, the trustee also has a duty to monitor the activities of the investment advisor. [Harlan at 65:14-71:21.] The Missouri preneed statute also makes clear that all trust assets must meet the prudent person standard. The trustees are responsible for compliance with this requirement. There is nothing in the law or trust agreement that relieves the trustee of this duty.

35.    The November 5, 1999 Delegation Letter is a remarkable display of Allegiant Bank trying to shirk its trustee obligations. [Ex. 185.] In this letter, Wulf, Bates & Murphy directed Allegiant Bank to distribute funds out of the trust at the direction of "any employee, agent, or representative" of NPS. No reasonably prudent trustee could ever agree to this supposed blanket delegation of authority from an "independent" investment advisor because it tries to eliminate the role of the trustee by supposedly giving complete control over the trust accounts to NPS. But not only did Allegiant Bank agree to sign this agreement, Herbert Morisse actually drafted this letter for David Wulf to sign. [Morisse at 556:17-25.]

36.    I have read the provisions of Chapter 436 that deal with the investment advisors. Investment advisors are common throughout the trust industry, but their presence has never relieved trustees of their fiduciary obligations to beneficiaries, including the duty to understand the investment goals and monitor the investment performance of the trust assets. The statute is consistent and in conformance with this custom and practice of the trust industry. It is unreasonable for the Trustees to claim that the presence of an investment advisor relieved them of their fiduciary responsibilities with respect to the administration and operations of the trusts, and of their responsibility to monitor the investment advisor. In fact, there is evidence in the record confirming that the Missouri Trustees had continuing investment responsibilities in all accounts, even if there was an actually independent investment advisor actually making investment decisions. For example, the Missouri Trustees regularly conducted portfolio investment reviews in these trusts, even though Mr. Wulf was supposedly appointed as the investment advisor. [Ex. 165.] Further evidence of this is Allegiant's statement in its annual

11

Expert Report of Don Fitzgerald

report that its trust department had $130 million in assets "under trust management." [Ex. 143.] In its publicly produced annual report, Allegiant conceded that it was managing those assets. Mr. Markow's testimony that he meant to use the term "assets under administration" in the Allegiant annual report is contradicted by both the annual report and his statement to me that the Allegiant trust department had hundreds of millions of dollars "under management." [Markow at 79:8-22.]

37.  Furthermore, a reasonably prudent trustee would not have considered these life insurance policies that were supposedly held by the trusts to be investments. The purpose and characteristics of these policies are contrary to the purpose and characteristics of ordinary trust investments because these policies had no serious possibility of appreciating in value. Specifically, the policies were purchased at the direction of NPS to facilitate and further the Cassitys' access to preneed consumer funds by funneling the money to an affiliated company and paying NPS a commission from the preneed funds as the insurance agent. In addition, the money from paid-in full contracts was used to buy a multi-pay policy with a cash value far below the total funds deposited on behalf of a particular consumer. Mr. Wulf also admitted that the purchase of the Lincoln life insurance policies was not done in his capacity as investment advisor. [Wulf at 483:17-486:1.] This is consistent with what a prudent trustee would understand to be the requirement of Chapter 436 in that the statute allows a seller to designate an investment advisor that possesses the investment advisor licenses under either federal or Missouri law. Neither of those statutorily designated licenses relate to or empower an investment advisor to give advice on or purchase life insurance.

*     *     *     *

38.  The questions listed above should have been asked of the Cassitys by a reasonably prudent trustee before accepting the NPS trusts. By failing to ask these questions, the Missouri Trustees chose to not get critical information that they needed and had a right to. By failing to properly evaluate or understand how these trusts were set up, the Missouri Trustees knew that they were fulfilling a role—that of a trustee that would do nothing—which the Cassitys needed to sell their pre-need contracts in Missouri. Had they just said no to the NPS Trusts, the Cassitys would have been stopped from taking Missouri consumers' money.

39.  Once having accepted the trusts the banks were responsible for complying with trustee standards, applicable law and the trust agreements. The bank's failure to perform even basic due diligence does not excuse their gross violations. The evidence of the fraud against the trust beneficiaries was readily available to the trustees.

40.  These questions are not merely hypothetical. In 2007 or 2008, I attended a meeting at NPS's offices with Patty Steinbach and Tom Shaner from First Bank. Tom and Patty

12

Expert Report of Don Fitzgerald

asked me to attend because I was the only senior trust officer with experience with pre-need trusts. Brent Cassity, Randy Sutton, and Nicki Province attended on behalf of NPS. NPS was looking to package its loan business with its trust business. I asked several questions concerning the due diligence we would have to perform before accepting the trusts, including questions about obtaining custody and control over the life insurance policies, the ratings of Lincoln, whether the policies were encumbered, who the owner and beneficiaries of the policies were, and whether the policies were all whole life policies. Brent Cassity became increasingly agitated by my questions. After I told Brent Cassity that we would need to review the policies and hold them in vaults, Mr. Cassity stood up, crumpled up the paper sitting in front of him, declared the meeting was over, and stormed out of the office.

41.     National City Bank reached a similar conclusion when it reviewed the NPS trusts. Based on its due diligence of the NPS, National City concluded that it did not want the NPS trusts. [Brantley at 77:4-15.] In fact, once National City began to investigate the NPS trusts, it concluded that it wanted to exit the NPS trusts "as soon as possible." [Ex. 568.]

42.     The problems with the NPS trusts were so great that they did not require much investigation to uncover. My potential involvement with the NPS trusts fell apart after fifteen minutes of questioning. National City's Jan Sackley concluded, after one lunch with Herb Morisse, that the NPS trusts could be used for money laundering since Allegiant did not have the insurance policies and never actually saw or talked to the purchasers of the pre-need contracts. [Sackley at 251:4-253:21; 256:4-18.] Even if my meeting had not ended prematurely, our later due diligence would have shown the existence of so many red flags that we would not have accepted the business. If any of the Missouri Trustees had engaged in even this minimal level of due diligence, NPS would have been unable to find other banks willing to accept these trusts on the conditions imposed by NPS.

Dated:  July 1, 2014

13

## EXHIBIT A TO THE EXPERT WITNESS REPORT

## OF DONALD FITZGERALD

## DOCUMENTS CONSIDERED IN FORMULATING EXPERT OPINIONS

1. Documents identified by Bates number in Attachment 1

2. Pleadings:

   a. Second and Third Amended Complaints, with exhibits

   b. Second Superseding Indictment (USA v. Sutton et al.)

   c. Wulf Response to Motion for Stay

3. Written discovery responses exchanged between Plaintiffs and BMO Harris Bank, N.A.; Bremen Bank and Trust Company; Marshall & Ilsley Trust Company, N.A.; Richard Markow, Herbert Morisse, National City Bank; PNC Bank, N.A.; Southwest Bank, an M&I Bank; and U. S. Bank, N.A.

4. Deposition transcripts of the following witnesses:

   a. Avella, Gino

   b. Barton, Joann

   c. BMO Harris 30(b)(6)_Horstmeier

   d. Botkin, Donna

   e. Brantley, Sandra

   f. Britson, Dennis

   g. Buchanan, Pamela

   h. Camilleri, Jeff

   i. Cannella, Dino L.

   j. Crawford, James

   k. Davis, Donald

   l. Farrell, Kevin

   m. Francis, Don

1842919

n.   Glarner, Paul

o.   Hall, Angela A.

p.   Hayes, Shaun

q.   Hipskind, Robert

r.   Jurmanovich, Thomas

s.   Kantra, Albert

t.   Ketchum, Donald

u.   Lock, Robert

v.   Markow, Richard

w.   Marshall & Ilsley 30(b)(6)_Roberts

x.   Maylack, Jean

y.   Meek, John M.

z.   Missouri Department of Insurance 30(b)(6)_Nelson

aa.   Moellenhoff, Christina W.

bb.   Morisse, Herbert

cc.   NCB 30(b)(6)_Newell

dd.   Ommen, Doug

ee.   Pisarkiewicz, David

ff.   Rialti, Terry L.

gg.   Roberts, Pamela J.

hh.   Sackley, Janice

ii.   Scannell, Katherine P.

jj.   Schmidt, Mary

kk.   Schoeck, Andrew

ll.   Schultz, Victor

1842919

mm.     Southwest Bank 30(b)(6)_ Cannella

nn.     Southwest Bank 30(b)(6)_Postel

oo.     Stamper, Richard

pp.     Steube, Paul

qq.     Stuart (Franklin), Sylvia

rr.     Texas Department of Banking 30(b)(6)_Reese

ss.     Texas Department of Insurance 30(b)(6)_Kazi

tt.     Texas Department of Insurance 30(b)(6)_Saenz

uu.     Texas Department of Insurance 30(b)(6)_Slape

vv.     U. S. Bank 30(b)(6)_Mullen

ww.    Weiss, Arthur

xx.     Weiss, John

yy.     Wittner, Howard

zz.     Wulf, David

aaa.    Zieser, John J.

5.  Transcript of criminal trial testimony of David Wulf

6.  Excerpts and/or highlighted transcripts for the following witnesses:

a.      BMO Harris 30(b)(6)_Horstmeier

b.      Botkin, Donna

c.      Brantley, Sandra

d.      Buchanan, Pamela

e.      Cannella, Dino L.

f.      Jurmanovich, Thomas

g.      Kantra, Albert

h.      Lock, Robert

1842919

i.      Marshall & Ilsley 30(b)(6)_Roberts

j.      Moellenhoff, Christina W.

k.      NCB 30(b)(6)_Newell

l.      Pisarkiewicz, David

m.      Roberts, Pamela J.

n.      Sackley, Janice (Vol. 2)

o.      Schmidt, Mary

p.      Schoeck, Andrew

q.      Southwest Bank 30(b)(6)_Cannella

r.      Southwest Bank 30(b)(6)_Postel

s.      Stuart (Franklin), Sylvia

t.      U. S. Bank 30(b)(6)_Mullen

u.      Weiss, Art

v.      Zieser, John J.

7.  Exhibits for each of the depositions identified in paras. 4 and 6.

8.  Expert reports of Robert Lock and Andrew Dalton

9.  U. S. Bank Sources of Information to Educate 30(b)(6) Witness

1842919

EXHIBIT #5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., | ) | |
| SPECIAL DEPUTY RECEIVER OF LINCOLN | ) | |
| MEMORIAL LIFE INSURANCE COMPANY, | ) | |
| MEMORIAL SERVICE LIFE INSURANCE | ) | |
| COMPANY, AND NATIONAL | ) | |
| PREARRANGED SERVICES, INC., ET AL., | ) | |
| | ) | |
| PLAINTIFFS, | ) | Case No. 09-CV-1252 ERW |
| V. | ) | |
| | ) | |
| J. DOUGLAS CASSITY; RANDALL K. | ) | |
| SUTTON; BRENT D. CASSITY; J. TYLER | ) | |
| CASSITY; RHONDA L. CASSITY; ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## AFFIDAVIT OF KATHERINE P. SCANNELL

I, Katherine P. Scannell, being of lawful age and duly sworn under oath, state that the following

is true and accurate, to the best of my present recollection:

1.  I served as General Counsel to National Heritage Enterprises (NHE) and provided

legal advice to many of its subsidiaries, as requested, from approximately October/November

2002 through approximately May 2008.  I have personal knowledge of the matters set forth in

this Affidavit.

2.  My paychecks were issued by National Heritage Enterprises.  NHE was a holding

company for numerous entities that I believe were ultimately owned by members of the Cassity

family through RBT Trust II, including Rhonda, Brent, and Tyler Cassity.  In my capacity as

General Counsel, I provided legal advice and services, as requested, to many of the entities

falling under NHE, including but not limited to National Prearranged Services (NPS), Lincoln

Memorial Life Insurance Company (Lincoln), Memorial Services Life Insurance Company

1

CONFIDENTIAL

PTF0020190

(Memorial), Forever Enterprises, Forever Network, and Hollywood Forever.   For purposes of this Affidavit, I refer to this family of companies as the "NHE Subsidiaries."

3.   Prior to being hired, I communicated several times with Brent Cassity on the phone and through e-mails, and also met in-person with Doug Cassity, Brent Cassity, and Tyler Cassity. During my tenure with the companies, I reported directly to Doug, Tyler, and Brent.

4.   Before I began working for the companies, I do not believe that I was aware that the NHE Subsidiaries included two insurance companies.   I had no background representing insurance companies coming into the position as General Counsel.   When interviewing for the General Counsel position, I was never asked by Doug, Brent, or Tyler Cassity whether I had any experience in insurance.   I now think that my lack of experience in insurance was an important factor that contributed to my hiring.   I do not believe that Doug and Wittner wanted someone knowledgeable about insurance in the role of in-house counsel.

5.   After I started work, I specifically asked whether I needed to get up to speed on the insurance companies and insurance law.   I was told by either Doug or Brent that I did not need to do so because Tony Lumpkin handled the insurance companies, and because Howard Wittner (outside counsel) was familiar with insurance.

6.   I also had no meaningful involvement in NPS's day-to-day Missouri financial operations.   I was told early on that I did not need to spend time worrying about NPS's Missouri financial operations because NPS had been involved in substantial litigation in Missouri, that its investments were closely monitored, and that it was now operating in Missouri under the 1994 Consent Judgment.   Later, when I tried on numerous occasions to obtain a copy of the Consent Judgment, but no one was able to produce it, including Brent Cassity, Doug Cassity, and Howard Wittner.   As a result I had only the representations of Doug, Brent, and Wittner as to the meaning

2

CONFIDENTIAL

PTF0020191

and contents of the Consent Judgment.  I was repeatedly led to believe by Doug, Brent, and Wittner that the Consent Judgment was a very thorough and detailed document that authorized certain NPS practices.  I believe that Doug and Brent relied primarily upon Wittner for advice relating to NPS and the Consent Judgment.  When I finally obtained a copy after several years as General Counsel, I was very surprised at how little it actually said.  Contrary to what I had been told by Brent, Doug, Wittner, and others, I did not read it as approving any particular NPS practice.  I now believe that Doug, Brent, and Wittner misled me numerous times through the years about the true contents of the Consent Judgment.

7.  I was given the impression that during the supervision period Bob Lock was physically in the NPS office.  Wittner, Sutton, and Doug also told me that the Missouri trusts had been monitored by Bob Lock.  Doug, Brent, and Howard Wittner represented to me that Lock knew about the policy loans and had expressly taken the position that NPS was within its legal rights to take policy loans on Lincoln policies owned by the various Missouri trusts.  Doug, Brent, and Howard Wittner told me that NPS had the right under the language of the insurance policies to take policy loans even if the consumers who were insured had no knowledge of these policy loans.  Doug, Brent, and Wittner never told me that Lock had written letters expressing concerns about the practice.

8.  Randy, Doug, and Brent also frequently told me that the Missouri trusts were "overfunded," and later told me that excess money could be taken out of the trusts as a result.

9.  Generally speaking, the tasks that I handled as General Counsel were determined by the specific requests from Doug, Brent, Tyler, and sometimes Sutton.  One task that I took upon myself shortly after starting, however, was to develop a corporate organizational chart, which I did not believe existed at the time.  I spent significant time trying to understand the identities of

3

CONFIDENTIAL

and relationships among the NHE Subsidiaries. It was extremely difficult and confusing, and discerning the corporate organization was much harder than I expected it to be. The number of entities, the similarity in names, the difficulty in locating (or non-existence of) corporate records, and the lack of employees with knowledge of the corporate structure all contributed to the difficulty of the task. Furthermore, Doug, Brent, Sutton, and Wittner provided only limited assistance to my efforts to complete a corporate organizational chart.

10. The NHE Subsidiaries were closely intertwined: employees held roles in multiple companies and changed between companies, officers and directors overlapped among the companies, and the companies shared office space.

11. As General Counsel, I sometimes had to discern employees' job responsibilities and understand who worked for which entities. This was frequently a complicated, difficult undertaking for which there was not a clear answer. Employees were assigned duties in different NHE Subsidiaries. Many employees, such as Nicki Province, Sutton, and Erin Province, served in multiple roles for more than one of the NHE Subsidiaries. Other employees, such as Darci Greco and Tony Lumpkin, had offices in St. Louis at NPS's headquarters yet were involved with the operation of the insurance companies. When I would have questions about the operations of NPS or the insurance companies, it was not unusual for me to be referred by Erin Province or another St. Louis-based employee to someone in the Austin, Texas office, only to then have the Austin-based employee refer me back to someone in St. Louis for an answer.

12. At various points during my tenure as General Counsel, I became aware that money transferred between and among the NHE Subsidiaries. To the best of my knowledge, any large transfers of money were directed by Sutton.

4

CONFIDENTIAL

PTF0020193

13. At some point, I developed the impression that the cemeteries owned by Forever Enterprises and Forever Network were not profitable. Neither was the "Life Stories" project that Forever Enterprises, Tyler, and Brent were pursuing when I first started with the companies. There were ongoing discussions among Mike Butler, Brent, Tyler and Sutton about the fact that the companies needed to become more profitable and discussion of how to do so. On one occasion, an acquaintance of mine who was doing some marketing work for the Forever companies called me directly to complain that his invoices were not being timely paid. At some point, Butler, the Chief Financial Officer for Forever Enterprises, told me that the Forever companies were slow to pay vendors and had cash flow problems.

14. On more than one occasion, I heard Sutton complain that some of the cemeteries and funeral homes were losing money. My impression was that Butler went to Sutton for funds to support the cemeteries and funeral homes within the Forever Network.

15. During my tenure as General Counsel, I and/or my legal assistant, Kelly Tate, were asked to draft promissory notes to memorialize transfers of money that had already occurred. The first one that I recall was in 2003, and was a promissory note for $150,000 that the Forever entities had borrowed from NPS to purchase a funeral home in Texas called All Faiths.

16. The requests to prepare a promissory note often caught me by surprise. I often had no knowledge that an NPS trust had loaned money. The requests for a promissory note typically came from Sutton. It was often confusing for me to figure out which entity had loaned the money and which received the money, and I would primarily have to go back to Sutton for clarification. The terms of the promissory notes (such as interest rate, payment term, whether the note was secured, the date to put on the note, etc.) were dictated to me, typically by Sutton.

5

CONFIDENTIAL

PTF0020194

17. The promissory notes were frequently drafted after the transfer of funds, sometimes many months later. I understood the purpose of the promissory notes was often to document transactions that had already taken place. Sutton would tell me something to the effect of, "This is what has happened, we just need to make the promissory note."

18. I do not recall David Wulf directly interacting with me concerning any loans from the trusts. I was not involved in the decision to provide funds. I never was asked to clear any terms or amounts with David Wulf, and on no occasion did I receive a request for information directly from David Wulf concerning any of the loans from the trusts or from the subsidiaries.

19. When a trust or one of the NHE Subsidiaries loaned money, I was not asked to set up a system to track principal and interest payments. I was never informed by a bank acting as trustee that they were not tracking principal and interest payments on loans from the trusts.

20. In or around March 2005, Sutton asked that I draft two sets of promissory notes memorializing transfers of funds that had occurred in 2004. One set of promissory notes was for $6,300,000 from Forever Enterprises to Lincoln Memorial Services, and then for the same amount from Lincoln Memorial Services to RBT Trust II. The promissory note was dated June 1, 2004, even though I was not asked to draft the note until March 2005. The other set of promissory notes was for the transfer of $4,600,000 out of NPS Trust IV to Lincoln Memorial Services, and then for the same amount from Lincoln Memorial Services to RBT Trust II. The promissory note was dated February 1, 2004, even though I was not asked to draft the note until March 2005.

21. At one point, I remember Sutton told me that he needed me to draft a set of promissory notes quickly because the bank was being audited and the bank needed documentation prior to the audit.

6

CONFIDENTIAL

PTF0020195

22. I never received any phone calls, e-mails, or other correspondence from the trustee of Trust IV in February 2004 or any other time, regarding this $4,600,000 outgoing transfer of funds from Trust IV to Lincoln Memorial Services. I do not recall ever drafting a promissory note with a signature block for the lender, including promissory notes reflecting transfers of money from Trust IV.

23. In the years that I served as General Counsel for NHE, I do not recall any phone calls, e-mails, or other correspondence with any of the bank trustees regarding any matter, including the trusts, the promissory notes, David Wulf, and Chapter 436 of the Missouri statutes.

24. I do not recall ever being asked to draft a promissory note reflecting money paid to any Cassity from NPS or any other NHE Subsidiary.

25. I heard Sutton complain on numerous occasions that Tyler spent too much money. Nicki Province also told me more than once that Sutton was upset that Tyler was spending too much money. It was my impression that Nicki received at least some credit card statements used by Tyler and Brent and would work with Sutton to get them paid.

26. Nicki Province was supposedly a paralegal, but I never felt that she worked exclusively for me. Her actual role in the company was not clear to me. She had a separate role from whatever assistance she provided to me and she would give directions to other people in the companies. She was very close with Doug, Rhonda, Brent, and Tyler Cassity and Wittner. It was my impression that she was closely involved in much of the Cassity family's business and personal affairs, including the personal finances for Doug, Rhonda, and Tyler. Functionally, she acted as a personal assistant to Doug, Brent, Tyler, and Rhonda Cassity. At one point, I told Doug, Brent, and Tyler that Nicki was spending a lot of time on their personal affairs. After I made those comments, I did not notice any change in how she spent her time.

7

CONFIDENTIAL

PTF0020196

27. Tyler was one of my bosses to whom I reported directly. I believe part of the reason I was hired was because Tyler openly expressed that he did not trust Wittner to look out for his interests. It was my understanding from Tyler that I should keep him informed about matters happening in the NHE Subsidiaries, particularly those based in St. Louis. That understanding was not limited to information about any particular company. I spoke to Tyler frequently during my time with the companies. Early in my tenure, I would go to California to meet with Tyler in person. As time went on, I primarily spoke with Tyler on the phone and e-mailed him updates concerning the companies.

28. I kept Tyler informed on matters material to NPS of which I was aware, including responses to regulators and NPS' contracts in new states. I also kept Tyler informed on matters material to Forever Enterprises and its subsidiaries of which I was aware, including the insurance companies Lincoln and Memorial. For example, I kept Tyler informed about litigation relating to the Forever trademark, the litigation with Hannover, and Forever Enterprise's decision to go private.

29. Tyler strongly wanted to purchase the Fernwood cemetery. I was involved in some of the discussions with Tyler and with the seller or her agent regarding the purchase agreement. Tyler and Doug discussed the funding. I was led to believe that at least a substantial part of the funds used to purchase Fernwood came from Tyler's own money. I do not believe that I was told by anyone within the NHE Subsidiaries that NPS Trust IV was the actual source of any of the funds used to purchase Fernwood.

30. In 2004, I handled the negotiations on behalf of Fernwood Cemetery to obtain a refund on crematory equipment purchased by the cemetery. I obtained a partial refund, and it is my understanding that the refund went back to Hollywood Forever, Inc. I did not know that the

8

CONFIDENTIAL

funds used to purchase the crematory equipment came from Trust IV. Neither Tyler nor anyone else ever instructed me to make sure that these funds went to Trust IV.

31. At one point, Tyler mentioned selling a house in Nantucket to fund the purchase of Fernwood. Tyler later mentioned that the house was not actually his. I was not involved in the sale of that house and never saw the title to any of the Nantucket houses.

32. I do not recall whether Tyler ever told me he needed a promissory note issued prior to the transfer of any funds to Hollywood Forever. I do not recall whether I had extensive communications with Tyler in which he expressed an interest to me about the source of the funds that went to Hollywood Forever, Inc. or any of his other ventures.

33. On February 21, 2006, I received an e-mail from Yogu Kanthiah stating that 24 out of 28 promissory notes involving Hollywood Forever, Inc. were missing. I am not aware whether all of these promissory notes were ever located. I do not believe that all of the promissory notes were eventually located.

34. There were times when Tyler would go "off the grid" and I could not get a hold of him, either directly or through employees at Hollywood Forever. These periods sometimes lasted many weeks. If I was able to get a hold of him during these periods, his behavior was frequently erratic.

35. I accompanied Tyler on a trip to China for the casket-selling company, Triad. Tyler did not participate in all of the meetings on this trip. On a separate trip to China that I did not go on, my understanding is that Tyler did not come out of his room for at least a portion of the trip.

36. Late in my tenure as General Counsel, I needed to obtain the bank statements for the Missouri trusts to respond to regulator inquiries. I was surprised at how difficult it was for me to

9

PTF0020198

obtain these statements.  Sutton was reluctant to give the trust statements to me to hand over to the regulators.

37. Doug and Wittner also did not want to disclose information about RBT Trust II to the regulators.

38. NPS was expanding its sales into new states throughout most of the time that I was General Counsel.  I was responsible for obtaining regulatory approval, when required, of the pre-need contract form in each new state that NPS wanted to sell in.  Brent Cassity and Randy Sutton were both persistently asking how quickly we could get the forms approved so that NPS could begin selling.

39. I also participated in weekly calls that were held to report on NPS sales volume. During the later part of my tenure as General Counsel, Butler sometimes participated in these weekly calls regarding NPS sales reports, even though he had no official position with NPS and was CFO of Forever Enterprises.  For most of the time I was with the companies, the sales volume was increasing.  There was constant pressure from Brent Cassity and Randy Sutton to improve sales.

40. By 2007, I had learned that there had been white-outs on multiple policies.  I believe that these policies were written in Illinois.  I did not have originals of the policies, but it was obvious from looking at the copies of the policies that I had that there were alterations.  At various points, I spoke with Nicki Province, Doug, Brent, Tyler, and Sutton about the white-outs. Nicki and Sutton told me that these alterations were simply how it had always been done.  Brent told me to "talk to Randy" because "we always get audited in Illinois and it's always fine." When I sought to learn who was directing the whiteouts, I could not get direct answers.  Erin

10

CONFIDENTIAL

PTF0020199

Province in St. Louis said that the whiteouts happened in Austin.  Someone in Austin told me the whiteouts happened in St. Louis.

41. The explanation I received from Doug, Brent, and Wittner regarding the practice of altering policies in Illinois was that NPS had the right to alter the policies because NPS was the owner or assignee of the policies.  I do not recall being told that the practice of altering policies in Illinois was a result of NPS lacking sufficient funds.  I advised the regulator that we would proceed pursuant to the regulator's instructions in the future.

42. I began to learn of the extent and magnitude of the policy loans through having to respond to regulatory inquiries during 2007 and 2008.  As regulators came to me with questions, I looked into NPS's authority to take such loans.  I remember that in some states, including Ohio, I could not find a good argument in response to regulator questions for why NPS could take policy loans.  With respect to Ohio, I was involved in drafting a letter to the regulators representing that as of July 9, 2007, there were no outstanding policy loans on insurance policies sold in Ohio.  While I knew that policy loans had been taken, I was told that all Ohio policy loans had been repaid.  I did not learn until later that they were repaid by simply shifting the balances to policies sold in other states.

43. When communicating with the regulators, I had to rely on others—including Sutton, Brent, Doug, Wittner, Lumpkin, Nicki Province, and others—to provide the information I would convey to the regulators because I did not have personal knowledge about those matters.  The approach we took was to provide the regulators with exactly what they asked for, but nothing more.  Based on what I know today, I believe that the information I was given was not always complete.  I am not aware whether the regulators always received full information.

11

CONFIDENTIAL

PTF0020200

Further affiant sayeth naught.

By: _____
Katherine P. Scannell


STATE OF MISSOURI     )
                           ) SS.
_____COUNTY OF St. Louis_____  )

SUBSCRIBED AND SWORN TO BEFORE ME on May 7, 2014, by Katherine P. Scannell.

_____
Notary Public, State of Missouri

My commission expires: _____

DEVIN LINDSAY
My Commission Expires
March 23, 2018
St. Louis City County
Commission #14596153

12

CONFIDENTIAL

PTF0020201

*Ex #6*

# AFFIDAVIT OF CHARLES F. BATES III

My name is Charles (Trip) F. Bates III, being of lawful age and duly sworn under oath, state as follows:

1.) I was the co-founder and President of Wulf, Bates & Murphy, Inc. (WBM) from 1986 until September 2013.

2.) In the years before the trial of David R. Wulf I had numerous opportunities to speak with Jim Crawford both in person and by phone. Most of the conversations in person took place in the offices of Wulf, Bates & Murphy with David R. Wulf present. Our office was located at 10 South Brentwood Blvd. 4th Floor, Clayton, MO from late 1999 until 2008.

3.) During the conversations, Mr. Crawford stated emphatically and frequently the following: 'I told the prosecutors and I told the investigators as well that Dave had nothing to do with the fraud at NPS.'

4.) Jim Crawford also made it clear that his declarations to the prosecutors and investigators were 'statements on the record' that David had nothing to do with the NPS fraud.

5.) Shortly after the trial I had another conversation with Mr. Crawford. During this conversation he indicated that due to the fact that both he and his wife were clients of Dave, the prosecutors considered him to be a 'throw-away witness'.

6.) Jim Crawford has often asserted that the reason he and his wife were clients of Dave Wulf was due to the fact that they trusted him implicitly and he was fully prepared to testify to the fact had he been asked.

I affirm under the penalties for perjury that the foregoing representations are true.


**CHARLES F. BATES III**


Subscribed and sworn to before me on ___**June 23**___, 2014 by Charles F. Bates III

MARY L. CARTER
Notary Public - Notary Seal
State of Missouri
Commissioned for Jefferson County
My Commission Expires: October 04, 2015
Commission Number: 11486645

Notary Public, State of

My commission expires: _____ 10·4·2015 _____

Ex # 7

# AFFIDAVIT OF CHARLES F. BATES III

My name is Charles (Trip) F. Bates III, being of lawful age and duly sworn under oath, state as follows:

1.) I was the co-founder and President of Wulf, Bates & Murphy, Inc. (WBM) from 1986 until September 2013.

2.) Our office was located at 10 South Brentwood Blvd. 4th Floor, Clayton, MO from late 1999 until 2008.

3.) WBM sublet this office space from National Prearranged Services (NPS). As landlord NPS had keys to our offices and access after normal business hours.

4.) Sometime in late 2001 or early 2002 I was present and witnessed an NPS employee enter the office and take about an inch thick amount of new unused WBM stationery from under our printer. She then proceeded to walk out the front door of the office.

5.) Also present was David R. Wulf, CEO of WBM, and Kelly Bates, Administrative Assistant of WBM.

6.) David R. Wulf stopped the NPS employee and informed her that she was not authorized to take or use WBM stationery under any circumstances.

7.) On that day it was decided to completely stop any and all funeral home letters written by WBM.

8.) Because of the incident, it was decided to take back an old David R. Wulf signature stamp that Sharon Nekol Province was thought to have. Sharon Nekol Province was an NPS employee and also one of the 5 people who was indicted for fraud and plead guilty.

9.) I was present during the conference call between Sharon Nekol Province, David R. Wulf and myself. In that call, Sharon Nekol Province was informed that WBM would not continue writing funeral home letters effective immediately. Mr. Wulf asked Sharon Nekol Province to return his signature stamp.

10.) Mr. Wulf made it clear that NPS was not authorized to use WBM stationery or write letters for funeral homes on its behalf, under any circumstances.

11.) Sharon Nekol Province returned a signature stamp to WBM.

12.) The retuned 'David R. Wulf' stamp was resumed lost, but has recently been found.

13.) During the discovery phase of the criminal trial of David R. Wulf, it was learned that NPS illicitly continued to write funeral home letters on illegally obtained WBM stationery from 2001 through 2008.

14.) It was also learned that NPS retained another David R. Wulf signature stamp. NPS illegally used this stamp on some of the forged letters and had NPS employees sign the name of David R. Wulf on others without any authorization and unknown to WBM.

15.) WBM didn't write, authorize, or know of any funeral home letters being written after this incident in late 2001 or early 2002. Any letter after this date is forged and fraudulent.

I affirm under the penalties for perjury that the foregoing representations are true.

**CHARLES F. BATES III**

Subscribed and sworn to before me on __June 26_____, 2014 by Charles F. Bates III

_Mary L Carter_____

Notary Public, State of

My commission expires: 10·04·2016

```
MARY L. CARTER
Notary Public - Notary Seal
State of Missouri
Commissioned for Jefferson County
My Commission Expires: October 04, 2015
Commission Number: 11486645
```

# AFFIDAVIT OF CHARLES F. BATES III

My name is Charles (Trip) F. Bates III, being of lawful age and duly sworn under oath, state as follows:

I have personal knowledge with regard to virtually all activities involving Wulf, Bates & Murphy, Inc. (WBM) and National Prearranged Services (NPS). I am certain that David Wulf did not knowingly participate in any fraudulent activities involving the NPS Trust.

I affirm under the penalties for perjury that the foregoing representations are true.

**CHARLES F. BATES III**

Subscribed and sworn to before me on _OcToBEr 6,_____, 2014 by Charles F. Bates III

Notary Public, State of _MISSOURI_

My commission expires: _7-4-2017_

JERRY R. HERBERT
Notary Public - Notary Seal
STATE OF MISSOURI
St. Louis County
My Commission Expires: July 4, 2017
Commission # 13516071

## Susie Woods

| | |
|---|---|
| **From:** | Susie Woods [susie112_98@yahoo.com] |
| **Sent:** | Friday, May 16, 2014 8:16 PM |
| **To:** | Susie Woods |
| **Subject:** | Fwd: Unauthorized use of WBM funeral home letters |

*EXHIBIT #8* (handwritten)

Sent from my iPhone

Begin forwarded message:

> **From:** Dave Wulf <drwulf@live.com>
> **Date:** September 17, 2013 at 11:30:38 AM CDT
> **To:** Stephanie Carenza <stephaniewulf@yahoo.com>, Eric Wulf <ewulf84@gmail.com>, Susie
> Woods <susie112_98@yahoo.com>, Jessica Lindemann <jessica.lindemann@btlaw.com>, Larry
> Mackey <larry.mackey@btlaw.com>
> **Subject: FW: Unauthorized use of WBM funeral home letters**

> From: davew@wbmnet.com
> To: drwulf@live.com
> Subject: Fw: Unauthorized use of WBM funeral home letters
> Date: Thu, 12 Sep 2013 11:47:05 -0500

> ----- Original Message -----
> **From:** Dave Wulf
> **To:** Joe Hogan
> **Cc:** Trip Bates ; Jonathan Andres
> **Sent:** Wednesday, May 22, 2013 9:01 AM
> **Subject:** Unauthorized use of WBM funeral home letters

>    *I know with certainty* that a letter from WBM to a funeral home in the Governments' "hot docs" is a
> signature stamp.  It is from early 2002.....I am *almost* positive WBM stopped writing letters in 2001.  I'm
> guessing because it was prior to the time of Kaitlin Bates' birth, September of 2003.  Kelly was not
> pregnant at the time of the NPS employee "episode" (at the latest, year end 2002).  Trip and Kelly were
> both present during the "episode".

>    It is becoming clear to me, through reading testimonies, that NPS used these letters for sales of one
> thing or another, sometimes rollovers...who knows what else.  I have previously told the story of the time
> an NPS employee walked in and took an inch or so of our stationary with out so much as a "Hello".  They
> also had a stamp of my signature and also many other people, it is being revealed.

>    Trip brings up the point to me that NPS had access to our offices, with assorted keys and such, even
> when we were not there.  They could have taken stationary without our knowledge.  I don't like to think
> they would do that.....except for *that letter* the Feds have with my signature stamp on it.  It could have
> been innocuous and the exception......or not.

> ***Questions about the Stamped Letter:***

1) *Who did that?* My guess is Nicki P. or Jim C. requested it. I believe it was an employee in Jim C.'s department (a woman who's name I do not remember but I think Nicki would remember. She had blonde hair).

2) *Why did they do that?* I now believe it was a big part of their tools to sell rollovers. Apparently funeral home directors did not trust the word of a sales person or NPS alone......it is becoming clear why. (Although, the funeral directors I have read, are at least as bad and probably worse than NPS with regard to any credibility.)

3) *Did they forge letters more than once?* I suspect yes is the answer.

4) *Did they continue to generate future letters after we stopped*? Sadly.....I again suspect the answer is yes. If I can prove it (beyond the one the Feds have) I will tell you. I think I know where to look.....in Jim C.'s testimony. I have not read it through yet. Stay tuned.

I can tell you *unequivocally that if I knew* that the letters were going to be used for *any kind of sales* by NPS, *WBM would never have written them*. I know it sounds a little naïve and silly now, but I honestly believed they were for *information purposes only*! *I did not know anything about the NPS sales process at all*. I did not know what relationship NPS had with funeral directors or funeral homes. I did not know if NPS was selling to funeral homes or if funeral homes were selling to NPS. I did not know if NPS owned funeral homes (I thought they might have owned a few) or were trying to buy the funeral home the letter was addressed to. I did not know about the "Advantage Program" or anything about it. I did not know if they were selling funeral paraphernalia (caskets and such) or buying form the funeral home. Frankly, I just did not care about NPS's sales process. The letters were for information purposes, they were written as a service to NPS, stating the truth (as I knew it then), and were stopped when we *suspected* they were being used for sales( I think that one time right before we stopped, Nicki P. e-mailed me that she needed "the letter", she mentioned a "sales kit" ....to me it was a "red flag" not mentioned before, but, also the requests were becoming more frequent)....because we did not really know......until now. I cannot go back fifteen years and erase a mistake *that was abused by NPS*. It really makes my blood boil! Dave W.

2

WULF, BATES, & MURPHY, INC.

—— REGISTERED INVESTMENT ADVISORS ——

10 SOUTH BRENTWOOD BOULEVARD
SUITE 406
CLAYTON, MO 63105
(314) 727-7232

DAVID R. WULF
CHARLES F. BATES, III
LT. COL. ROBERT J. MEYER USA (Ret.)

*EXHIBIT #8A*

August 13, 2003

Mr. Richard Dowden
Price Funeral Home
120 East 1ˢᵗ
Maryville, MO 64468

Dear Mr. Dowden:

Wulf, Bates, and Murphy, Inc. is a registered investment advisor under the Investment Advisors Act of 1940.  As such, we work directly with Allegiant Trust, St. Louis, Missouri, and National Prearranged Services, Inc. In that capacity, I hereby certify to you that the funds are invested among various marketable securities and the Benchmark Portfolio money market fund and then in life insurance contracts.  This is done to provide income and liquidity until such life insurance contracts are issued.  The money market fund is invested in high quality (A1/P1 rated), short-term (average life 44 days), securities. There has never been any fluctuation in the net asset value for as long as we have used the fund.

Very truly yours,

David R. Wulf

# WULF, BATES, & MURPHY, INC.
## ——— REGISTERED INVESTMENT ADVISORS ———

DAVID R. WULF
CHARLES F. BATES, III
LT. COL. ROBERT J. MEYER USA (Ret.)

10 SOUTH BRENTWOOD BOULEVARD
SUITE 406
CLAYTON, MO. 63105
(314) 727-7232



August 13, 2003

Mr. Richard Dowden
Price Funeral Home
120 East 1st
Maryville, MO 64468

Dear Mr. Dowden:

Wulf, Bates, and Murphy, Inc. is a registered investment advisor under the Investment Advisors Act of 1940. As such, we work directly with Allegiant Trust, St. Louis, Missouri, and National Prearranged Services, Inc. In that capacity, I hereby certify to you that the funds are invested among various marketable securities and the Benchmark Portfolio money market fund and then in life insurance contracts. This is done to provide income and liquidity until such life insurance contracts are issued. The money market fund is invested in high quality (A1/P1 rated), short-term (average life 44 days), securities. There has never been any fluctuation in the net asset value for as long as we have used the fund.

Very truly yours,

David R. Wulf

*Nov. 1999*
*CONTRACTS*
*+ MO. AUDITOR*
*AFFIDAVIT*
*Exhibit #9*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., | ) | |
| SPECIAL DEPUTY RECEIVER OF LINCOLN | ) | |
| MEMORIAL LIFE INSURANCE COMPANY, | ) | |
| MEMORIAL SERVICE LIFE INSURANCE | ) | |
| COMPANY, AND NATIONAL | ) | |
| PREARRANGED SERVICES, INC., ET AL., | ) | |
| | ) | |
| PLAINTIFFS, | ) | Case No. 09-CV-1252 ERW |
| V. | ) | |
| | ) | |
| J. DOUGLAS CASSITY; RANDALL K. | ) | |
| SUTTON; BRENT D. CASSITY; J. TYLER | ) | |
| CASSITY; RHONDA L. CASSITY; ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**AFFIDAVIT OF DONALD J. FRANCIS**

I, Donald J. Francis, being of lawful age and duly sworn under oath, state as follows:

1. I was employed as a trust examiner by the Missouri Division of Finance between approximately 1992 and 2000. I have personal knowledge of the matters set forth in this Affidavit.

2. I served as an examiner on the Missouri Division of Finance's examination of Allegiant Trust Company, a division of Allegiant Bank ("Allegiant"), which commenced on January 4, 1999.

3. During the course of this January 1999 examination, I found Allegiant to be in violation of multiple sections of Chapter 436 of the Missouri Revised Statutes with regard to Allegiant's administration of the National Prearranged Services pre-need trust accounts ("NPS Trusts").

1785395

*793-2969*

4. Allegiant's violations of Chapter 436, which included a failure to maintain sole custody and control over the life insurance policy assets associated with the NPS Trusts, were memorialized in the Report of Trust Examination that was issued at the conclusion of the January 1999 exam.

5. During the course of the January 1999 examination and exit meeting, I discussed these deficiencies with various officers and employees of Allegiant, as well as possible solutions to the violations of law later outlined in the January 1999 Report of Trust Examination. During these discussions I was never shown the Custody Agreement for Life Insurance Policies Held Under National Prearranged Services, Inc. Pre-Need Plans Trusts that was later finalized on November 1, 1999 (attached hereto as "Exhibit A").

6. At no time during the January 1999 examination or exit meeting did I represent or otherwise communicate to anyone at Allegiant that Allegiant would be in compliance with Chapter 436 while allowing National Prearranged Services to maintain the only books and records of receipts from pre-need contract purchasers, or to have the authority to take all action regarding the liquidation or maturation of the NPS Trusts' life insurance policies and the resulting distribution of proceeds.

7. At no time during the January 1999 examination or exit meeting did I represent or otherwise communicate to anyone at Allegiant that it would be possible for Allegiant to maintain title and control over the life insurance policy assets of the NPS Trusts without maintaining sole custody of such policies.

8. In no way, shape, or form did I ever recommend or otherwise communicate to anyone at Allegiant that National Prearranged Services could serve as an agent or custodian to the bank for purposes of maintaining control of the life insurance policy assets associated with the NPS

1785395

Trusts or for purposes of maintaining the records and accountings for such life insurance policies.

9.  Had I received a copy of Exhibit A during the January 1999 examination, I would have expressed my opinion to Allegiant that the arrangement outlined in Exhibit A is in direct violation of Chapter 436.

10. At no time during the January 1999 exam or exit meeting was I shown the letter from Wulf, Bates & Murphy to Allegiant that was later finalized on November 5, 1999 (attached hereto as "Exhibit B").

11. Had I received a copy of Exhibit B during the January 1999 examination, I would have expressed my opinion to Allegiant that the arrangement outlined in Exhibit B is in direct violation of Chapter 436.

Further affiant sayeth naught.

By: _____
Donald J. Francis

STATE OF MISSOURI          )
                           ) SS.
_____ COUNTY OF  Platte    )

> **ANA C. CORREIA**
> Notary Public - Notary Seal
> State of Missouri
> Commissioned for Platte County
> My Commission Expires: Apr. 1, 2017
> 13466281

SUBSCRIBED AND SWORN TO BEFORE ME on March 15, 2014, by Donald J. Francis.

_____
Notary Public, State of Missouri

My commission expires: 4-1-2017

1785395

# EXHIBIT A



### CUSTODY AGREEMENT FOR LIFE INSURANCE POLICIES HELD UNDER NATIONAL PREARRANGED SERVICES, INC. PRE-NEED PLANS TRUSTS

This Custody Agreement is made as of the *1st* day of *November* , 1999, by and among Allegiant Bank, as successor Trustee under the Trust Agreement for National Prearranged Services, Inc. Pre-Need Plans dated 2/22/89 and under the Trust Agreement for National Prearranged Services, Inc. Pre-Need Plans dated 7/24/89 (Allegiant Bank hereinafter called the "Trustee" and the trusts hereinafter collectively called the "Trusts"), National Prearranged Services, Inc. (hereinafter called the "Custodian") and Wulf, Bates & Murphy, Inc., the investment advisor for the Trusts appointed by the Grantor of the Trusts (hereinafter called the "Investment Advisor").

Trustee and Custodian agree as follows:

1. RECITALS

    A. The Trusts are preneed trusts as defined in Section 436.005 R.S.Mo. and are subject to the provisions of Chapter 436 R.S.Mo.
    B. The Grantor of the Trusts has appointed the Investment Advisor to manage the investments of the Trusts.
    C. The assets of the Trusts include investments in life insurance policies insuring the lives of purchasers of pre-need contracts. Title to the policies remains with the Trustee, which is evidenced by certification by the respective life insurance companies issuing the policies that the Trustee is the owner and beneficiary of the policies.
    D. More than 46,200 life insurance policies are currently held as investments in the Trusts. Custodian, in its capacity as Grantor of the Trusts, keeps and maintains records, accountings and other information relating to the policies held in the Trusts, as well as all of the records, accountings and other information required to be kept and maintained by the Grantor of the Trusts under Chapter 436 R.S.Mo.

2. CUSTODIAN'S DESIGNATED AGENTS

    The Custodian designates the following named employees of the Custodian as its agents to be responsible for the performance of the Custodian's duties hereunder and to receive Directions pursuant to this Custody Agreement, to-wit: Angie Hall, Lisa Kaleps, Nekol Province and Randall K. Sutton. The Custodian shall give written notification of any change to this designation of authorized agents to the Trustee and to the Investment Advisor.

3. DIRECTIONS

    Whenever the terms "Direction(s)" or "Direct" are used in this Custody Agreement, they shall mean written Directions (including, without limitation, Directions received by the Custodian via facsimilie) and verbal Directions (including, without limitation, Directions received by the Custodian via telecommunications devices) which the

NATIONAL CITY BANK
001071

Custodian receives and reasonably believes to be from an authorized employee, agent or representative of the Trustee or from an authorized employee, agent or representative of the Investment Advisor.

4. SAFEKEEPING, RECEIPT AND DELIVERY OF POLICIES

The Custodian agrees to hold and keep safely all life insurance policies owned by the Trustee as investments in the Trusts. The Custodian shall receive any life insurance policies purchased by the Investment Advisor and shall deliver any life insurance policies sold by the Investment Advisor in accordance with the directions of the Investment Advisor.

5. LIQUIDATION OF POLICIES UPON CANCELLATION OF PRENEED CONTRACTS

Upon delivery to the Custodian of a receipt by a purchaser of a preneed contract pursuant to which a deposit was made to any of the Trusts for payment to such purchaser of an amount equal to all payments made into any of the Trusts under such preneed contract due to cancellation of such preneed contract by such purchaser or by the seller of such preneed contract, the Custodian shall, and is hereby authorized to, subject to the Investment Advisor's direction to the contrary, liquidate all life insurance policies insuring the life of such purchaser held by the Custodian and distribute the proceeds therefrom, to the extent of all deposits made into any of the Trusts with respect to such cancelled preneed contract, to the seller of such preneed contract. The Custodian shall maintain accurate books and records of all receipts from purchasers, all actions taken with respect to the liquidation of life insurance policies and all distribution of proceeds in connection with the cancellation of any above referenced preneed contract and the Custodian shall furnish information regarding the same to the Grantor(s) of the Trusts to enable such Grantor(s) to deliver such Affidavits to the Trustee as are required under the Trusts.

6. MATURITY OF POLICIES UPON DEATH OF INSURED

Upon delivery to the Custodian of a receipt by a provider of funeral services under a preneed contract pursuant to which a deposit was made to any of the Trusts for payment to such provider of an amount equal to all payments required to be made pursuant to a written agreement between the seller of such preneed contract and the provider or all payments made under the preneed contract due to the death of the purchaser of such preneed contract, the Custodian shall, and is hereby authorized to, subject to the Investment Advisor's direction to the contrary, claim the proceeds of all life insurance policies insuring the life of such purchaser held by the Custodian and distribute the proceeds therefrom, to the extent of the lesser amount of the above referenced payment to such provider and all deposits made into any of the Trusts with respect to such preneed contract, to the provider of such funeral services under such preneed contract. The Custodian shall maintain accurate books and records of all receipts from providers, all actions taken with respect to the maturity of life insurance policies and all distribution of proceeds in connection with the maturity of any such life insurance policy and the Custodian shall furnish information regarding the same to the Grantor(s) of the Trusts to enable such Grantor(s) to deliver such Affidavits to the Trustee as are required under the Trusts.

NATIONAL CITY BANK
001072

7.  CUSTODIAN'S LIABILITY

The Custodian shall be responsible to the Trustee for any claim, loss or damage resulting from any failure by the Custodian to perform its duties hereunder.

8.  FEES AND EXPENSES

The Custodian shall not receive any compensation for the Custodian's services hereunder, nor shall the Custodian be entitled to any reimbursement or other payment for any expenses incurred by the Custodian in connection with the Custodian's performance of the Custodian's duties hereunder.  The Custodian presently receives compensation as Grantor of the Trusts and the consideration for the Custodian's agreement to perform the services hereunder is the Trustee's services as Trustee of the Trusts.

9.  MISSOURI LAW

This Custody Agreement shall be governed by and construed under the laws of the State of Missouri.

10. TRUSTEE'S TITLE TO AND CONTROL OF INSURANCE POLICIES

Nothing herein shall constitute or be construed to constitute any waiver or relinquishment by the Trustee of the Trustee's title to and control of the life insurance policies held by the Custodian pursuant to this Custody Agreement.

11. TERMINATION

This Custody Agreement may be terminated at any time by the Trustee or the Custodian by giving written notice to the other, whereupon all life insurance policies held by the Custodian shall be delivered in accordance with the Trustee's directions to the Custodian.

ALLEGIANT BANK

By: _____ (RICHARD L. MARKOW)
Title: PRESIDENT, ALLEGIANT TRUST COMPANY,
A DIVISION OF ALLEGIANT BANK

WULF, BATES & MURPHY, INC.

By: _____
Title:  CEO : DAVID R. WULF

NATIONAL PREARRANGED
SERVICES, INC.

By: _____
Title: _____

NATIONAL CITY BANK
001073

# EXHIBIT B

**WULF, BATES, & MURPHY, INC.**

——— REGISTERED INVESTMENT ADVISORS ———

10 SOUTH BRENTWOOD BOULEVARD
SUITE 315
CLAYTON, MO 63105
(314) 727-7232

DAVID R. WULF
CHARLES F. BATES, III
MICHAEL P. MASTERSON
LT. COL. ROBERT J. MEYER USA (Ret.)

November 5, 1999

Mr. Richard E. Markow
President, Allegiant Trust Company,
 a division of Allegiant Bank
7801 Forsyth Blvd.
St. Louis, MO 63105

RE:   Hiram Cemetery Endowed Care Trust; A/C #191500024
      Mason Securities Pre-Need Plans Trust; A/C #191500016
      NPS Pre-Need Trust I; A/C #191500073
      NPS Pre-Need Trust II; A/C #191500081
      NPS Pre-Need Trust III; A/C #191500099
      NPS Pre-Need Trust IV; A/C #191500107
      NPS Pre-Need Trust V; A/C #191500487

Dear Mr. Markow:

This will serve as direction and authorization by Wulf, Bates, & Murphy, Inc., Investment
Advisor for the above referenced trust accounts, to Allegiant Bank, as Trustee of the
referenced trusts, to:

1.  Deposit all cash, securities and other assets received physically, by wire or electronic
    transfer or by check by Allegiant Bank, any of its agents, nominees or custodians,
    from any person or entity to such of the above referenced trust accounts identified for
    the deposit of such cash, securities or other assets upon receipt of identification of
    the trust account to which such cash, securities or other assets are to be deposited
    by fax, telephone or in person from a principal, officer, employee, agent or
    representative of Wulf, Bates & Murphy, Inc. or National Prearranged Services, Inc..;

2.  Distribute any cash, securities or other assets from any of the above referenced trust
    accounts in accordance with any directions received by Allegiant Bank by fax,
    telephone or in person from a principal, officer, employee, agent or representative of
    Wulf, Bates, & Murphy, Inc. or National Prearranged Services, Inc.; and

3.  Settle any trades in any of the above referenced trust accounts in accordance with
    any form of trade confirmation received by Allegiant Bank, or any of its agents,
    nominees or custodians so long as such trade confirmation identifies the account as
    Allegiant Trust F/A National Prearranged Services.  If any trade confirmation does
    not identify in which of the above referenced trust accounts the trade is to be settled,
    Allegiant Bank is directed and authorized to rely on direction by telephone, fax or in

NATIONAL CITY BANK
012067

person from a principal, officer, employee, agent or representative of Wulf, Bates, & Murphy, Inc. or National Prearranged Services, Inc. as to the trust account in which to settle the trade.

Wulf, Bates, & Murphy, Inc. further acknowledges that it has received statements from Allegiant Bank for all of the above referenced trust accounts reflecting all transactions in the above referenced trust accounts from the dates of appointment, respectively, of Allegiant Bank as successor Trustee of the referenced trusts to the date hereof and that all investment transactions reflected therein were executed upon the direction and authorization of Wulf, Bates, & Murphy, Inc., as Investment Advisor for the referenced trust accounts.

Sincerely,

Wulf, Bates, & Murphy, Inc.

By: _____   11-5-99

DAVID  R.  WULF

NATIONAL CITY BANK
012068

*EXHIBIT*
*9 C*

ALLEGIANT TRUST COMPANY
7801 Forsyth Blvd.
St. Louis, MO 63105
(314) 863-2200
(314) 726-5700 (FAX)
(314) 726-0506 (TTY)

MEMORANDUM

TO:      SANDY FRIEDMAN

FROM:   RICH MARKOW

DATE:    MARCH 4 1999

RE:      REPORT FROM THE MISSOURI DIVISION OF FINANCE REGARDING AUDIT OF
         TRUST COMPANY, DATED FEBRUARY 11, 1999

As requested, the following is in response to the "Comments and Recommendations" set out on pages
T-1 and T-1-1 and "Violations of Laws and Regulations" set out on page T-1-a of the above referenced
report. The numbers of the following responses correspond with the numbers of the paragraphs of the
enclosed copies of the above referenced pages of the report.

1) All Mutual Funds Classified as Common Stock: Upon Allegiant's additional request, Midwest has
   corrected the classification of mutual funds in all accounts subject to the Missouri Division of
   Finance auditor's comment. We have been advised that mutual funds will be properly classified on
   future statements to customers. With respect to new accounts, Allegiant has requested Midwest to
   properly classify mutual fund assets. Allegiant will manually review the classification of mutual
   fund assets no later than the required 60 day account review (in accordance with Allegiant's trust
   policy ) or at such later time as mutual fund assets are received into an account, and request Midwest
   to take any necessary corrective action. We have been advised by Midwest that its trust system
   cannot automatically classify mutual fund assets appropriately as equity or fixed income
   investments, so Midwest will need to classify such mutual fund assets manually.

2) Review of the Fiduciary Services Policy Manual: The initial fee paid to Midwest Trust Company in
   September, 1997 included Midwest's preparation of a fiduciary services policy manual for Allegiant,
   which, in form, is substantially similar to Midwest's manual given the need for coordination for
   operations, administration and investment activities in light of Allegiant's contract with Midwest. I
   made several modifications to the drafts submitted by Midwest for review as to serve Allegiant's
   initial needs. After assessing the Trust Company's first full year of operation and after considering
   the auditor's observations and recommendations, it is apparent that some of the trust policies need
   revision, while some policies need to be eliminated. I have established as a project for Herb Morisse
   and I to perform a complete review of all trust policies in the manual and to make appropriate

**NCB-015969**

recommendations to the Trust Committee for specific policy revisions and elimination.  This project will commence in this month and should be completed by the end of July, 1999.

3) Requirement of an External Audit:  No external (or internal) audit of Allegiant Trust Company has yet been performed.  I recently visited with Tom Daiber and we discussed the appropriateness of scheduling an internal audit some time in 1999.  He will be scheduling an internal audit to occur in 1999.  Tom and I, along with Jeff Heutel, also discussed the appropriateness of making internal trust audits the responsibility of the bank's audit committee, rather than the responsibility of a separately constituted trust audit committee (as presently required by Allegiant's trust policy 1.02).  Therefore, the external audit for the Trust Company should be governed by the same timetable as for other departments of the bank that are under the supervision of the bank audit committee.

4) Establish a Trust Audit Committee:  The Trust Company's trust policy 1.02 requires the establishment of a trust audit committee.  This committee has not been established.  In my visit with Tom and Jeff, in preparation for the Missouri Division of Finance audit, we discussed the appropriateness of establishment of a trust audit committee when the Trust Company has grown to a level at which a separately constituted trust audit committee is justified.  Therefore, we believe that existing trust policy 1.02 should be repealed and replaced with a policy whereby the bank's audit committee will be responsible for Trust Company audits.

5) Adoption of updated FDIC Statement of Principles of Trust Department Management:  Allegiant Bank's board originally adopted the FDIC Statement of Principles of Trust Department Management in September, 1997.  The Principles were updated in 1998.  The board adopted the updated Statement at its February, 1999 board meeting.

6) NPS Pre-Need Funeral Accounts:  All NPS and Forever Enterprises funeral pre-need trust accounts have been reviewed and it has been determined that the accounts have been administered in compliance with the governing instruments (and as the accounts were administered by Mark Twain Bank and Mercantile Bank, the former Trustees for the trust accounts) but that the provisions of the governing instruments differ in some respects from the statutory provisions cited at page T-1-a of the report.

   a) Apparent violation of Section 436.031.2 RSMo:

      Section 436.031.2 RSMo provides:
      "All property held in a preneed trust, including principal and undistributed income, shall be invested and reinvested by the trustee thereof.  The trustee shall exercise such judgment and care under circumstances than prevailing which men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income therefrom as well as the probable safety of their capital.  A preneed trust agreement may provide that when the principal and interest in a preneed trust exceeds two hundred fifty thousand dollars, investment decisions regarding the principal and undistributed income may be made by a federally registered or Missouri-registered independent qualified investment advisor designated by the seller who established the trust; provided, that title to all investment assets shall remain with the

*IN OTHER WORDS, THIS PROCEDURE IS THE SAME AS FOR THE TWO PREVIOUS TRUST COMPANIES.*

NCB-015970

<u>trustee and be kept by the trustee</u> to be liquidated upon request of the advisor of the seller.  <u>In no case shall control of said assets be divested from the trustee</u> nor shall said assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in. The trustee shall be relieved of all liability <u>regarding investment decisions</u> made by such qualified investment advisor" (emphasis added).

The governing trust instruments provide, in part, as follows:

Article II, Section 2.2: "The Trustee shall have the exclusive management and control of the Trust and its funds; provided that when the principal and interest of this pre-need trust exceeds $250,000.00, the Seller, at its discretion, may appoint an independent qualified investment advisor so long as the requirements of Missouri law are met, and the Trustee shall have no liability for any <u>investment decision</u> made by such investment advisor."

Article II, Section 2.3: "The ownership of all the assets comprising the Trust shall be solely in the Trustee.  No Owner shall be deemed to have individual ownership of any asset of the Trust, but shall be deemed to have only the right to the distributions herein provided in Article III."

The individual <u>life insurance policies are in safekeeping at NPS</u> and Forever Enterprises. Allegiant receives a <u>monthly certification</u> of Evidence of Insurance from the insurance company confirming the issuance of each policy by policy number, name of insured and face amount of insurance, and also confirming that Allegiant Trust Company is the owner and beneficiary of the policies.  The Missouri Division of Finance auditor believes that the <u>absence of physical possession</u> of each individual policy by Allegiant <u>violates the statutory provisions</u> that "title to all investment assets shall remain with the trustee and be kept by the trustee..." and  that "in no case shall control of said assets be divested from the trustee...."  If the auditor's interpretation of the relevant statutory provisions is accepted, we <u>concur with his recommendation</u> to consider entering <u>into an agency agreement with NPS' custodian</u> of the individual policies whereby the custodian would be a non-paid agent <u>of Allegiant Trust Company</u> to "keep" and "control" the <u>individual policies</u> in compliance with the auditor's interpretation of the statutory provisions.

*HENCE THE CONTRACTS IN NOV. '99 OF COURSE, WBM HAD NO KNOWLEDGE WHATSO EVER OF THIS CONSIDERATION*

b)  Apparent violation of Section 436.045 RSMo:

The provision of Section 436.045 RSMo are set out in the third paragraph of page T-1-a of the report.

Section 436.005.(7) RSMo provides: "As used in sections 436.005 to 436.071, unless the context otherwise requires, the following terms shall mean: ... (7) "Provider", the person obligated to provide the disposition and funeral services, facilities, or merchandise described in a preneed contract;"

The governing trust instruments provide, in part, as follows:

Article I, Section 1.4: "Provider shall mean the person obligated to provide the disposition and funeral and/or burial services, facilities and merchandise described in the Funeral Agreement."

NCB-015971

Article III, Section 3.2: "The Trust principal shall be distributed by the Trustee from time to time in the following circumstances.

(a) Death of a Beneficiary. Upon presentation to the Trustee of the Provider's notarized affidavit to the effect (i) that a Funeral Agreement has matured as the result of the death of the Beneficiary thereof, and (ii) that all the terms and conditions of the Funeral Agreement applicable to such Beneficiary have been fully performed by Provider, or that Provider has provided alternative funeral benefits for the beneficiary pursuant to special arrangements made with the Owner, accompanied by a copy of the death certificate of the Beneficiary, the Trustee shall distribute and pay over to the Seller all amounts which have been theretofore deposited into the Trust with respect to said Funeral Agreement."

NPS or Forever Enterprises, as the grantor of the applicable preneed trust, (1) distributes the death benefits from the life insurance policy on the life of a decedent for funeral services for the decedent pursuant to the provisions of the decedent's Funeral Agreement and (2) furnishes Allegiant a notarized Affidavit in the form evidenced by Exhibit A attached hereto. If it is determined that NPS or Forever Enterprises is not the "Provider" from whom a receipt is required, Allegiant will request NPS and Forever Enterprises to furnish a copy of the "Provider's" receipt with the Affidavit furnished to Allegiant.

7) Nadine Allen Testamentary Trust Account Investment Review: The required initial investment review was noted in the Minutes of the Trust Committee, but the file copy of the investment synopsis for the account was marked "reschedule" to permit communication of investment recommendations and setting investment objectives at a meeting with the income beneficiary. Investment objectives were in fact established for the trust account at a meeting with a representative of the income beneficiary and correspondence confirming and memorializing the investment objectives was mailed to the beneficiary, with a copy kept in Allegiant's file. It was not understood that the action subsequent to the initial reference in the Minutes of the Trust Committee should be referred back to the Trust Committee until mentioned by the Missouri Division of Finance auditor. Accordingly, the initial investment review was formally concluded at the January 21, 1999 meeting of the Trust Committee. The income beneficiary and remaindermen will be requested to deliver written authorization for the retention of the Central Bancshares stock per the auditor's recommendation.

8) Marion D. Brunk Investment Agency Investment Review: The required initial investment review was noted in the Minutes of the Trust Committee, but the file copy of the investment synopsis for the account was marked "reschedule" to permit communication of investment recommendations and setting investment objectives at a meeting with the account owner. Investment objectives were in fact established for the investment management account at a meeting with the account owner and her attorney and correspondence confirming and memorializing the investment objectives was mailed to the account owner and her attorney, with a copy kept in Allegiant's file. It was not understood that the action subsequent to the initial reference in the Minutes of the Trust Committee should be referred back to the Trust Committee until mentioned by the auditor. The initial investment review was therefore formally concluded at the January 21, 1999 meeting of the Trust Committee. The investment objectives will be changed in line with the auditor's suggestion at the first annual review of this account.

NCB-015972

9) Y2K Readiness:
   a) Potential Risks to Assets in Managed Fiduciary Accounts
   b) FFIEC Statement dated September 2, 1998:

On Thursday, February 18, 1999, I met with Jeff Heutel to discuss both a) & b), above.

   a) By mid-March, 1999, I will be providing Jeff with a report that addresses potential Y2K risks regarding assets in our managed fiduciary accounts. Midwest has supplied me with various internal memos regarding a number of Y2K issues, including what Midwest has done to analyze Y2K risks relative to companies in which Midwest invests. Additionally, Midwest subscribes to a service entitled "Y2K Reporter", which addresses Y2K risk of various publicly traded companies. I will make reference to Midwest's memos/Y2K Reporter in my report to Jeff, which I will share with the Trust Committee for review and response/action at either our March, 1999 or April, 1999 meeting.

   b) The topic of "a)," above, is one of the matters addressed in the FFIEC Interagency Statement-Guidance Concerning Fiduciary Services and Year 2000 Readiness dated September 2, 1998. Attached is a copy of the Statement and I will be addressing the various "areas of concern" in my memo to Jeff.

**NCB-015973**



2122 Kratky Road
St. Louis, Missouri 63114
(314) 692-8200 • Fax: (314) 692-8500

Member FDIC

March 19, 1999

Mr. Lawrence C. Clos, Chief Examiner
Missouri Department of Economic Development
Division of Finance
301 West High Street
P.O. Box 716
Jefferson City, MO 65102-0716

Dear Mr. Clos:

In response to the State of Missouri Division of Finance Trust Examination which commenced January 4, 1999 (hereafter the "Trust Examination") and correspondence from your office dated February 11, 1999 (hereafter the "Report"), we offer the following comments. The Board of Directors appreciates the comments provided by the State and is committed to establishing or revising the Trust Company's procedures to ensure that the noted exceptions are not repeated in the future. The documentation that follows addresses each point of concern in the Report and details the Trust Company's corrective action.

<u>Investment Classification/Mutual Funds</u>

Your Report noted that all mutual funds are currently classified and reported on the trust statements as common stock. Midwest Trust has corrected the classification of mutual funds in all current accounts and advised us that mutual funds will be properly classified on all future statements to customers. With respect to new accounts, Midwest Trust will manually code mutual fund assets for proper classification since its trust system cannot automatically code mutual fund assets for proper classification. Allegiant Bank will review necessary documentation to ensure proper classifications.

<u>Fiduciary Policies and Procedures</u>

The Fiduciary Services Policy manual will be reviewed by the Trust Company staff and appropriate changes will be recommended to the Trust Committee for approval by June 30, 1999.

## PLEDGED TO A BETTER WAY OF BANKING.

CONFIDENTIAL

NCB-015896

**External Audit**

An audit of the Trust Company is part of the Bank's internal audit plan and is scheduled for 1999. Although the Fiduciary Services Policy manual requires the establishment of a Trust Audit Committee, it will be recommended to the Trust Committee that the Bank Audit Committee be responsible for the Trust Company's audit review. The Fiduciary Services Policy manual will be amended accordingly.

**FDIC Statement of Principles**

The Board of Directors originally adopted the FDIC Statement of Principles of Trust Department Management in September, 1997. The Principles were updated in 1998. At the February 18, 1999 board meeting, the Board of Directors adopted and approved the updated Statement of Principles of Trust Department Management.

**NPS Pre-Need Funeral Account**

Your review of the NPS Pre-Need Funeral Account disclosed apparent violations of Sections 436.031.2 and 436.045 of the Missouri Revised Statutes. Section 436.031.2 provides that "when an investment advisor has been designated to perform investment management of trust assets, as in the case of the trust in question, title to all investment assets shall remain with the trustee and be kept by the trustee. In no case shall control of said assets be divested from the trustee." Certain assets of the trust in question, life insurance policies approximating $56.9 million, are physically held by the Grantor. The Trust Company will take necessary action as trustee of the account to maintain control of the insurance policy assets in question. Section 436.045 provides that "the trustee shall distribute trust assets to the appropriate parties upon delivery to the trustee of a receipt from the provider." In the future, the Trust Company will obtain receipts. The Report also addresses concerns related to the administration of this account, including adequate documentation for income distributions and direction from the investment advisor. Documentation will be improved to address each of these issues.

**Nadine Allen Testamentary Trust**

A formal investment review of this Trust was concluded at the January 21, 1999 meeting of the Trust Committee. The income beneficiary and remainder will be requested to deliver written authorization for the retention of the Central Bancshares stock.

**Marion D. Brunk Investment Agency**

A formal investment review was concluded at the January 21, 1999 meeting of the Trust Committee. The investment objectives will be amended at the first annual review of this account.

**CONFIDENTIAL**                                                                                     **NCB-015897**

**Year 2000 Readiness**

The Trust company will ensure that Midwest Trust Company formally evaluates the Year 2000 risks associated with the companies in which they invest for managed accounts. Documentation related to Midwest Trust's Year 2000 evaluations will be maintained by Allegiant Trust Company.

Sincerely

Shaun R. Hayes
President and CEO

Cc:   Mr. Stephen B. Gillis
      Trust Examiner Supervisor
      Missouri State Office Building
      Room 511
      615 East 13th Street
      Kansas City, Missouri 64106

      Mr. Michael F. Imhoff


      Mr. Terry Rialti
      Missouri Department of Economic Development
      Division of Finance
      301 West High Street
      P.O. Box 716
      Jefferson City, MO 65102-0716

**CONFIDENTIAL**                                                                      **NCB-015898**

*Exhibit 10A*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 4:09CR00509 JCH |
| | ) | |
| DAVID R. WULF, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF TONY LUMPKIN

1.     My name is Tony Lumpkin.  I have personal knowledge of all facts set forth in this Declaration.

2.     I was the Chief Operating Officer of Lincoln Memorial Life Insurance Company.

3.     Federal investigators and prosecutors interviewed me on several occasions in connection with the investigation that led to the indictment of J. Douglas Cassity, Brent Cassity, Howard Wittner, Randall Sutton, Sharon Province, and David Wulf.  They also interviewed me several times in preparation for trial in this matter.

4.     During several interviews, I told the investigators and prosecutors that David Wulf had no knowledge of any criminal activity.  I told them that, to the extent there was a fraudulent scheme, Doug Cassity had hidden it from David.

5.     I gave the investigators and prosecutors several examples to show David had no knowledge of the criminal activity.  For example, in or about 2010, I told the investigators and prosecutors that I had seen Sharon Province using David's signature stamp to stamp documents without David's permission or knowledge.

1

6.      Whenever I gave such an example, they responded that the problem was that David had not taken action when he should have done so.

I affirm, under the penalties for perjury, that the foregoing representations are true.

_____

Tony Lumpkin

2

*Exhibit 10B*

# AFFIDAVIT OF TONY LUMPKIN

1.) My name is Tony Lumpkin. I have personal knowledge of all facts set for in this Affidavit.

2.) I was the Chief Operating Officer of Lincoln Memorial Life Insurance Company.

3.) Federal investigators and prosecutors interviewed me on several occasions in connection with the investigation that led to the indictment of J. Douglas Cassity, Brent Cassity, Howard Wittner, Randall Sutton, Sharon Nekol Province, and David R. Wulf. They also interviewed me in preparation for trial in this matter.

4.) During several interviews, I told the investigators and prosecutors that David R. Wulf had no knowledge of any criminal activity. I told them that, to the extent there was a fraudulent scheme, Doug Cassity and Randall Sutton had hidden it from David Wulf.

5.) I gave the investigators and prosecutors several examples to show David had no knowledge of the criminal activity. For example, in or about 2010, I told the investigators and prosecutors that I had seen Sharon Nekol Province using David's signature stamp to stamp documents without David's permission or knowledge.

6.) Whenever I gave such an example, they responded that the problem was that David had not taken action when he should have done so.

I affirm under the penalties for perjury that the foregoing representations are true.


**TONY LUMPKIN**

Subscribed and sworn to before me on _____ July 15th _____, 2014 by Tony Lumpkin

Notary Public, State of _Texas_

My commission expires: _2/5/17_

SAL RAMIREZ JR
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 2/5/17

*Exhibit 11*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,              )
                                       )
              Plaintiff,               )
                                       )
       v.                              )       Case Number: 4:09CR00509 JCH
                                       )
DAVID R. WULF,                         )
                                       )
              Defendant.               )

### DECLARATION OF DARCI GRECO

1.      My name is Darci Greco.  I have personal knowledge of all facts set forth in this Declaration.

2.      I primarily worked as Tony Lumpkin's assistant at National Prearranged Services and later Memorial Service Life Insurance Company.

3.      Federal investigators and prosecutors interviewed me on several occasions in _____ related to the indictment of J. Douglas Cassity, Brent Cassity, _____ and David Wulf.  They also interviewed me

4.      During interviews, I told the investigators and prosecutors that David Wulf had no _____ made to policy applications.  I told them that I did not _____ I told them any alleged fraudulent scheme was the _____ David Wulf.

_____ of Missouri after David's co-defendants pled _____ I would still need to testify

against David Wulf because, as I had stated on numerous occasions, I did not believe he was involved in any criminal activity.

I affirm, under the penalties for perjury, that the foregoing representations are true.

Darci Greco

*Exhibit # 12*

# AFFIDAVIT OF SUSAN E. WOODS

My name is Susan (Susie) E. Woods, being of lawful age and duly sworn under oath, state as follows:

1.) My father is David R. Wulf

2.) After the criminal trial of David R. Wulf in August 2013, but before sentencing in November 2013, I talked to Sharon Nekol Province on the telephone a few times. Sharon Nekol Province was a defendant in the original indictment and pleaded guilty to fraud and was sentenced to 18 months in prison.

3.) During our conversations, Ms. Province told me that she was very sorry that this had happened to my father and that the fraud and conspiracy that had happened during the NPS (National Prearranged Services) scandal was kept from my Dad. Ms. Province told me that she would do anything to help my dad right the wrong that had been done to him.

4.) When asked if she ever told the prosecutors or investigators that my Dad was innocent, Ms. Province told me about a meeting she had with the Federal Prosecutors and an IRS agent prior to my Dad's trial. This meeting was not disclosed to my Dad or his defense counsel.

5.) In this meeting, Ms. Province told the prosecutors that David R. Wulf did not participate in or know of any conspiracy to commit fraud.

6.) In this meeting, Ms. Province disclosed that she told the prosecutors that she created fraudulent funeral home letters and used a David R. Wulf signature stamp on Wulf, Bates & Murphy stationery without my father's knowledge or permission.

7.) Ms. Province stated that the previous prosecutor, a Mr. Jensen, had said to her that: 'Dave Wulf should never have been indicted in the first place.'

8.) I asked if Ms. Province would sign an affidavit affirming what she just told me on the phone and she stated that she would, but she would have to double check with her lawyer, Mr. Joe Green, before she signed anything. She stated that he was in California for a murder trial and that when he got back she would ask him.

9.) When her attorney, Mr. Joe Green, got back from California he called my Dad's attorney, Mr. Joe Hogan.

10.) I was present in a meeting between Mr. Joe Hogan, David R. Wulf, and myself in which Mr. Hogan said he talked to Mr. Joe Green.

11.) Mr. Hogan related to us, from his conversations with Mr. Green, that this meeting between the prosecutors and Ms. Province was an off the record meeting and that Ms. Province should have never said anything in the first place.

Page 2, Woods Affidavit

12.) Ms. Province also called me to let me know that she shouldn't have told me about this meeting and that she wouldn't be able to sign an affidavit to help my Dad.

13.) Mr. Hogan related to us that what Ms. Province had disclosed to prosecutors was that Howard Wittner's office had my Dad's signature stamp. Howard Wittner, NPS's attorney, was also indicted for fraud and pleaded guilty, and is currently serving a 36-month sentence.

I affirm under the penalties for perjury that the foregoing representations are true.

_SUSAN E. WOODS_

**SUSAN E. WOODS**

Subscribed and sworn to before me on  June 25TH  , 2014 by Susan E. Woods

_Jeff Rainwater_

Notary Public, State of  MISSOURI

My commission expires:  04/27/2018

**JEFFREY RAINWATER**
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: April 27, 2018
14609547