UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DAVID R. WULF, ) | |
| ) | |
| Movant, ) | |
| ) | |
| vs. ) | Case No. 4:14CV1903 JCH |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on *pro se* Movant David R. Wulf's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, filed November 10, 2014. (ECF No. 1).

## BACKGROUND

On November 18, 2010, Movant was charged in a second superseding indictment with one count of conspiracy to commit mail fraud affecting a financial institution, mail fraud, wire fraud affecting a financial institution, wire fraud, and bank fraud in violation of 18 U.S.C. § 1349[1]; ten counts of bank fraud in violation of 18 U.S.C. § 1344; seven counts of wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343; four counts of wire fraud in violation of 18 U.S.C. § 1343; six counts of mail fraud affecting a financial institution in violation of 18 U.S.C. § 1341; six counts of mail fraud in violation of 18 U.S.C. § 1341; one count of money laundering in violation of 18 U.S.C. § 1957; one count of conspiracy to commit insurance fraud in violation of 18 U.S.C. § 371; two counts of making a false statement to an insurance regulatory agency that

---

[1] Charged as co-conspirators were Randall K. Sutton, Sharon Nekol Province, James Douglas Cassity, a/k/a Doug Cassity, Brent Douglas Cassity, and Howard A. Wittner. All defendants

˘ 1 ˘

jeopardized the safety and soundness of an insurer in violation of 18 U.S.C. § 1033(a)(1) and (a)(2); and two counts of embezzling or misappropriating funds from an insurer which jeopardized the safety and soundness of an insurer in violation of 18 U.S.C. § 1033(b)(1) and (b)(2).[2]

Movant's criminal trial began on August 5, 2013. On August 21, 2013, the parties agreed to redact the second superseding indictment to remove certain counts which the United States did not pursue at trial, to remove the forfeiture allegation against Movant, and to renumber the remaining counts. On August 22, 2013, the jury returned a verdict of guilty on all eighteen counts of the redacted indictment, including one count of conspiracy to commit mail fraud affecting a financial institution, mail fraud, wire fraud affecting a financial institution, wire fraud, and bank fraud, eight counts of bank fraud, six counts of wire fraud affecting a financial institution, and three counts of wire fraud. On November 14, 2013, the Court sentenced Movant to 120 months imprisonment, to be followed by a five-year term of supervised release. Movant's motion to dismiss his direct appeal was granted before a ruling was issued.

As stated above, Movant filed the instant § 2255 Motion on November 10, 2014[3], alleging the following two grounds for relief:

---

other than Movant pled guilty in June and July, 2013.
[2] In its response, the Government describes the criminal conduct at issue as follows: "The fundamental misrepresentation which was the basis of the fraud charges against Wulf and his codefendants was that money paid for a funeral in the future would be kept secure in a financial institution trust or with an insurance company until the time of need. Yet as the evidence at trial overwhelmingly established, customers' money was repeatedly and systematically misdirected to the codefendants' benefit through various mechanisms, including misappropriation of insurance premiums paid by customers, unauthorized loans taken against insurance policies purchased by or on behalf of the customers, and the surrender of whole life insurance policies without the knowledge of individuals whose lives the policies insured." (Government's Response, P. 2).
[3] "A 1-year period of limitation shall apply to a motion under [§ 2255]." 28 U.S.C. § 2255(f). "The limitation period shall run from...(1) the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). As stated above, the Court entered its Judgment on November 14, 2013. The present motion, filed November 10, 2014, thus is within the 1-year limitation period provided for in § 2255.

(1) That the Government's attorneys engaged in prosecutorial misconduct by failing to disclose evidence material to Movant's defense; and

(2) That Movant received ineffective assistance of counsel at trial.

(§ 2255 Motion, P. 5; Memorandum in Support of § 2255 Motion, PP. 3-61).[4]

## STANDARDS GOVERNING MOTIONS UNDER 28 U.S.C. § 2255

Pursuant to 28 U.S.C. § 2255, a federal prisoner may seek relief on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack,..." 28 U.S.C. § 2255(a). Claims based on a federal statute or rule, rather than on a specific constitutional guarantee, "can be raised on collateral review only if the alleged error constituted a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Reed v. Farley*, 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) (citations omitted).[5]

The Court must hold an evidentiary hearing to consider claims in a § 2255 motion "'[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994), quoting 28 U.S.C. § 2255. Thus, a movant is entitled to an evidentiary hearing "'when the facts alleged, if true, would entitle him to relief.'" *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996), quoting *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986). The Court may dismiss a claim "without an evidentiary hearing if the

---

[4] The manner in which Movant elected to format his motion, by mainly quoting from two expert reports and inserting commentary at various points, made it difficult to decipher his individual claims.

[5] "[A]t least where mere statutory violations are at issue, '§ 2255 was intended to mirror § 2254 in operative effect.'" *Reed*, 512 U.S. at 353, quoting *Davis v. United States*, 417 U.S. 333, 344, 94 S.Ct. 2298, 2304, 41 L.Ed.2d 109 (1974).

claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw*, 24 F.3d at 1043 (citation omitted).

## DISCUSSION

I. **Ground 1**

As stated above, in Ground 1 of his § 2255 Motion Movant asserts the Government's attorneys engaged in prosecutorial misconduct, by failing to disclose evidence material to Movant's defense. In order to establish a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Movant must show that "(1) the evidence was favorable to the defendant, (2) the evidence was material to guilt, and (3) the government suppressed evidence." *United States v. Sigillito*, 759 F.3d 913, 929 (8th Cir. 2014) (quotation marks and citation omitted), *cert. denied*, 135 S.Ct. 1019 (2015). "[E]vidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995) (citations omitted); *see also Masten v. United States*, 752 F.3d 1142, 1147 (8th Cir. 2014) (same). Further, a "reasonable probability" means that "the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 132 S.Ct. 627, 630 (2012), quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted).

Movant specifies several individuals with allegedly exculpatory information, and the Court will address each in turn.

    A. **Sharon Nekol Province**

As support for his claim that co-conspirator Sharon Nekol Province gave exculpatory evidence to the Government, Movant provides an affidavit from his daughter, Susan E. Woods, in which she attests in relevant part as follows:

2. After the criminal trial of David R. Wulf in August 2013, but before sentencing in November 2013, I talked to Sharon Nekol Province on the telephone a few times....

3. During our conversations, Ms. Province told me that….the fraud and conspiracy that had happened during the NPS (National Prearranged Services) scandal was kept from my Dad….

4. When asked if she ever told the prosecutors or investigators that my Dad was innocent, Ms. Province told me about a meeting she had with the Federal Prosecutors and an IRS agent prior to my Dad's trial. This meeting was not disclosed to my Dad or his defense counsel.

5. In this meeting, Ms. Province told the prosecutors that David R. Wulf did not participate in or know of any conspiracy to commit fraud.

6. In this meeting, Ms. Province disclosed that she told the prosecutors that she created fraudulent funeral home letters and used a David R. Wulf signature stamp on Wulf, Bates & Murphy stationery without my father's knowledge or permission.

(Movant's Exh. 12).

By way of response, the Government asserts it has no record of Ms. Province ever making such statements to government attorneys. (Government's Response, P. 14). Instead, the Government notes that Ms. Province met with government attorneys on May 27, 2011, and June 22, 2011, and the memoranda of those interviews do not reflect the statements contained in Ms. Woods' affidavit. (*Id.*; *see also* Government's Exh. 1).[6] *See United States v. Heppner*, 519 F.3d 744, 750 (8th Cir.) (citations omitted) ("*Brady* does not require the government to discover information not in its possession or of which it was not aware."), *cert. denied*, 555 U.S. 909 (2008). The Government further notes that Ms. Province's alleged assertion that Movant did not participate in or know of the alleged conspiracy is contradicted by her Plea Agreement, in which she admitted as follows: "The banks were further defrauded with each trust transfer made pursuant to the direction of co-defendant David R. Wulf, or under the color of the authority of Wulf, Bates & Murphy, Inc. as an independent investment advisor." (*See* Cause No. 4:09CR509 JCH, ECF No. 440, P. 23).

---

[6] In an affidavit provided with the Government's response Movant's trial attorney, Mr. Joseph M. Hogan, attests that he received reports of interview for numerous witnesses, including Ms. Province. (Government's Exh. A, § 7).

Upon consideration the Court finds that with this claim, Movant fails to establish the third element of his *Brady* claim. In other words the hearsay testimony[7] presented in the affidavit prepared by his daughter, when contrasted with the statements provided by the Government, does not establish that the Government possessed but suppressed evidence relating to Ms. Province. This portion of Movant's § 2255 Motion will therefore be denied.

### B. Tony Lumpkin

Movant next claims the Government withheld exculpatory materials relating to Mr. Tony Lumpkin, former Chief Operating Officer of Lincoln Memorial Life Insurance Company. As support for this assertion Movant provides a declaration from Mr. Lumpkin, in which he attests in relevant part as follows:

> 4. During several interviews, I told the [federal] investigators and prosecutors that David Wulf had no knowledge of any criminal activity. I told them that, to the extent there was a fraudulent scheme, Doug Cassity had hidden it from David.
>
> 5. I gave the investigators and prosecutors several examples to show David had no knowledge of the criminal activity. For example, in or about 2010, I told the investigators and prosecutors that I had seen Sharon Province using David's signature stamp to stamp documents without David's permission or knowledge.

(Movant's Exh. 10B).

In response, the Government again notes that it turned over all memoranda of interview involving Mr. Lumpkin to Movant's attorney prior to trial. (*See* Government's Response, P. 8; Government's Exh. A, ¶ 7). The Government continues to assert that Mr. Lumpkin's memoranda of interview do not reflect his current position that Movant did not knowingly participate in the fraud. Further, and perhaps more importantly, the Government notes that the statements in Mr. Lumpkin's declaration directly contradict the testimony he provided at Movant's trial. For example, Mr. Lumpkin testified that Movant was the designated investment advisor for the Missouri trusts at issue, and that Movant was responsible for

---

[7] In her affidavit, Ms. Woods claims that although Ms. Province initially indicated a willingness to provide an affidavit affirming her statements, she allegedly declined to do so after speaking

directing the money held in trusts. (*See* Cause No. 4:09CR509 JCH, ECF No. 745, PP. 101-103). Mr. Lumpkin continued to detail Movant's role in requesting fraudulent policy loans, and in communicating to regulators about his decisions, as investment advisor, to take those loans. (*Id.*, PP. 106-117). He further testified that he became concerned over time about the amount or volume of policy loans, and about what the trusts actually held, and that he discussed those concerns with Movant.[8] (*Id.*, PP. 120-21). Mr. Lumpkin finally testified that Movant acknowledged the fraudulent decision to surrender whole life insurance policies and replace them with term life insurance was made under his authority as investment advisor. (*Id.*, PP. 122-25).

Upon consideration of the foregoing, the Court finds that with his claim regarding Tony Lumpkin, Movant fails to establish two elements of his *Brady* violation claim. First, as with the alleged information regarding Ms. Province, Movant fails to establish that the Government suppressed evidence relating to Mr. Lumpkin. In other words, the Court's review of the memoranda of interview regarding Mr. Lumpkin reveals he did not express doubt or concern regarding Movant's role in the conspiracy and fraud. Furthermore, Movant fails to establish that the evidence at issue was "material"; in other words, the Court does not find a reasonable probability that, had the evidence contained in Mr. Lumpkin's affidavit been disclosed, the result at trial would have been different. To the contrary, the jury found Movant guilty, despite the fact that his attorney elicited at trial that Mr. Lumpkin never once accused Movant of fraud during his ten or eleven interviews with federal agents, and further that he personally trusted Movant enough to invest with him and to recommend his financial services to a friend. (*Id.*, PP. 147-48, 157-58). This portion of Movant's § 2255 Motion will therefore be denied.

### C. **Darci Greco**

---

with her attorney. (*See* Woods Aff., ¶¶ 8-12).
[8] With respect to his questions regarding the contents of the trusts, Mr. Lumpkin testified that Movant responded "that it was just better not to talk to [Lumpkin] about that." (*See* Cause No. 4:09CR509 JCH, ECF No. 745, PP. 120-21).

Movant next claims the Government withheld exculpatory materials relating to Ms. Darci Greco, Mr. Lumpkin's former assistant at National Prearranged Services ("NPS") and later Memorial Service Life Insurance Company. As support for this assertion Movant provides a declaration from Ms. Greco[9], in which she attests in relevant part as follows:

> 4. During interviews, I told the [federal] investigators and prosecutors that David Wulf had no knowledge of any changes being made to policy applications. I told them that I did not understand why they were charging David. I said that any alleged fraudulent scheme was the work of Randy Sutton and Doug Cassity, not David Wulf.
>
> 5. I expected that I would no longer need to testify after David's co-defendants pled guilty. I told the prosecutor I was surprised when he informed me I would still need to testify against David Wulf because, as I had stated on numerous occasions, I did not believe he was involved in any criminal activity.

(Movant's Exh. 11).

Upon consideration the Court finds that with his claim regarding Darci Greco, Movant again fails to establish two elements of his *Brady* violation claim. First, as with the alleged information regarding Ms. Province and Mr. Lumpkin, Movant fails to establish that the Government suppressed evidence relating to Ms. Greco. In other words, the Court's review of the memoranda of interview regarding Ms. Greco reveals she did not express doubt or concern regarding Movant's role in the conspiracy and fraud; rather, she barely mentioned Movant at all in her interviews. Furthermore, Movant fails to establish that the evidence at issue was "material"; in other words, the Court does not find a reasonable probability that, had the evidence contained in Ms. Greco's declaration been disclosed, the result at trial would have been different. To the contrary, the jury found Movant guilty, despite the fact that Ms. Greco testified on direct examination that Movant was a friend of hers, and on cross-examination that she never dealt directly with Movant, that Movant had nothing to do with the changing of policies or whiting out of terms therein, and that Ms. Greco believed her own actions at the time were lawful. (*Id.*, PP. 23, 78-79, 81-83). This portion of Movant's § 2255 Motion will therefore be denied.

---

[9] Ms. Greco's undated declaration apparently was prepared in conjunction with Movant's

### D. Katherine Scannell

Movant finally claims the Government withheld exculpatory materials relating to Ms. Katherine Scannell, former general counsel to National Heritage Enterprises.[10] As support for this assertion Movant provides an affidavit from Ms. Scannell[11], in which she attests in relevant part as follows:

> 18. I do not recall David Wulf directly interacting with me concerning any loans from the trusts. I was not involved in the decision to provide funds. I never was asked to clear any terms or amounts with David Wulf, and on no occasion did I receive a request for information directly from David Wulf concerning any of the loans from the trusts or from the subsidiaries….
>
> 23. In the years that I served as General Counsel for [National Heritage Enterprises], I do not recall any phone calls, e-mails, or other correspondence with any of the bank trustees regarding any matter, including the trusts, the promissory notes, David Wulf, and Chapter 436 of the Missouri statutes.

(Movant's Exh. 5).

Upon consideration the Court finds that with his claim regarding Katherine Scannell, Movant again fails to establish two elements of his *Brady* violation claim. First, Movant fails to establish that the Government suppressed evidence relating to Ms. Scannell; rather, the memoranda of interview regarding Ms. Scannell, which were provided to Movant's counsel, are consistent with her affidavit in that they contain only sparse mentions of Movant, and they confirm Ms. Scannell did not usually deal with Movant directly. Furthermore, Movant fails to establish that the evidence at issue was "material"; in other words, the Court does not find a reasonable probability that, had the evidence contained in Ms. Scannell's affidavit regarding the fact that she did not personally interact with Movant been disclosed, the result at trial would have been different.[12] This portion of Movant's § 2255 Motion will therefore be denied.

---

criminal case, Cause No. 4:09CR509 JCH.

[10] In her position as general counsel for National Heritage Enterprises, Ms. Scannell also provided legal advice and services to, among other entities, NPS, Lincoln Memorial Life Insurance Company, Memorial Services Life Insurance Company, and Forever Enterprises. (Scannell Aff., ¶ 2).

[11] Ms. Scannell's affidavit apparently was prepared in conjunction with a civil suit against Movant and others, Cause No. 4:09CV1252 ERW.

[12] The Court's review of the memoranda of interview involving Ms. Scannell reveals that if

## II. Ground 2

As stated above, in Ground 2 of his § 2255 Motion Movant asserts he received ineffective assistance of counsel at trial. In order to prevail on a claim of ineffective assistance of counsel, Movant must show that his attorney's performance was "deficient," and that the deficient performance was "prejudicial." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. To overcome this presumption, Movant must prove that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Even if Movant satisfies the performance component of the analysis, he is not entitled to relief unless he can prove sufficient prejudice. *Id.* at 691. Movant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Movant specifies numerous instances of allegedly ineffective assistance of trial counsel, and the Court will address the claims in turn.

### A. Failure To Review Discovery

---

anything, her testimony would have been detrimental to Movant's case.

For his first claim of ineffective assistance of counsel, Movant alleges his attorney failed to prepare for trial by reviewing the discovery provided by the Government, including memoranda of interview for various witnesses. Movant continues to assert that because of this lack of preparation, his attorney was unable adequately to cross examine the witnesses when the Government presented them at trial.[13]

Upon consideration the Court finds that with this claim, Movant fails to demonstrate deficient performance on the part of his attorney. Specifically, the Court notes that with its response the Government provides an affidavit from attorney Hogan, in which he attests that he met with Movant more than thirty times during the course of his representation, spending a total of hundreds of hours on the case. (Hogan Affidavit, ¶ 5). With respect to discovery, Mr. Hogan asserts that he considered the discovery in Movant's case to have been the "most forthcoming" of any federal case he had defended. (*Id.*, ¶ 6). He continues to assert that he reviewed the voluminous discovery provided by the Government, and attended several meetings during which the Government explained the significance of those documents it considered "hot", or most relevant to the claims and defenses in the case. (*Id.*, ¶¶ 4, 6). Mr. Hogan maintains he personally reviewed all reports of interview that he received[14], provided copies of both those and the "hot documents" to Movant, and met with Movant to discuss the various records. (*Id.*, ¶¶ 6, 7). Finally, Mr. Hogan asserts he prepared his cross examination of those witnesses testifying at trial based in part upon his meetings with Movant. (*Id.*, ¶ 7). Under these circumstances, the Court does not find Mr. Hogan's performance was constitutionally deficient, and so this portion of Movant's § 2255 Motion will be denied.

---

[13] According to Movant, this failure then hindered the efforts of the attorney he hired to pursue his direct appeal, as trial counsel's failure to object at appropriate times meant the points were not preserved.

[14] Mr. Hogan attests that his purpose in reviewing the reports of interview during the trial itself was to allow him to determine if any of the witnesses' statements during direct examination

### B. Failure To Call Defense Witnesses

For his second claim of ineffective assistance of counsel Movant alleges his attorney failed to call any defense witnesses, other than Movant. As support for this alleged deficiency, Movant provides an affidavit from his former business partner, Charles F. Bates, III, in which Mr. Bates claims to have witnessed an incident in late 2001 or early 2002, when an employee of NPS entered the offices of Wulf, Bates & Murphy, Inc. ("WBM"), and attempted to remove a large amount of WBM stationery from under the printer. (Movant's Exh. 7, ¶ 4). Mr. Bates continues to assert that Movant stopped the woman from taking the stationery, and further called Sharon Nekol Province to inform her that WBM would not continue writing funeral home letters for NPS, and to request that she return Movant's signature stamp. (*Id.*, ¶¶ 6-10). Mr. Bates maintains that although Ms. Province did in fact return a signature stamp, it was later learned that NPS retained and continued to utilize another David R. Wulf signature stamp. (*Id.*, ¶¶ 11-14).[15] Movant further provides an affidavit from Kelly L. Bates, WBM's former administrative assistant, in which she confirms Mr. Bates' testimony. (Movant's Exh. 2).

Mr. Hogan addresses Movant's claim regarding the failure to call Charles and Kelly Bates as trial witnesses in his affidavit, as follows:

> 20. I am aware that Mr. Wulf has challenged my decision not to call his one-time partner [Charles] Bates as a witness at trial. At Mr. Wulf's suggestion, I had considered calling Mr. Bates in advance of trial. According to Mr. Wulf, Mr. Bates would have testified that his signature stamp had been stolen from the office by co-defendant Sharon Nekol Province. The ultimate decision not to call Mr. Bates was made in consultation with Mr. Wulf after I received and shared with Mr. Wulf a Memorandum of Interview reflecting an interview of Mr. Bates and his wife Kelly Bates on July 23, 2013….My colleague Ethan Corlija was present for the meeting

---

contradicted their earlier statements to law enforcement. (Hogan Aff., ¶ 19).

[15] Movant provides a second affidavit from Mr. Bates, in which through hearsay he claims that Jim Crawford stated "emphatically and frequently" that he told the federal prosecutors, on the record, that Movant had nothing to do with the fraud at NPS. (Movant's Exh. 6).

where Mr. Wulf and I discussed this memorandum. The memorandum reflected that Mr. Bates had stated to the interviewing agents, among other things, the following:

\*       that Mr. Bates's wife, Kelly Bates, had put together "Monday morning" reports showing balances and identifying the money in and out of NPS and other client accounts;

\*       "I don't mean to throw my partner under the bus, but those were his accounts," in reference to NPS's accounts;

\*       that the bulk of Wulf, Bates & Murphy's business was comprised of NPS-related accounts and those which Mr. Bates managed for his family members, that Mr. Bates and Mr. Wulf "knew where our bread was buttered," and that NPS was a client that they "wouldn't want to lose";

\*       that Mr. Wulf monitored the trades in a Caymus Fund, which he said was "basically a hedge fund" and "not a conservative investment vehicle" (and which I knew to be a fund into which Trust IV funds had been invested);

\*       that it was Mr. Wulf who had solicited NPS to participate in the Caymus Fund;

\*       that on one occasion, Mr. Wulf had contacted Mr. Bates stating that he had a "bunch of wires" related to NPS accounts that Mr. Wulf could not decipher; and

\*       that he knew of no evidence that could exonerate Mr. Wulf.

Once he learned of these statements, Mr. Wulf forcefully indicated that he no longer wished to have Mr. Bates called as a witness. I regarded the decision not to call Mr. Bates as the proper tactical decision, given the prior statements he had made to law enforcement, and I therefore did not call him.

21.     I also understand that Mr. Wulf has challenged my decision not to call Kelly Bates, Mr. Bates's wife, to the stand. Like the decision not to call Mr. Bates, the decision not to call Ms. Bates was reached by me in consultation with Mr. Wulf after receiving the interview report described above. In that interview, Ms. Bates admitted, among other things, that she recalled receiving either monthly or quarterly NPS bank and trust account statements and that she gave the statements to Wulf, who would in turn have her file them in a cabinet designated for NPS-related business. She indicated that the statements were readily available to Mr. Wulf. Again, based upon these statements, Mr. Wulf and I both regarded calling Ms. Bates as a poor tactical decision, and I therefore did not call her.

(Hogan Aff., ¶¶ 20-21).

Upon consideration the Court finds that with this claim, Movant fails to establish either prong of the *Strickland* test. With respect to performance, the Court finds that Mr. Hogan's decision not to call Mr. or Mrs. Bates as witnesses at trial was the product of sound trial strategy on his part. *See Emery v. United States*, 2011 WL 5553776, at 5 (E.D. Mo. Nov. 15, 2011) (internal quotation marks and citations omitted) ("We have consistently held that a reasoned decision not to call a witness is a virtually unchallengeable decision of trial strategy, in part because there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences."); *see also Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant….In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's….litigation decisions."). With respect to prejudice, the Court does not find a reasonable probability that, but for counsel's failure to call the two witnesses, the result of the proceeding would have been different. Instead, the Court finds the limited value of the statements in Mr. and Mrs. Bates' affidavits would not have canceled out the testimony they presumably would have provided in conformance with their earlier interviews, much less any other evidence the Government brought forth at trial. This portion of Movant's § 2255 Motion will therefore be denied.

### C. Failure To Elicit Additional Testimony From Movant

Movant next alleges his attorney was ineffective for failing to elicit certain testimony from Movant during his direct testimony at trial. Specifically, Movant complains that his attorney (1) did not ask him to testify regarding the fact that the letters used to convict him of mail and bank fraud contained forged signatures; (2) did not utilize Movant's testimony to establish that the letter used to demonstrate that Movant directed the bank trustees to allow NPS to hold life insurance policies was

authored not by him, but by Herb Morisse and Rich Markow, then President and Vice-President of Allegiant Trust Company; and (3) did not ask whether Movant had knowledge of allegedly unlawful activities going on in states other than Missouri.

The Government addresses Movant's claims in turn. First, the Government points out that Movant's attorney did question him with respect to the forged signatures, and Movant's request that NPS stop sending letters to funeral homes with his signature in 2001. (*See* Government's Response, P. 23; Cause No. 4:09CR509 JCH, ECF No. 747, PP. 44-47). Under these circumstances, the Court finds Movant's attorney's performance in this regard was not constitutionally deficient. With respect to the authorship of the November 5, 1999, letter, in which as investment advisor for the trust accounts Movant delegated certain investment direction powers to NPS (despite the fact that he was supposed to be independent from NPS), the Government points out that although Movant claims not to have authored the letter, he never claims not to have signed it. (Government's Response, PP. 22-23). Under these circumstances the Court need not consider whether Movant's attorney's performance was deficient, because it finds no reasonable probability that the result of his trial would have been different had counsel raised the point.

Finally, with respect to whether Movant had knowledge of allegedly unlawful activities going on in states other than Missouri, the Government notes as follows: First, because of the conspiracy charged in Count 1 of the second superseding indictment, Movant would be held accountable for the acts of his co-conspirators, regardless of what direct knowledge he might have had. (Government's Response, P. 24).[16] Second, the trust assets allegedly directed by Movant were part of the larger Ponzi-like scheme, as "trust assets were used to both pay insurance premiums in other states and pay the operation costs of the insurance company itself", and "customer funds from other states (which

---

[16] Movant's attorney thus was not ineffective for failing to object to the introduction of evidence

were to be held in individually owned insurance policies) were used to pay debts of the trust." (*Id.*, PP. 24-25). Finally, the Government points out that Mr. Hogan in fact asked numerous witnesses, including Movant himself, about Movant's lack of participation in any criminal activity. (*Id.*, P. 25; *see also, e.g.,* Cause No. 4:09CR509 JCH, ECF No. 738, PP. 98, 147, 152-53; ECF No. 739, PP. 57, 147-48, 235; ECF No. 740, PP. 78-79, 205-06; ECF No. 741, P. 230; ECF No. 745, PP. 147-48; ECF No. 747, P. 47). Under these circumstances, the Court finds Mr. Hogan's performance fell well within the wide range of professionally competent assistance sanctioned by *Strickland*, and Movant suffered no prejudice. This portion of Movant's § 2255 Motion will therefore be denied.

### D. Failure To Identify And Call An Expert To Testify At Trial

Movant next asserts his trial counsel was ineffective for failing to present an expert willing to testify it was neither Movant's responsibility nor within his authority as investment advisor to absolve the trustees from their duty to keep the life insurance policies used to fund the Missouri trusts within their custody and under their control.[17] In response, the Government provides the following testimony from Mr. Hogan:

> 22. I am aware that Mr. Wulf has also challenged my decision not to call an expert witness to testify at trial during Mr. Wulf's case-in-chief. Prior to trial, I contacted two different individuals to determine whether they might be willing to testify as expert witnesses for Mr. Wulf. I recommended the first of these individuals to Mr. Wulf, but he rejected this expert. Instead, Mr. Wulf indicated that he wished to retain Mr. Louis Smith as an expert witness, whom he knew personally from his dealings with Maloney Securities, where Mr. Smith was employed.
>
> 23. Like the decision not to call Mr. Bates, this decision not to call an expert witness was made in direct consultation with Mr. Wulf. Mr. Wulf and I were both present in the courtroom for the testimony of Arthur Laby, an expert witness designated by the government. Mr. Wulf and I both regarded Mr. Laby's testimony as devastating. Before, during, and after Mr. Laby's testimony, I asked Mr. Wulf if

---

regarding allegedly unlawful activities in states other than Missouri at trial either.

[17] Movant claims the arrangement set forth in the November 5, 1999, letter from WBM to Allegiant Trust Company, as Trustee of NPS's trusts, violated Allegiant's duties under Chapter 436 of the Missouri Revised Statutes.

he had any suggestions of questions that I could ask Mr. Laby to dispute his testimony. Mr. Wulf indicated he could think of no questions to ask Mr. Laby.

24.  After Mr. Laby testified, I met with Mr. Wulf and Mr. Corlija. All three of us agreed that, in light of Mr. Laby's testimony, we should not call an expert witness in Mr. Wulf's case-in-chief. None of us believed that Mr. Smith could provide testimony that would successfully rebut the testimony of Mr. Laby. Further, we believed that calling an expert would have provided another opportunity for the government to emphasize during cross examination the points that it had made through the direct examination of its own expert. We all agreed that this risk was not worth the minimal potential rewards.

(Hogan Aff., ¶¶ 22-24).

Upon consideration the Court finds that with this claim, Movant fails to satisfy either prong of the *Strickland* test. With respect to performance, the Court again finds that Mr. Hogan's decision not to call an expert witness to testify on Movant's behalf at trial was the product of sound trial strategy on his part. *See Emery*, 2011 WL 5553776, at *5 (internal quotation marks and citations omitted) ("We have consistently held that a reasoned decision not to call a witness is a virtually unchallengeable decision of trial strategy, in part because there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences."); *see also Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant….In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's….litigation decisions."). Furthermore, with respect to prejudice, the Court finds that regardless of whether Movant had the authority as investment advisor to absolve the trustees from their duties, and/or whether said trustees also violated Missouri statutes, the jury still would have seen ample evidence that Movant signed the letter at issue, and thus participated in the alleged fraud. Under these circumstances Movant fails to establish a reasonable probability that, had counsel designated an expert witness, the result of his

proceeding would have been different. This portion of Movant's § 2255 Motion will therefore be denied.

### E. Failure Adequately To Cross Examine Richard Markow

Movant next claims his trial attorney failed adequately to cross examine Mr. Richard Markow, one-time Vice-President of Allegiant Trust Company and President of Bremen Bank. Specifically, Movant complains that when Mr. Markow testified he did not remember talking to Movant about the November 5, 1999, letter, Mr. Hogan did not follow up with questions regarding the letter's originators and/or authors.[18]

Once again the Court finds that with this claim, Movant fails to establish either prong of the *Strickland* test. With respect to deficient performance, Mr. Hogan stated in his affidavit as follows:

> 25. I understand that Mr. Wulf has challenged my strategy in my cross examination of Richard Markow, the former President of Bremen Bank, one of the trustees over National Prearranged Services Trust IV, for which Mr. Wulf had been designated as the statutorily appointed independent investment advisor. During preparation for trial, Mr. Wulf and I discussed the possibility of confronting Mr. Markow about whether he had been the author of the November 5, 1999 letter….Mr. Wulf suggested that Mr. Markow was the author.
>
> 26. In court, I asked Mr. Markow whether he recalled discussing the letter with Mr. Wulf. Mr. Markow responded "No." In light of Mr. Markow's failed recollection, I did not believe he would agree that he had written the letter if I had asked the question. Especially considering the minimal relevance of the authorship of the letter (given the undisputed fact that Mr. Wulf had signed it), I regarded it as too great a risk to ask the question and instead pursued other lines of questioning I hoped would be more fruitful.

(Hogan Aff., ¶¶ 25-26). The Court finds this decision did not fall outside the wide range of performance sanctioned by *Strickland*. Further, with respect to prejudice, as noted above although Movant claims not to have authored the November 5, 1999, letter, he never claims not to have signed it. Under these circumstances the Court finds no reasonable probability that the result of his trial

---

[18] Again, Movant claims the letter was co-authored by Mr. Markow and Mr. Morisse.

would have been different had counsel raised the point with Mr. Markow during cross examination. This portion of Movant's § 2255 Motion will therefore be denied.

### F. Failure Adequately To Cross Examine Angela Hall

Movant finally asserts his trial counsel was ineffective for failing adequately to cross examine Ms. Angela Hall. Specifically, Movant claims he was never copied on wire instruction faxes sent by NPS (despite the fact that the computer generated cover sheets show he was "cc'd" on the missives), and so his attorney was ineffective for failing to question Ms. Hall about her motives for testifying otherwise.[19]

Upon consideration the Court finds that with this claim, Movant fails to demonstrate the requisite prejudice. In other words, even if Mr. Hogan had questioned Ms. Hall further regarding Movant's alleged receipt of faxes concerning wire transfer requests, there is no reasonable probability the result of Movant's proceeding would have been different because at least two other witnesses, Ms. Shari Gray and Ms. Sandi Wallis, testified as to similar procedures. (*See* Cause No. 4:09CR509 JCH, ECF No. 741, PP. 227-28; ECF No. 742, PP. 6-7). This portion of Movant's § 2255 Motion will therefore be denied.[20]

### CONCLUSION

Accordingly,

---

[19] Ms. Hall testified that it was her practice to either fax, email or hand-deliver copies of all forms documenting wires out of trusts to Movant. (*See* Cause No. 4:09CR509 JCH, ECF No. 750, PP. 52-53).

[20] In its response, the Government recounts the abundant evidence establishing Movant's guilt presented at trial, including Movant's own concessions during a prior arbitration proceeding and during his testimony at trial. (*See* Government's Response, PP. 30-37). The Court will not repeat the detailed recitation here, but notes it provides additional support for the Court's finding that any alleged deficiencies on the part of Movant's trial attorney did not result in prejudice.

**IT IS HEREBY ORDERED** that Movant's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (ECF No. 1) is **DENIED,** and his claims are **DISMISSED** with prejudice. An Order of Dismissal will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that because Movant cannot make a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997), *cert. denied*, 525 U.S. 834 (1998).

Dated this 25th Day of April, 2016.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE